No. 26-1326

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellant

v.

JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,
Defendant-Appellee

COMMON CAUSE; KYLE GIDDINGS; ANNE KEKE; COLORADO ALLIANCE FOR RETIRED AMERICANS; BRITTON DEFORD,
Defendants Intervenors-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
The Honorable Judge Philip A. Brimmer
D.C. No. 1:25-cv-3967-PAB-TPO

# JOINT APPENDIX
Volume 1 of 2 (Pages 1-281)

*(See inside cover for Counsel)*

*(Continuation of Counsel)*


PETER G. BAUMANN
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6152
peter.baumann@coag.gov

LANE TOWERY
Colorado Attorney General
Ralph L. Carr Judicial Building
1300 Broadway
Denver, CO 80203
720-508-6470
lane.towery@coag.gov

*Counsel for Jena Griswold*

ELISABETH C. FROST
Elias Law Group LLP
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
(202) 968-4513
efrost@elias.law

JOSHUA CHARLES ABBUHL
Elias Law Group LLP
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
(202) 987-5228
jabbuhl@elias.law

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
J. KATIE NEFF
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 11403
Washington, D.C. 20044-4403
(771) 333-0019
jeri.neff@usdoj.gov

*Counsel for the United States of America*


*(See next page for continuation of Counsel)*

(*Continuation of Counsel*)

KEVIN RONALD KOWALEWSKI
Elias Law Group
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
(202) 985-3535
kkowalewski@elias.law

WALKER ROY MCKUSICK
Elias Law Group
1700 Seventh Avenue
Suite 2100
Seattle, WA 98101
(202) 968-4659
wmckusick@elias.law

UZOMA NKEM NKWONTA
Elias Law Group
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
(202) 968-4517
unkwonta@elias.law

*Counsel for Colorado Alliance for Retired Americans; Britton DeFord*

SOPHIA LIN LAKIN
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004-2400
(212) 519-7836
slakin@aclu.org

*(See next page for continuation of Counsel)*

(*Continuation of Counsel)*

THERESA JEANE LEE
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004-2400
(212) 549-2500
tlee@aclu.org

TIMOTHY R. MACDONALD
ACLU of Colorado
303 East 17th Avenue
Suite 350
Denver, CO 80203
(720) 402-3151
tmacdonald@aclu-co.org

SARA R. NEEL
ACLU of Colorado
303 East 17th Avenue
Suite 350
Denver, CO 80203
(720) 402-3107
sneel@aclu-co.org

PATRICIA YAN
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, D.C. 20005
(202) 715-0839
pyan@aclu.org

*Counsel for Common Cause; Anne Keke; Kyle Giddings*

## INDEX OF JOINT APPENDIX

## VOLUME 1 OF 2

**DOCUMENT TITLE:** **PAGE**


District Court Docket Sheet,
*United States v. Griswold*, No. 1:25cv3967 (D. Colo.) ..................... 1

Complaint, filed December 11, 2025 (ECF 1) ........................................ 15

Motion for Order to Compel Records Demanded Pursuant to the
Civil Rights Act of 1960, filed December 11, 2025 (ECF 2)........... 23

Memorandum of Law in Support of the Request for Order to
Compel Production of Records Pursuant to
52 U.S.C. § 20701, *et seq.*, filed December 11, 2025 (ECF 5) ........ 27

Exhibits to Memorandum in Support of Request for Order to
Compel Production of Records, filed December 11, 2025
(ECF 5-1) ........................................................................................ 38

Declaration of Eric Neff, filed December 11, 2025 (ECF 5-2) ................ 60

Secretary Griswold's Response to Motion to Compel,
filed February 10, 2026 (ECF 37) ................................................. 63

Exhibit A – Declaration of Nathan Borochoff-Porte,
filed February 10, 2026 (ECF 37-1) .............................................. 78

Exhibit B – Letter from Secretary Griswold to the DOJ,
dated May 27, 2025 (ECF 37-3) .................................................... 81

Exhibit C – Email Exchange Between the DOJ and Nathan
Borochoff-Porte, dated May 27, 2025 (ECF 37-4).......................... 84

Exhibit D – Email Confirmation of Shared Files,
dated May 27, 2025 (ECF 37-5) .................................................... 87

**DOCUMENT TITLE:** **PAGE**


Exhibit E – Email Exchange Between Chris Hayes and Nathan Borochoff-Porte, filed February 10, 2026 (ECF 37-6) .................... 94

Exhibit G – Confidential Memorandum of Understanding (Colorado), filed February 10, 2026 (ECF 37-8) .......................... 102

Exhibit H – Letter from the DOJ to Senator Padilla, filed February 10, 2026 (ECF 37-9) ............................................ 112

Exhibit B – Declaration of Hilary Rudy, filed February 10, 2026 (ECF 37-10) ........................................................................... 117

Secretary Griswold's Motion to Dismiss, filed February 10, 2026 (ECF 40) ................................................................................ 121

The United States' Memorandum in Opposition to the Motions to Dismiss, filed February 24, 2026 (ECF 49) ................................ 136

Declaration of Eric Neff in Support of the United States' Motion to Compel and in Opposition to the Motions to Dismiss, filed February 24, 2026 (ECF 49-1) ............................................ 171

Exhibit 5 – Memorandum of Understanding (Texas), filed February 24, 2026 (ECF 49-2) ............................................ 175

Exhibit 6 – Complaint (*U.S. v. State of Georgia and Cathy Cox*), filed February 24, 2026 (ECF 49-3) ............................................ 178

Exhibit 7 – Consent Judgment and Decree (*U.S. v. State of Georgia and Cathy Cox*), filed February 24, 2026 (ECF 49-4) ...................................................................... 184

Exhibit 8 – Consent Judgment and Order (*U.S. v. North Carolina State Board of Elections, et al.*), filed February 24, 2026 (ECF 49-5) ............................................ 192

**DOCUMENT TITLE:** **PAGE**


Exhibit 9 – Defendants' Second Status Report (*U.S. v. North Carolina State Board of Elections, et al.*), filed February 24, 2026 (ECF 49-6) .......... 206

Exhibit 13 – To Assure Pride and Confidence in the Electoral Process, filed February 24, 2026 (ECF 49-10) .......... 209

Reply in Support of Motion to Dismiss, filed March 17, 2026 (ECF 57) .......... 219

Exhibit A to Reply in Support of Motion to Dismiss (Supplemental Declaration of Hilary Rudy), filed March 17, 2026 (ECF 57-1) .......... 234

Exhibit 1 to Support Rudy Declaration (Electronic Registration Information Center: Technology and Security Overview), filed March 17, 2026 (ECF 57-2) .......... 237

Colorado Alliance for Retired Americans and Britton DeFord's Reply to Plaintiff's Response to Motion to Dismiss, filed March 18, 2026 (ECF 62) .......... 242

Brief of Amici Curiae Former Employees of the U.S. Department of Justice, filed June 23, 2026 (ECF 77) .......... 252

District Court Order, filed July 8, 2026 (ECF 84) .......... 268


**VOLUME 2 OF 2**


Motion to Dismiss of Common Cause, Kyle Giddings, and Anne Keke, filed July 10, 2026 (ECF 85) .......... 282

Motion to Dismiss by Intervenors Colorado Alliance for Retired Americans and Britton DeFord, filed July 10, 2026 (ECF 86) .......... 301

**DOCUMENT TITLE:** **PAGE**

Colorado Alliance for Retired Americans and Britton DeFord's Opposition to Motion for Order to Compel Records, filed July 10, 2026 (ECF 87) .......... 316

Colorado Alliance for Retired Americans and Britton DeFord's Supplemental Brief Supporting Motion to Dismiss, filed July 17, 2026 (ECF 94) .......... 331

United States of America's Response to Motion to Dismiss of Intervenor-Defendants Common Cause, Kyle Giddings, and Anne Keke, filed July 24, 2026 (ECF 98) .......... 336

Reply in Support of Motion to Dismiss of Common Cause, Kyle Giddings, and Anne Keke, filed July 31, 2026 (ECF 101).......... 351

District Court Order, filed August 3, 2026 (ECF 102) .......... 362

Final Judgment, filed August 4, 2026 (ECF 103).......... 376

Notice of Appeal, filed August 17, 2026 (ECF 105) .......... 378

# 1:25cv3967, Usa V. Griswold

US District Court Docket

United States District Court, Colorado

(Denver)

**This case was retrieved on 09/15/2026**

## Header

**Case Number:** 1:25cv3967
**Date Filed:** 12/11/2025
**Assigned To:** Judge Philip A. Brimmer
**Referred To:** Magistrate Judge Timothy P O'Hara
**Nature of Suit:** Voting (441)
**Cause:** - Help America Vote Act
**Lead Docket:** None
**Other Docket:** USCA - 10th Circuit, 26-01326
**Jurisdiction:** U.S. Government Plaintiff

**Class Code:** Closed
**Closed:** 08/04/2026
**Statute:** 42:15483
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Voting

## Participants

### Litigants

USA
**Plaintiff**

### Attorneys

Eric Neff
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
150 M Street Ne Suite 8-139
Washington, DC 20002
USA
202-532-3628 Email:Eric.Neff@usdoj.Gov

James Thomas Tucker
ATTORNEY TO BE NOTICED
U.S. Department of Justice
4 Constitution Square 150 M Street Ne 7th Floor
Washington, DC 20530
USA
202-307-2767 Email:James.T.Tucker@usdoj.Gov

John Casali
ATTORNEY TO BE NOTICED
U.S. Department of Justice
150 M Street Ne Suite 8-135
Washington, DC 20002
USA
202-316-8087 Email:John.Casali@usdoj.Gov

Jonathon P. Hauenschild
ATTORNEY TO BE NOTICED
U.S. Department of Justice
150 M Street Ne Suite 8.1134
Washington, DC 20002
USA

| Litigants | Attorneys |
| --- | --- |
| | 202-215-2110 Email:Jonathon.Hauenschild@usdoj.Gov |
| Jena Griswold<br>in her Official Capacity as Secretary of State for the State of Colorado \|<br>**Defendant** | Lane Towery<br>ATTORNEY TO BE NOTICED<br>Colorado Attorney General<br>Ralph L. Carr Judicial Building 1300 Broadway<br>Denver, CO 80203<br>USA<br>720-508-6470 Email:Lane.Towery@coag.Gov<br><br>Peter G. Baumann<br>ATTORNEY TO BE NOTICED<br>Colorado Attorney General's Office<br>Ralph L. Carr Colorado Judicial Center 1300 Broadway<br>Denver, CO 80203<br>USA<br>720-508-6152 Email:Peter.Baumann@coag.Gov |
| Common Cause<br>**Intervenor Defendant** | Patricia Yan<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>915 15th Street Nw<br>Washington, DC 20005<br>USA<br>202-715-0839 Email:Pyan@aclu.Org<br><br>Sara R. Neel<br>ATTORNEY TO BE NOTICED<br>ACLU of Colorado<br>303 East 17th Avenue Suite 350<br>Denver, CO 80203<br>USA<br>720-402-3107 Fax: 303-777-1773 Email:Sneel@aclu-Co.Org<br><br>Sophia Lin Lakin<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street 18th Floor<br>New York, NY 10004-2400<br>USA<br>212-519-7836 Email:Slakin@aclu.Org<br><br>Theresa Jeane Lee<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org<br><br>Timothy R. Macdonald<br>ATTORNEY TO BE NOTICED<br>ACLU of Colorado<br>303 East 17th Avenue Suite 350<br>Denver, CO 80203<br>USA<br>720-402-3151 Email:Tmacdonald@aclu-Co.Org |
| Kyle Giddings<br>**Intervenor Defendant** | Patricia Yan<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation |

| Litigants | Attorneys |
| --- | --- |
| | 915 15th Street Nw<br>Washington, DC 20005<br>USA<br>202-715-0839 Email:Pyan@aclu.Org |
| | Sara R. Neel<br>ATTORNEY TO BE NOTICED<br>ACLU of Colorado<br>303 East 17th Avenue Suite 350<br>Denver, CO 80203<br>USA<br>720-402-3107 Fax: 303-777-1773 Email:Sneel@aclu-Co.Org |
| | Sophia Lin Lakin<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street 18th Floor<br>New York, NY 10004-2400<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa Jeane Lee<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| | Timothy R. Macdonald<br>ATTORNEY TO BE NOTICED<br>ACLU of Colorado<br>303 East 17th Avenue Suite 350<br>Denver, CO 80203<br>USA<br>720-402-3151 Email:Tmacdonald@aclu-Co.Org |
| Anne Keke<br>**Intervenor Defendant** | Patricia Yan<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>915 15th Street Nw<br>Washington, DC 20005<br>USA<br>202-715-0839 Email:Pyan@aclu.Org |
| | Sara R. Neel<br>ATTORNEY TO BE NOTICED<br>ACLU of Colorado<br>303 East 17th Avenue Suite 350<br>Denver, CO 80203<br>USA<br>720-402-3107 Fax: 303-777-1773 Email:Sneel@aclu-Co.Org |
| | Sophia Lin Lakin<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street 18th Floor<br>New York, NY 10004-2400<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |

| Litigants | Attorneys |
|---|---|
| | Theresa Jeane Lee<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| | Timothy R. Macdonald<br>ATTORNEY TO BE NOTICED<br>ACLU of Colorado<br>303 East 17th Avenue Suite 350<br>Denver, CO 80203<br>USA<br>720-402-3151 Email:Tmacdonald@aclu-Co.Org |
| Colorado Alliance for Retired Americans<br>**Intervenor Defendant** | Elisabeth C. Frost<br>ATTORNEY TO BE NOTICED<br>ELIAS LAW GROUP LLP<br>250 Massachusetts Avenue Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4513 Email:Efrost@elias.Law |
| Britton DeFord<br>**Intervenor Defendant** | Elisabeth C. Frost<br>ATTORNEY TO BE NOTICED<br>ELIAS LAW GROUP LLP<br>250 Massachusetts Avenue Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4513 Email:Efrost@elias.Law |
| Democratic National Committee<br>**Amicus** | Martha M. Tierney<br>ATTORNEY TO BE NOTICED<br>Tierney Lawrence Stiles LLC<br>225 East 16th Avenue Suite 350<br>Denver, CO 80203<br>USA<br>303-356-4870 Email:Mtierney@tierneylawrence.Com |
| Former Employees of the U.S. Department of Justice<br>**Amicus** | Leah Godesky<br>ATTORNEY TO BE NOTICED<br>O'Melveny & Myers LLP<br>1999 Avenue Of The Stars 8th Floor<br>Los Angeles, CA 90067<br>USA<br>310-246-8501 Email:Lgodesky@omm.Com |
| BIPARTISAN FORMER STATE SECRETARIES OF STATE<br>**Amicus** | Isabel Juliana Broer<br>ATTORNEY TO BE NOTICED<br>Olson Grimsley Kawanabe Hinchcliff & Murray LLC<br>700 17th Street Suite 1600<br>Denver, CO 80202<br>USA<br>303-535-9151 Email:Ibroer@olsongrimsley.Com |
| Danielle Purdy<br>[Terminated: 07/08/2026]<br>**Interested Party** | Danielle Purdy<br>PRO SE<br><br>P.O. Box 1234<br>Cripple Creek, CO 80813<br>USA |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 12/11/2025 | COMPLAINT against Jena Griswold Attorney Eric Neff added to party United States of America(pty:pla), filed by United States of America. (Attachments: # 1 Civil Cover Sheet, # 2 Supplemental Civil Cover Sheet Attachment to Civil Cover Sheet)(Neff, Eric) (Entered: 12/11/2025) | |
| 2 | 12/11/2025 | MOTION to Compel Production of Documents Demanded Pursuant to the Civil Rights Act of 1960 by Plaintiff United States of America. (Neff, Eric) (Entered: 12/11/2025) | |
| 3 | 12/11/2025 | Case assigned to Chief Judge Philip A. Brimmer and drawn to Magistrate Judge Cyrus Y. Chung. Text Only Entry. (echa, ) (Entered: 12/11/2025) | |
| 4 | 12/11/2025 | Magistrate Judge consent form issued pursuant to 28 U.S.C. 636(c). (echa, ) (Entered: 12/11/2025) | |
| 5 | 12/11/2025 | BRIEF in Support of 2 MOTION to Compel Production of Documents Demanded Pursuant to the Civil Rights Act of 1960 filed by Plaintiff USA. (Attachments: # 1 Exhibit Exhibits 1-4, # 2 Affidavit Declaration of Eric Neff, # 3 Proposed Order (PDF Only) Proposed Order Granting Motion to Compel Production of Documents)(Neff, Eric) (Entered: 12/11/2025) | |
| 6 | 12/11/2025 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 1 Complaint, 2 MOTION to Compel Production of Documents Demanded Pursuant to the Civil Rights Act of 1960 filed by attorney Brittany E. Bennett. The s/signature did not match the filer name on the account for which the login and password are registered. DO NOT REFILE THE DOCUMENT. Action to take - future documents must be filed pursuant to D.C.COLO.LCivR 5.1(a) and 4.3(c) of the Electronic Case Filing Procedures (Civil cases). (Text Only Entry) (echa, ) (Entered: 12/11/2025) | |
| 7 | 12/11/2025 | ADVISORY NOTICE. Attorney Brittany E. Bennett attempted to enter an appearance in this case by filing a pleading with a digital signature, ECF 5. D.C.COLO.LAttyR 5(a)(5) requires that an attorney be a member of the bar of this Court to enter a valid appearance as counsel of record. Counsel does not appear on the Attorney Roll of this Court because Counsel has not been admitted to practice in the District of Colorado; therefore, the purported entry of appearance by counsel cannot be recognized. Upon admission to the bar of this Court, counsel may then file a Notice of Entry of Appearance in this case. (Text Only Entry) (adubo) (Entered: 12/11/2025) | |
| 8 | 12/16/2025 | NOTICE of Entry of Appearance by Peter G. Baumann on behalf of Jena GriswoldAttorney Peter G. Baumann added to party Jena Griswold(pty:dft) (Baumann, Peter) (Entered: 12/16/2025) | |
| 9 | 12/17/2025 | WARRANT Returned, WAIVER OF SERVICE Returned Executed by USA. Jena Griswold waiver sent on 12/12/2025, answer due 2/10/2026. (Bennett, Brittany) (Entered: 12/17/2025) | |
| 10 | 12/17/2025 | Unopposed MOTION to Intervene as Intervenor-Defendants by Intervenor Parties Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Appendix, # 2 Proposed Order (PDF Only))(Frost, Elisabeth) (Entered: 12/17/2025) | |
| 11 | 12/17/2025 | CORPORATE DISCLOSURE STATEMENT. (Frost, Elisabeth) (Entered: 12/17/2025) | |
| 12 | 12/18/2025 | ORDER REFERRING CASE to Magistrate Judge Cyrus Y. Chung for non-dispositive matters. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, and (4) conduct a pretrial conference and enter a pretrial order. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding, by Chief Judge Philip A. Brimmer on 12/18/2025. Text Only Entry (pabsec, ) (Entered: 12/18/2025) | |
| 13 | 12/18/2025 | MEMORANDUM regarding 10 Unopposed MOTION to Intervene as Intervenor-Defendants filed by Britton DeFord, Colorado Alliance for Retired Americans. Motion referred to Magistrate Judge Cyrus Y. Chung, by Chief Judge Philip A. Brimmer on 12/18/2025. Text Only Entry (pabsec, ) (Entered: 12/18/2025) | |
| 14 | 12/18/2025 | NOTICE of Entry of Appearance by Joshua Charles Abbuhl on behalf of Colorado Alliance for Retired Americans, Britton DeFordAttorney Joshua Charles Abbuhl added to party Colorado Alliance for Retired Americans(pty:intv), Attorney Joshua Charles Abbuhl added to party Britton DeFord(pty:intv) (Abbuhl, Joshua) (Entered: 12/18/2025) | |
| 15 | 12/18/2025 | NOTICE of Entry of Appearance by Kevin Kowalewski on behalf of Colorado Alliance for Retired Americans, Britton DeFordAttorney Kevin Kowalewski added to party Colorado Alliance for Retired Americans(pty:intv), Attorney Kevin Kowalewski added to party Britton DeFord(pty:intv) (Kowalewski, Kevin) (Entered: 12/18/2025) | |
| 16 | 12/19/2025 | COURT'S NOTICE CONCERNING WAIVER OF JUDICIAL DISQUALIFCATION (Attachments: # 1 ELECTION OF WAIVER OF JUDICIAL DISQUALIFICATION)(norlin, ) (Entered: 12/19/2025) | |
| 17 | 12/19/2025 | Unopposed MOTION to Intervene by Intervenor Defendants Common Cause, Kyle Giddings, Anne Keke. (Attachments: # 1 Exhibit 1 - Proposed Motion to Dismiss, # 2 Exhibit 2 - DOJ MOU, # 3 Exhibit 3 - Belknap Declaration, # 4 Exhibit 4 - Giddings Declaration, # 5 Exhibit 5 - Keke Declaration, # 6 Proposed Order (PDF Only) Proposed Order Granting Intervention)(Lee, Theresa) (Entered: 12/19/2025) | |
| 18 | 12/22/2025 | MEMORANDUM regarding 17 Unopposed MOTION to Intervene filed by Kyle Giddings, Anne Keke, Common Cause. Motion referred to Magistrate Judge Cyrus Y. Chung, by Chief Judge Philip A. Brimmer on 12/22/2025. Text Only Entry (pabsec, ) (Entered: 12/22/2025) | |
| 19 | 12/26/2025 | NOTICE re 16 Notice (Other) Non-consent to US Magistrate Judge Jurisdiction by Plaintiff USA (Bennett, Brittany) (Entered: 12/26/2025) | |
| 20 | 12/26/2025 | NOTICE re 16 Notice (Other) Concerning Judicial Disqualification by Defendant Jena Griswold (Baumann, Peter) (Entered: 12/26/2025) | |
| 21 | 12/29/2025 | Unopposed MOTION for Extension of Time to File Response/Reply as to 2 MOTION to Compel Production of Documents Demanded Pursuant to the Civil Rights Act of 1960 by Defendant Jena Griswold. (Baumann, Peter) (Entered: 12/29/2025) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 22 | 12/30/2025 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 12/30/2025 re: 21 Unopposed Motion for an Extension of Time is GRANTED. Defendant shall respond to the 2 Motion to Compel on or before February 10, 2025. Text Only Entry.(agryan) (Entered: 12/30/2025) | |
| 23 | 12/30/2025 | MINUTE ORDER: Pursuant to notices that the parties do not waive judicial disqualification, ECF Nos. 19 , 20 , the Clerk's office is hereby ORDERED to reassign this case to a different magistrate judge. Although I am fully confident that I am able to fairly, impartially, and disinterestedly adjudicate any issues that may come before me in this matter, 28 U.S.C. § 455(a) instructs that a Magistrate Judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." For the reasons previously stated, ECF No. 16 , I hereby recuse myself from this matter in order to avoid the appearance of impropriety. Entered by Magistrate Judge Cyrus Y. Chung on 12/30/2025. Text Only Entry. (agryan) (Entered: 12/30/2025) | |
| 24 | 12/30/2025 | REASSIGNING MAGISTRATE JUDGE. Pursuant to 23 Minute Order, Magistrate Judge is randomly reassigned to Timothy P O'Hara for all future proceedings. All future pleadings should be designated as 25-cv-03967-PAB-TPO.(Text Only Entry) (agryan) (Entered: 12/30/2025) | |
| 25 | 01/05/2026 | NOTICE of Entry of Appearance by Timothy R. Macdonald on behalf of Common Cause, Kyle Giddings, Anne KekeAttorney Timothy R. Macdonald added to party Common Cause(pty:intvd), Attorney Timothy R. Macdonald added to party Kyle Giddings(pty:intvd), Attorney Timothy R. Macdonald added to party Anne Keke(pty:intvd) (Macdonald, Timothy) (Entered: 01/05/2026) | |
| 26 | 01/05/2026 | NOTICE of Entry of Appearance by Sara R. Neel on behalf of Common Cause, Kyle Giddings, Anne KekeAttorney Sara R. Neel added to party Common Cause(pty:intvd), Attorney Sara R. Neel added to party Kyle Giddings(pty:intvd), Attorney Sara R. Neel added to party Anne Keke(pty:intvd) (Neel, Sara) (Entered: 01/05/2026) | |
| 27 | 01/05/2026 | Unopposed MOTION for Leave to File Notice of Supplemental Authority by Intervenor Parties Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Exhibit 1 - Scanlan Order, # 2 Exhibit 2 - Nago Order, # 3 Proposed Order (PDF Only))(Frost, Elisabeth) (Entered: 01/05/2026) | |
| 28 | 01/06/2026 | MEMORANDUM regarding 27 Unopposed MOTION for Leave to File Notice of Supplemental Authority filed by Britton DeFord, Colorado Alliance for Retired Americans, 17 Unopposed MOTION to Intervene filed by Kyle Giddings, Anne Keke, Common Cause, 10 Unopposed MOTION to Intervene as Intervenor-Defendants filed by Britton DeFord, Colorado Alliance for Retired Americans. Motions referred to Magistrate Judge Timothy P O'Hara, by Chief Judge Philip A. Brimmer on 1/06/2026. Text Only Entry (pabsec, ) (Entered: 01/06/2026) | |
| 29 | 01/13/2026 | NOTICE of Supplemental Authorities re: 2 MOTION to Compel Production of Documents Demanded Pursuant to the Civil Rights Act of 1960 by Plaintiff USA (Attachments: # 1 Exhibit Order to Show Cause Connecticut)(Bennett, Brittany) (Entered: 01/13/2026) | |
| 30 | 01/16/2026 | RESPONSE to 29 Notice of Supplemental Authorities, by Defendant Jena Griswold. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Baumann, Peter) (Entered: 01/16/2026) | |
| 31 | 01/23/2026 | NOTICE of Supplemental Authorities re: 17 Unopposed MOTION to Intervene by Intervenor Defendants Common Cause, Kyle | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Giddings, Anne Keke (Attachments: # 1 Exhibit 1 - Order in US v WEC, # 2 Exhibit 2 - Order in US v PA, # 3 Exhibit 3 - Order in US v Simon, # 4 Exhibit 4 - Order in US v Amore, # 5 Exhibit 5 - Order in US v Galvin, # 6 Exhibit 6 - Order in US v Oliver)(Lee, Theresa) (Entered: 01/23/2026) | |
| 32 | 01/28/2026 | NOTICE of Entry of Appearance by Lane Towery on behalf of Jena GriswoldAttorney Lane Towery added to party Jena Griswold(pty:dft) (Towery, Lane) (Entered: 01/28/2026) | |
| 33 | 02/06/2026 | MOTION for Leave to File Amicus Curiae Brief by Intervenor Defendant Danielle Purdy. (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Exhibits)(sphil, ) (Entered: 02/09/2026) | |
| 34 | 02/09/2026 | MEMORANDUM regarding 33 MOTION for Leave to filed by Danielle Purdy. Motion referred to Magistrate Judge Timothy P O'Hara, by Chief Judge Philip A. Brimmer on 2/09/2026. Text Only Entry (pabsec, ) (Entered: 02/09/2026) | |
| 35 | 02/10/2026 | NOTICE of Entry of Appearance by David D. Powell, Jr on behalf of Colorado Alliance for Retired Americans, Britton DeFordAttorney David D. Powell, Jr added to party Colorado Alliance for Retired Americans(pty:intv), Attorney David D. Powell, Jr added to party Britton DeFord(pty:intv) (Powell, David) (Entered: 02/10/2026) | |
| 36 | 02/10/2026 | NOTICE of Entry of Appearance by Lys M. Runnerstrom on behalf of Colorado Alliance for Retired Americans, Britton DeFordAttorney Lys M. Runnerstrom added to party Colorado Alliance for Retired Americans(pty:intv), Attorney Lys M. Runnerstrom added to party Britton DeFord(pty:intv) (Runnerstrom, Lys) (Entered: 02/10/2026) | |
| 37 | 02/10/2026 | RESPONSE to 2 MOTION to Compel Production of Documents Demanded Pursuant to the Civil Rights Act of 1960 filed by Defendant Jena Griswold. (Attachments: # 1 Exhibit A, Decl. of N. Borochoff-Porte, # 2 Exhibit A to Borochoff-Porte Decl., Dhillon Letter, # 3 Exhibit B to Borochoff-Porte Decl., Kline Letter, # 4 Exhibit C to Borochoff-Porte Decl., Riordan Email, # 5 Exhibit D to Borochoff-Porte Decl., Virtu Confirmation, # 6 Exhibit E to Borochoff-Porte Decl., Hayes Email, # 7 Exhibit F to Borochoff-Porte Decl., Neff Email, # 8 Exhibit G to Borochoff-Porte Decl., Proposed MOU, # 9 Exhibit H to Borochoff-Porte Decl., Lampard Letter, # 10 Exhibit B, Decl. of H. Rudy)(Baumann, Peter) (Entered: 02/10/2026) | |
| 38 | 02/10/2026 | Unopposed MOTION for Leave to File (Proposed Motion to Dismiss and Proposed Opposition to Motion to Compel) by Intervenor Parties Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Exhibit Proposed Motion to Dismiss, # 2 Exhibit Proposed Opposition to Motion to Compel, # 3 Proposed Order (PDF Only))(Frost, Elisabeth) (Entered: 02/10/2026) | |
| 39 | 02/10/2026 | Unopposed MOTION for Leave to File Notice of Supplemental Authority by Intervenor Parties Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Exhibit 1 - Copeland Hanzas Order, # 2 Exhibit 2 - Albence Order, # 3 Exhibit 3 Raffensperger Order, # 4 Exhibit 4 DeMarinis Order, # 5 Proposed Order (PDF Only))(Frost, Elisabeth) (Entered: 02/10/2026) | |
| 40 | 02/10/2026 | MOTION to Dismiss by Defendant Jena Griswold. (Towery, Lane) (Entered: 02/10/2026) | |
| 41 | 02/11/2026 | MEMORANDUM regarding 39 Unopposed MOTION for Leave to File Notice of Supplemental Authority filed by Britton DeFord, Colorado Alliance for Retired Americans, 38 Unopposed MOTION for Leave to File (Proposed Motion to Dismiss and Proposed Opposition to Motion to Compel) filed by Britton DeFord, Colorado | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Alliance for Retired Americans. Motions referred to Magistrate Judge Timothy P O'Hara, by Chief Judge Philip A. Brimmer on 2/11/2026. Text Only Entry (pabsec, ) (Entered: 02/11/2026) | |
| 42 | 02/11/2026 | Unopposed MOTION to File Amicus Brief in Support of Defendant's Motion to Dismiss and in Opposition to Plaintiff's Motion to Compel by Amicus Democratic National Committee. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order Granting Amicus Curiae The Democratic National Committee's Motion for Leave to File Amicus Brief)(Tierney, Martha) (Entered: 02/11/2026) | |
| 43 | 02/11/2026 | RESPONSE to 33 MOTION for Leave to File Amicus Brief by Danielle Purdy filed by Defendant Jena Griswold. (Baumann, Peter) (Entered: 02/11/2026) | |
| 44 | 02/18/2026 | Unopposed MOTION to File Amicus Brief by Amicus Former Employees of the U.S. Department of Justice. (Attachments: # 1 Proposed Order (PDF Only), # 2 Proposed Brief of Amici Curiae Former Employees of the U.S. Department of Justice, # 3 Appendix to Brief of Amici Curiae Former Employees of the U.S. Department of Justice)(Godesky, Leah) (Entered: 02/18/2026) | |
| 45 | 02/23/2026 | NOTICE OF CLARIFICATION AND ALIGNMENT by Amicus Curiae Danielle Purdy (ccuen, ) (Entered: 02/23/2026) | |
| 46 | 02/23/2026 | NOTICE of Entry of Appearance by Jonathon P. Hauenschild on behalf of USAAttorney Jonathon P. Hauenschild added to party USA(pty:pla) (Hauenschild, Jonathon) (Entered: 02/23/2026) | |
| 47 | 02/23/2026 | MOTION for Leave to File Excess Pages by Plaintiff USA. (Hauenschild, Jonathon) (Entered: 02/23/2026) | |
| 48 | 02/24/2026 | ORDER by Chief Judge Philip A. Brimmer on 2/24/2026 re: 47 United States' Motion to Exceed Page Limitations is GRANTED. Plaintiff may file a response to the [38-1] 40 Motions to Dismiss that is not to exceed 35 pages. Text Only Entry(sphil, ) (Entered: 02/24/2026) | |
| 49 | 02/24/2026 | BRIEF in Opposition to 86 MOTION to Dismiss filed by Plaintiff USA. (Attachments: # 1 Declaration in Support of Opposition to Motion to Dismiss, # 2 Exhibit 5 - Texas MOU, # 3 Exhibit 6 - Georgia Complaint, # 4 Exhibit 7 - Georgia Consent Order, # 5 Exhibit 8 - NC Consent Order, # 6 Exhibit 9 - NC HAVA Report, # 7 Exhibit 10 - Michigan Opinion, # 8 Exhibit 11 - California Order, # 9 Exhibit 12 - Oregon Order and Opinion, # 10 Exhibit 13 - Ford-Carter Report)(Hauenschild, Jonathon) Modified on 7/13/2026 to correct linkage per Chambers (ggill, ). (Entered: 02/24/2026) | |
| 50 | 02/26/2026 | Unopposed MOTION for Extension of Time to File Response/Reply as to 40 MOTION to Dismiss by Defendant Jena Griswold. (Towery, Lane) (Entered: 02/26/2026) | |
| 51 | 02/26/2026 | ORDER by Chief Judge Philip A. Brimmer on 2/26/2026, re: 50 Unopposed Motion for a Seven-Day Extension of Time is GRANTED. Defendant may file a reply in support of her 40 Motion to Dismiss on or before March 17, 2026. Text Only Entry(sphil, ) (Entered: 02/26/2026) | |
| 52 | 03/02/2026 | MOTION to File Amicus Brief in Support of Defendant's Motion to Dismiss by Amicus Bipartisan Former State Secretaries of State. (Attachments: # 1 Amicus Brief)(Broer, Isabel) (Entered: 03/02/2026) | |
| 53 | 03/09/2026 | AMICUS CURIAE SUPPLEMENTAL Statement of Fact by Intervenor Defendant Danielle Purdy. (echa, ) (Entered: 03/09/2026) | |
| 54 | 03/11/2026 | Unopposed MOTION for Leave to File Excess Pages by Defendant Jena Griswold. (Towery, Lane) (Entered: 03/11/2026) | |
| 55 | 03/11/2026 | ORDER by Judge Philip A. Brimmer on 3/11/2026 re: 54 | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Defendant's Unopposed Motion to Exceed Page Limit is GRANTED. Defendant shall file a reply in support of her 40 Motion to Dismiss that is not to exceed 15 pages. Text Only Entry(pabsec, ) (Entered: 03/11/2026) | |
| 56 | 03/17/2026 | NOTICE of Entry of Appearance by John Casali on behalf of USAAttorney John Casali added to party USA(pty:pla) (Casali, John) (Entered: 03/17/2026) | |
| 57 | 03/17/2026 | REPLY to Response to 40 MOTION to Dismiss filed by Defendant Jena Griswold. (Attachments: # 1 Exhibit A, 2d Rudy Declaration, # 2 Exhibit 1 to Ex A, ERIC: Technology & Security Overview)(Towery, Lane) (Entered: 03/17/2026) | |
| 58 | 03/17/2026 | MOTION for Leave to File Proposed Reply to Plaintiff's Response to Motion to Dismiss 38 Unopposed MOTION for Leave to File (Proposed Motion to Dismiss and Proposed Opposition to Motion to Compel) by Intervenor Parties Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Proposed Document - Proposed Reply to Plaintiff's Response to Motion to Dismiss, # 2 Proposed Order (PDF Only))(Frost, Elisabeth) (Entered: 03/17/2026) | |
| 59 | 03/17/2026 | MOTION for Leave to File Notice of Supplemental Authority by Intervenor Parties Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Exhibit 1 - Minute Order, United States v. Evans (D.D.C. Mar. 16, 2026), # 2 Exhibit 2 - Text Order, United States v. Matthews (C.D. Ill. Mar. 2, 2026), # 3 Proposed Order (PDF Only))(Frost, Elisabeth) (Entered: 03/17/2026) | |
| 60 | 03/18/2026 | MEMORANDUM regarding 59 MOTION for Leave to File Notice of Supplemental Authority filed by Britton DeFord, Colorado Alliance for Retired Americans. Motion referred to Magistrate Judge Timothy P O'Hara, by Judge Philip A. Brimmer on 3/18/2026. Text Only Entry (pabsec, ) (Entered: 03/18/2026) | |
| 61 | 03/18/2026 | ORDER by Judge Philip A. Brimmer re: 58 Motion by Proposed Intervenors Colorado Alliance for Retired Americans and Britton DeFord for Leave to File Proposed Reply to Plaintiff's Response to Motion to Dismiss is GRANTED. Colorado Alliance for Retired Americans and Britton DeFord shall file their proposed reply on or before March 20, 2026. Text Only Entry(pabsec, ) (Entered: 03/18/2026) | |
| 62 | 03/18/2026 | REPLY to Response to 86 MOTION to Dismiss, filed by Intervenor Parties Colorado Alliance for Retired Americans, Britton DeFord. (Frost, Elisabeth) Modified on 7/13/2026 to update linkage per Chambers (ggill, ). (Entered: 03/18/2026) | |
| 63 | 03/26/2026 | MOTION for Leave to File Notice of Supplemental Authority by Intervenor Parties Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Exhibit 1 - Mem. Decision and Order, United States v. Henderson (D. Utah Mar. 23, 2026), # 2 Exhibit 2 - Order, United States v. Aguilar (D. Nev. Mar. 20, 2026), # 3 Proposed Order (PDF Only))(Frost, Elisabeth) (Entered: 03/26/2026) | |
| 64 | 03/26/2026 | MEMORANDUM regarding 63 MOTION for Leave to File Notice of Supplemental Authority filed by Britton DeFord, Colorado Alliance for Retired Americans. Motion referred to Magistrate Judge Timothy P O'Hara, by Judge Philip A. Brimmer on 3/26/2026. Text Only Entry (pabsec, ) (Entered: 03/26/2026) | |
| 65 | 04/09/2026 | NOTICE of Supplemental Authorities by Defendant Jena Griswold (Attachments: # 1 Exhibit A, United States v. Galvin Order)(Baumann, Peter) (Entered: 04/09/2026) | |
| 66 | 04/13/2026 | RESPONSE to 65 Notice of Supplemental Authorities by Plaintiff USA. (Hauenschild, Jonathon) (Entered: 04/13/2026) | |
| 67 | 04/17/2026 | NOTICE of Supplemental Authorities by Defendant Jena Griswold | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | (Attachments: # 1 Exhibit A)(Towery, Lane) (Entered: 04/17/2026) | |
| 68 | 04/22/2026 | RESPONSE to 67 Notice of Supplemental Authorities by Plaintiff USA. (Hauenschild, Jonathon) (Entered: 04/22/2026) | |
| 69 | 04/29/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss by Defendant Jena Griswold (Attachments: # 1 Exhibit A)(Towery, Lane) (Entered: 04/29/2026) | |
| 70 | 05/01/2026 | RESPONSE to 69 Notice of Supplemental Authorities by Plaintiff USA. (Casali, John) (Entered: 05/01/2026) | |
| 71 | 05/19/2026 | Unopposed MOTION for Leave to File Notice of Supplemental Authority 10 Unopposed MOTION to Intervene as Intervenor-Defendants by Intervenor Parties Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Proposed Order (PDF Only))(Frost, Elisabeth) (Entered: 05/19/2026) | |
| 72 | 05/19/2026 | MEMORANDUM regarding 71 Unopposed MOTION for Leave to File Notice of Supplemental Authority 10 Unopposed MOTION to Intervene as Intervenor-Defendants filed by Britton DeFord, Colorado Alliance for Retired Americans. Motion referred to Magistrate Judge Timothy P O'Hara, by Judge Philip A. Brimmer on 5/19/2026. Text Only Entry (pabsec, ) (Entered: 05/19/2026) | |
| 73 | 05/21/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss by Defendant Jena Griswold (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Towery, Lane) (Entered: 05/21/2026) | |
| 74 | 06/01/2026 | RESPONSE to 73 Notice of Supplemental Authorities by Plaintiff USA. (Hauenschild, Jonathon) (Entered: 06/01/2026) | |
| 75 | 06/22/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss by Defendant Jena Griswold (Attachments: # 1 Exhibit A, Maryland Order)(Baumann, Peter) (Entered: 06/22/2026) | |
| 76 | 06/23/2026 | ORDER by Judge Philip A. Brimmer on 6/23/2026 re: 42 Unopposed Motion of the Democratic National Committee for Leave to File Amicus Brief in Support of Defendant's Motion to Dismiss and in Opposition to Plaintiffs Motion to Compel, 44 Unopposed Motion for Leave to File Brief of Amici Curiae Former Employees of the U.S. Department of Justice, 52 Motion for Leave to File Brief of Bipartisan Former State Secretaries of State as Amici Curiae in Support of Defendants Motion to Dismiss are GRANTED. The parties shall file their amicus briefs as separate docket entries on or before June 26, 2026. Text Only Entry(pabsec, ) (Entered: 06/23/2026) | |
| 77 | 06/23/2026 | BRIEF by Amicus Former Employees of the U.S. Department of Justice. (Attachments: # 1 Appendix to Brief of Amici Curiae Former Employees of the U.S. Department of Justice)(Godesky, Leah) (Entered: 06/23/2026) | |
| 78 | 06/24/2026 | BRIEF in Support of 40 MOTION to Dismiss , 2 MOTION to Compel Production of Documents Demanded Pursuant to the Civil Rights Act of 1960 Amicus Brief of the Democratic National Committee in Support of 40 Motion to Dismiss and in Opposition to 2 Motion to Compel Production of Documents Demanded Pursuant to the Civil Rights Act of 1960 filed by Amicus Democratic National Committee. (Tierney, Martha) (Entered: 06/24/2026) | |
| 79 | 06/25/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss by Defendant Jena Griswold (Attachments: # 1 Exhibit A, Sixth Circuit Opinion)(Baumann, Peter) (Entered: 06/25/2026) | |
| 80 | 06/26/2026 | BRIEF in Support of 40 MOTION to Dismiss filed by Amicus Bipartisan Former State Secretaries of State. (Broer, Isabel) (Entered: 06/26/2026) | |
| 81 | 06/29/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | by Defendant Jena Griswold (Attachments: # 1 Exhibit W.D. Pa. Decision, # 2 Exhibit D.N.H. Decision)(Baumann, Peter) (Entered: 06/29/2026) | |
| 82 | 07/01/2026 | RESPONSE to 75 Notice of Supplemental Authorities by Plaintiff USA. (Hauenschild, Jonathon) (Entered: 07/01/2026) | |
| 83 | 07/01/2026 | RESPONSE to 79 Notice of Supplemental Authorities by Plaintiff USA. (Hauenschild, Jonathon) (Entered: 07/01/2026) | |
| 84 | 07/08/2026 | ORDER. Accordingly, it is hereby ordered that: 1. The Unopposed Motion of Colorado Alliance for Retired Americans and Britton Deford to Intervene as Intervenor-Defendants [ECF 10 ] is granted; 2. The Motion of Common Cause, Kyle Giddings, and Anne Klein to Intervene as Defendants [ECF 17 ] is granted; and 3. The Unopposed Motion for Leave to File Proposed Motion to Dismiss and Proposed Opposition to Motion for Order to Compel Records by Proposed Intervenors Colorado Alliance for Retired Americans and Brittany DeFord [ECF 38 ] is granted. By July 10, 2026, the Alliance Intervenor-Defendants shall file their Motion to Dismiss [ECF 38-1] and Opposition to Motion to Compel [ECF 38-1] as separate docket entries. Also by July 10, 2026, the Common Cause Intervenor- Defendants shall file their Proposed Motion to Dismiss [ECF 17-1] as a separate docket entry. The deadline for filing a Response to the Common Cause Intervenors' Motion to Dismiss shall be fourteen (14) days from the date of filing. The deadline for filing any Reply shall be seven (7) days after the Response is filed. Consistent with this Court's Order, the Clerk of Court is directed to update the case caption with the Intervenor-Defendants as Parties to this action. It is further ordered that: 4. The Motions for Leave to File Notices of Supplemental Authority [ECFs 27 ; 39 ; 59 ; 63 ; and 71 ] are granted; and 5. The Motion for Leave to File Amicus Curiae Brief [ECF 33 ] is denied. By Magistrate Judge Timothy P. O'Hara on 7/8/2026.(ggill, ) (Entered: 07/08/2026) | |
| 85 | 07/10/2026 | MOTION to Dismiss by Intervenor Defendants Common Cause, Kyle Giddings, Anne Keke. (Macdonald, Timothy) (Entered: 07/10/2026) | |
| 86 | 07/10/2026 | MOTION to Dismiss by Intervenor Defendants Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Exhibit A)(Frost, Elisabeth) (Entered: 07/10/2026) | |
| 87 | 07/10/2026 | BRIEF in Opposition to 2 MOTION to Compel Production of Documents Demanded Pursuant to the Civil Rights Act of 1960 filed by Intervenor Defendants Colorado Alliance for Retired Americans, Britton DeFord. (Frost, Elisabeth) (Entered: 07/10/2026) | |
| 88 | 07/10/2026 | MOTION for Leave to File Supplemental Brief Supporting 86 MOTION to Dismiss by Intervenor Defendants Colorado Alliance for Retired Americans, Britton DeFord. (Attachments: # 1 Proposed Order (PDF Only))(Frost, Elisabeth) (Entered: 07/10/2026) | |
| 89 | 07/10/2026 | ORDER by Judge Philip A. Brimmer on 7/10/2026 re: 88 Colorado Alliance for Retired Americans and Britton DeFord's Motion for Leave to File Supplemental Brief Supporting Their Motion to Dismiss, ECF No. 86 is GRANTED. Colorado Alliance for Retired Americans and Britton DeFord shall file their supplemental brief, not to exceed 5 pages, on or before July 17, 2026. Text Only Entry.(echa, ) (Entered: 07/10/2026) | |
| 90 | 07/13/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss by Defendant Jena Griswold (Attachments: # 1 Exhibit A)(Baumann, Peter) (Entered: 07/13/2026) | |
| 91 | 07/13/2026 | NOTICE re: [ECF 86 ] Intervenor Defendants Colorado Alliance | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | for Retired Americans, Britton DeFord's Motion to Dismiss. Document linkage for the previously submitted briefs has been corrected in CM/ECF. Plaintiff's Response is at [ECF 49 ], and Intervenor Defendants' Reply is at [ECF 62 ]. By Magistrate Judge Timothy P. O'Hara on 7/13/2026. Text Only Entry (ggill, ) (Entered: 07/13/2026) | |
| 92 | 07/14/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss by Defendant Jena Griswold (Attachments: # 1 Exhibit A)(Towery, Lane) (Entered: 07/14/2026) | |
| 93 | 07/15/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss by Defendant Jena Griswold (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Baumann, Peter) (Entered: 07/15/2026) | |
| 94 | 07/17/2026 | BRIEF in Support of 86 MOTION to Dismiss filed by Intervenor Defendants Colorado Alliance for Retired Americans, Britton DeFord. (Frost, Elisabeth) (Entered: 07/17/2026) | |
| 95 | 07/21/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss by Defendant Jena Griswold (Attachments: # 1 Exhibit A)(Baumann, Peter) (Entered: 07/21/2026) | |
| 96 | 07/23/2026 | RESPONSE to 92 Notice of Supplemental Authorities, 81 Notice of Supplemental Authorities, 95 Notice of Supplemental Authorities, 90 Notice of Supplemental Authorities, 93 Notice of Supplemental Authorities by Plaintiff USA. (Hauenschild, Jonathon) (Entered: 07/23/2026) | |
| 97 | 07/24/2026 | NOTICE of Supplemental Authorities re: 40 MOTION to Dismiss by Defendant Jena Griswold (Attachments: # 1 Exhibit A)(Towery, Lane) (Entered: 07/24/2026) | |
| 98 | 07/24/2026 | RESPONSE to 85 MOTION to Dismiss filed by Plaintiff USA. (Hauenschild, Jonathon) (Entered: 07/24/2026) | |
| 99 | 07/28/2026 | NOTICE of Entry of Appearance by Sophia Lin Lakin on behalf of Common Cause, Kyle Giddings, Anne KekeAttorney Sophia Lin Lakin added to party Common Cause(pty:intvd), Attorney Sophia Lin Lakin added to party Kyle Giddings(pty:intvd), Attorney Sophia Lin Lakin added to party Anne Keke(pty:intvd) (Lakin, Sophia) (Entered: 07/28/2026) | |
| 100 | 07/28/2026 | NOTICE of Entry of Appearance by Patricia Yan on behalf of Common Cause, Kyle Giddings, Anne KekeAttorney Patricia Yan added to party Common Cause(pty:intvd), Attorney Patricia Yan added to party Kyle Giddings(pty:intvd), Attorney Patricia Yan added to party Anne Keke(pty:intvd) (Yan, Patricia) (Entered: 07/28/2026) | |
| 101 | 07/31/2026 | REPLY to Response to 85 MOTION to Dismiss filed by Intervenor Defendants Common Cause, Kyle Giddings, Anne Keke. (Lee, Theresa) (Entered: 07/31/2026) | |
| 102 | 08/03/2026 | ORDER by Judge Philip A. Brimmer on 8/3/26. The United States' Motion for Order to Compel Records Demanded Pursuant to the Civil Rights Act of 1960 2 is DENIED. Secretary of State Jena Griswold's Motion to Dismiss 40 is GRANTED. The Common Cause Intervenors' Motion to Dismiss 85 is GRANTED. The Alliance Intervenors' Motion to Dismiss 86 is GRANTED. The United States' complaint is DISMISSED with prejudice. This case is closed.(sgrim) Modified on 8/4/2026 to add text. (sgrim, ). (Entered: 08/04/2026) | |
| 103 | 08/04/2026 | FINAL JUDGMENT re: 102 Order, by Clerk on 8/4/26. (sgrim) (Entered: 08/04/2026) | |
| 104 | 08/17/2026 | NOTICE of Entry of Appearance by James Thomas Tucker on behalf of USAAttorney James Thomas Tucker added to party USA(pty:pla) (Tucker, James) (Entered: 08/17/2026) | |
| 105 | 08/17/2026 | NOTICE OF APPEAL as to 103 Clerk's Judgment, 102 Order on | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Motion to Dismiss,,,,,,,,, Order on Motion to Compel,, by Plaintiff USA (Tucker, James) (Entered: 08/17/2026) | |
| 106 | 08/18/2026 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 105 Notice of Appeal filed by USA to the U.S. Court of Appeals. (Attachments: # 1 Preliminary Record and Docket Sheet)(echa, ) (Entered: 08/18/2026) | |
| 107 | 08/18/2026 | USCA Case Number 26-1326 for 105 Notice of Appeal filed by USA. (echa, ) (Entered: 08/18/2026) | |
| 108 | 08/28/2026 | LETTER TO USCA and all counsel certifying the record is complete as to 105 Notice of Appeal filed by USA. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 26-1326) Text Only Entry (sphil, ) (Entered: 08/28/2026) | |

## Judgments

| Date | In Favor Of | Against | Amount | Interest | Court Cost | Status | Status Date |
|---|---|---|---|---|---|---|---|
| 08/04/2026 | Colorado Alliance for Retired Americans | USA | $ 0.00 | 0.00% | $ 0.00 | No Payment | 08/04/2026 |
| 08/04/2026 | Common Cause | USA | $ 0.00 | 0.00% | $ 0.00 | No Payment | 08/04/2026 |
| 08/04/2026 | Britton DeFord | USA | $ 0.00 | 0.00% | $ 0.00 | No Payment | 08/04/2026 |
| 08/04/2026 | Kyle Giddings | USA | $ 0.00 | 0.00% | $ 0.00 | No Payment | 08/04/2026 |
| 08/04/2026 | Jena Griswold | USA | $ 0.00 | 0.00% | $ 0.00 | No Payment | 08/04/2026 |
| 08/04/2026 | Anne Keke | USA | $ 0.00 | 0.00% | $ 0.00 | No Payment | 08/04/2026 |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,<br><br>Defendant. | Civil Action No. 1:25-cv-03967<br><br>**COMPLAINT** |

# <u>COMPLAINT</u>

## INTRODUCTION

1. Title III of the Civil Rights Act of 1960 ("CRA") imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), to "retain and preserve … *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. § 20701 (emphasis added).

2. Title III likewise grants the Attorney General the sweeping power to obtain these records: "Any record or paper required by [section 301] to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative…." 52 U.S.C. § 20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

3. If the custodian to whom the written demand is made refuses to comply, the CRA requires "a special statutory proceeding in which the courts play a limited, albeit vital, role" in assisting the Attorney General's investigative powers. *Lynd*, 306 F.2d at 225. The Attorney General or her representative may request a federal court to issue an order directing the Secretary of election to produce the demanded records, akin to "a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Id.*

4. In this "summary" proceeding, *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963), the Attorney General need only show that she made a "written demand" for records covered by Section 301 of the CRA and that "the person against whom an order for production is sought … has failed or refused to make such papers 'available for inspection, reproduction, and copying,'" *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703). The court does not adjudicate "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand" or "the scope of the order to produce." *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703).

## I. JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 2201(a); and 52 U.S.C. § 20705.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' claims occurred in this District, and the Defendant is located in and conducts election administration activities in this District.

## II. PARTIES

7. Plaintiff is the Attorney General of the United States. The Attorney General has authority to enforce various federal election statutes, including the CRA, *see* 52 U.S.C. § 20703; the National Voter Registration Act ("NVRA"), *id.* § 20510(a); and Title III of the Help America Vote Act ("HAVA"), *id.* § 21111.

8. Defendant Secretary of State of Colorado, Jena Griswold, is sued in her official capacity as chief state election official responsible for coordinating Colorado's responsibilities under the NVRA. *See* 52 U.S.C. § 20509; Col. Rev. Statutes 1-1-107(b). Griswold is sued in her official capacity only.

## BACKGROUND

9. This proceeding arises from the Attorney General's investigation into Colorado compliance with federal election law, particularly the NVRA and HAVA.

10. Both the NVRA and HAVA require States to maintain and preserve certain records and papers that fall within the scope of Section 301 of Title III of the CRA.

### The National Voter Registration Act

11. The NVRA requires each state to "designate a State Secretary or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA. 52 U.S.C. § 20509. Defendant Griswold is the chief election official of the State of Colorado.

12. The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of the death of the registrant, or a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)[.]" 52 U.S.C. § 20507(a)(4)

13. The NVRA also requires States to maintain, with exceptions not relevant here, "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1).

**The Help America Vote Act**

14. HAVA requires all States to maintain and administer "a single, uniform, official, centralized, interactive computerized statewide voter registration list" that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).

15. HAVA further establishes "[m]inimum standard[s] for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), and prohibits States from processing voter-registration applications without obtaining and verifying certain identifying information from the applicants, namely, a driver's license number for those who possess a valid one, the last four digits of a social security number for those who do not possess a valid drivers' license, and for those who have neither a unique identifier. *id.* § 21083(a)(5)(A).

**The Civil Rights Act**

16. Congress empowered the Attorney General to request records pursuant to Title III of the CRA, codified at 52 U.S.C. § 20701, *et seq.*

17. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701, *et seq.*

18. Section 303 of the CRA provides, in pertinent part, "[a]ny record or paper required by Section 20701 of this title to be retained and preserved shall, upon demand in writing by the

Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…." 52 U.S.C. § 20703.

## FACTUAL ALLEGATIONS

19. The Attorney General recently received a complaint alleging noncompliance of Secretary Griswold's office with the duties outlined in 52 U.S.C. § 20507.

20. On May 12, 2025, the Attorney General sent a letter to Secretary Griswold seeking information regarding Colorado's compliance with federal election law. See Letter from Attorney General to Secretary Griswold ("May 12 Letter").

21. The Letter requested a copy of all records, as outlined in 52 U.S.C. § 20701, and a certification that no record required for preservation has been deleted, destroyed or altered from its original format. The May 12 Letter also requested that Colorado provide all statutes, regulations, written guidance, internal policies, or database user manuals that set out the procedures Colorado has put in place relating to implementing the requirements of 52 U.S.C. § 20701.

22. The May 12 Letter requested that this information be provided within 14 days of the date of the letter.

23. Secretary Griswold did not respond to the May 12 Letter.

24. On December 1, 2025, attorney Eric Neff followed up by email to Secretary Griswold requesting Colorado's Statewide Voter Registration list ("SVRL") (the December 1 Email). The December 1 Email also stated that:

> The United States is prepared at this early stage to enter into an MOU with the State of Colorado regarding the sharing of the nonpublic, unredacted voter registration list. I have

attached that MOU, which we believe cures all potential concerns a state might rightfully raise regarding its citizens' private data and identifying information.

25. On December 3, 2025, Secretary Griswold responded by email stating "We received your request. We will not be producing unredacted voter files or signing the MOU." December 3 Email.

**COUNT ONE**
**VIOLATION OF THE CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20703**

26. On May 12, 2025, the Attorney General sent a written demand to Secretary Griswold for the production of specific election records pursuant to 52 U.S.C. § 20703.

27. The written demand "contain[ed] a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

28. On December 3, 2025, Secretary Griswold refused to provide the records requested.

Wherefore, the United States respectfully requests this Court:

A. Declare that Defendant's refusal to provide the election records upon a demand by the Attorney General violates Title III of the Civil Rights Act as required by 52 U.S.C. § 20703;

B. Order Secretary Griswold to provide to the Attorney General the current electronic copy of Colorado's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or

HAVA unique identifier as required by 52 U.S.C. § 21083 within 5 days of a Court order.

DATED: December 11, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

/s/ *Brittany E. Bennett*
BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,<br><br>Defendant. | CASE NO: 1:25-cv-03967<br><br>MOTION FOR ORDER TO COMPEL THE PRODUCTION OF RECORDS PURSUANT TO 52 U.S.C. § 20701, *et seq*. |

**MOTION FOR ORDER TO COMPEL RECORDS DEMANDED PURSUANT TO THE CIVIL RIGHTS ACT OF 1960**

Plaintiff, UNITED STATES OF AMERICA, by and through the Attorney General, pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701, *et seq.*, hereby moves this Honorable Court for an Order compelling Defendant, JENA GRISWOLD, to produce the documents requested by Plaintiff. The Attorney General offers the attached Memorandum of Law, Declaration of Eric Neff, and Exhibits, in Support of its Motion to Compel Production.

**Introduction**

The Attorney General has been tasked by Congress with enforcement authority for both the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). *See* 52 U.S.C. § 20510(a) and 52 U.S.C. § 21111. Both statutes require Defendant to conduct specified maintenance of Colorado's voter registration list. These requirements are an integral measure to ensure that Defendant's statewide voter registration lists ("SVRL") are accurate. Ensuring the accuracy of the list of eligible voters preserves the integrity of Colorado's federal election procedures.

Pursuant to Section 301 of the CRA, 52 U.S.C. § 20701, "every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any *application, registration*, payment of poll tax, or other act requisite to voting in such election[.]" (emphasis added).

Further, Section 303 of the CRA provides, "Any record or paper required by section 301 to be retained and preserved shall, *upon demand in writing by the Attorney General* or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703 (emphasis added).

The United States has properly demanded records from Defendant pursuant to these federal statutes and Defendant has failed to comply as detailed in the Memorandum of Law in Support of this Motion, and exhibits filed contemporaneously herein. The United States brings this action and files this Motion to compel Defendant to produce the requested records forthwith.

Section 305 of the CRA, 52 U.S.C. § 20705, provides that "[t]he United States District Court for the district in which a demand is made pursuant to Section 303, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper."

**Prayer for Relief**

For the foregoing reasons, Plaintiff requests that this Court enter an Order directing Defendant to produce the demanded records. Plaintiff further requests this Court:

A. Order Defendant to produce an electronic copy of the Colorado statewide Voter Registration List, to include each registrant's name, date of birth, address, and as

required by HAVA, the last four digits of the registrant's social security number, driver's license/state identification number or the unique HAVA identifier; and

B. Order the Defendant to submit the demanded records electronically to the Attorney General within 5 (five) days of this order.

DATED: December 11, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

/s/ *Brittany E. Bennett*
BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,<br>Defendant. | CASE NO: 1:25-cv-03967<br><br>MEMORANDUM IN SUPPORT OF THE REQUEST FOR ORDER TO COMPEL PRODUCTION OF RECORDS PURSUANT TO 52 U.S.C. § 20701, *et seq*. |

## **MEMORANDUM OF LAW**

## I. INTRODUCTION

Section 301 of Title III of the Civil Rights Act of 1960 ("CRA") imposes a "sweeping" obligation on election officials. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962).[1] It provides, "Every officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…" 52 U.S.C. § 20701 (transferred from 42 U.S.C. § 1974) (emphasis added).

Section 303 provides the Attorney General of the United States a correspondingly sweeping power to obtain Federal election records: "Any record or paper required by [52 U.S.C. § 20701] to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying … by the Attorney General

[1] Caselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue. The United States is unaware of any courts disagreeing with the Fifth Circuit's approach to the CRA.

or [her] representative…." 52 U.S.C. § 20703. The written demand need only "contain a statement of the basis and the purpose therefor." *Id.*; *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam).

On May 12, 2025, the Attorney General, through her representatives, made a written demand to Secretary of State Jena Griswold to produce certain federal election records covered by the CRA. That written demand explained that the purpose of the demand was to assess Colorado's compliance with the list maintenance requirements of the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). Secretary Griswold refused to produce the requested Federal election records. This litigation followed.

Pursuant to Section 305 of the CRA, the United States moves for an order to compel production that requires Secretary Griswold to produce the federal election records identified in the written demand. *See Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855-56 (M.D. Ala. 1960), *aff'd and adopted in full sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961) (per curiam). The CRA displaces the Federal Rules of Civil Procedure by creating a "special statutory proceeding." *Lynd*, 306 F.2d at 225. "All that is required is a simple statement by the Attorney General" after making a written demand for Federal election records and papers covered by the statute, explaining that the person against whom an order is sought has failed or refused to make the requested records "'available for inspection, reproduction, and copying…'" *Id.* at 226 (quoting 52 U.S.C. § 20703). The United States has satisfied those requirements. Accordingly, the United States respectfully requests that the Court issue an order to compel Defendant to produce the federal election records described in its written demand.

## II. BACKGROUND

### A. Title III of the Civil Rights Act of 1960.

Under Section 301 of the CRA, every "officer of election" must "retain and preserve … all records and papers which come into his possession relating to any … act requisite to voting in [a Federal] election" for a period of twenty-two months from that election. 52 U.S.C. § 20701. Section 303 of the CRA provides, "Any record or paper required by section 301 to be retained

and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative…." 52 U.S.C. § 20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

If an officer of election refuses to comply with the CRA's command, the Act requires "a special statutory proceeding in which the courts play a limited, albeit vital, role" in assisting the Attorney General's investigative powers. *Lynd*, 306 F.2d at 225. The Attorney General or her representative may request a federal court to issue an order directing the officer of election to produce the demanded records, akin to "a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Id.*

The special proceeding is "summary" in "nature" and neither "plenary [n]or adversary." *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963); *see Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (noting that this procedure "does not amount to the filing of a suit of any kind"). "All that is required is a simple statement by the Attorney General that after a … written demand" for Federal election records covered by Section 301 of the CRA (52 U.S.C. § 20701), "the person against whom an order for production is sought … has failed or refused to make such papers 'available for inspection, reproduction, and copying ….'" *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703). The court does not entertain "any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Id.* (quoting 52 U.S.C. § 20703). Rather, "[t]he Court, with expedition, should grant the relief sought or, if the respondent-custodian opposes the grant of such relief, the matter should be set down without delay for suitable hearing on the matters open for determination." *Id.*

Those matters, though, are "severely limited." *Id.* The court may adjudicate only: (1) "whether the written demand has been made"; and (2) "whether the custodians against whom

orders are sought have been given reasonable notice of the pendency of the proceeding." *Id.* Neither "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand" nor "the scope of the order to produce" is open for review. *Id.*; *see Coleman*, 313 F.2d at 868. As the Fifth Circuit has explained, "No showing even of a prima facie case of a violation of Federal law need be made." *Id.* (citation omitted). Instead, "[i]f, after issuance of an order to produce, a genuine dispute subsequently arises as to whether or not any specified particular paper or record comes within [52 U.S.C. § 20701's] broad statutory classification," that issue may be decided by the court. *Lynd*, 306 F.2d at 226.

**B. The Attorney General is demanding Federal election records under the CRA to assess Colorado's NVRA and HAVA compliance.**

On May 12, 2025, the Attorney General, acting through her representatives at the Department of Justice ("Department"), sent a letter to Jena Griswold, Secretary of State of Colorado, regarding Colorado's compliance with federal list maintenance requirements. Ex. 1, Dep't Ltr. to Griswold dated May 12, 2025 ("May 12 Letter"). The NVRA and HAVA have list maintenance requirements "to protect the integrity of the electoral process." 52 U.S.C. § 20501(b)(3). The statutes impose certain recordkeeping duties and require reasonable efforts to maintain lists of eligible voters for federal elections. *See* 52 U.S.C. §§ 20507(a)(4), 20507(i)(1), 21083(a)(1)(A).

The Letter requested a copy of all records, as outlined in 52 U.S.C. § 20701, and a certification that no record required for preservation has been deleted, destroyed or altered from its original format. The May 12 Letter also requested that Colorado provide all statutes, regulations, written guidance, internal policies, or database user manuals that set out the procedures Colorado has put in place relating to implement the requirements of 52 U.S.C. § 20701.

The May 12 Letter requested that this information be provided within 14 days of the date of the letter.

On December 1, 2025, attorney Eric Neff followed up by email to Secretary Griswold requesting Colorado's Statewide Voter Registration list ("SVRL") (the December 1 Email). The December 1 Email also stated that:

> The United States is prepared at this early stage to enter into an MOU with the State of Colorado regarding the sharing of the nonpublic, unredacted voter registration list. I have attached that MOU, which we believe cures all potential concerns a state might rightfully raise regarding its citizens' private data and identifying information. Ex. 2, December 1 Email.

On December 3, 2025, Secretary Griswold responded by email stating "We received your request. We will not be producing unredacted voter files or signing the MOU." December 3 Email. Ex. 3.

## III. ARGUMENT

### A. The United States is entitled to an Order to Compel Production under the CRA.

An order to compel production of documents under the CRA is appropriate when the United States files a "simple statement" describing its written demand for inspection, reproduction, and copying, and explaining that the officer of election to whom it was directed has "failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Lynd*, 306 F.2d at 226 (citation omitted). The written demand must include "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The Department's May 12 Letter satisfies these requirements by: (1) making a written demand for inspection, reproduction, and copying of federal election records, including the SVRL and records of voter registration application within twenty-two months of a federal election; (2) directing that demand to Secretary Griswold, an officer of election as defined by

Section 306 of the CRA;[2] and (3) stating that the purpose of the demand is "[t]o assist our efforts in evaluating the complaint…" Ex. 1, May 12 Letter.

The Attorney General cannot assess compliance with HAVA and the NVRA without the full, unredacted SVRL and other requested federal election records pertaining to Colorado's list maintenance efforts. HAVA prohibits a state from processing a voter registration application without the applicant's driver's license number, where an applicant has a current and valid driver's license, or, for other applicants, the last four digits of the applicant's social security number; for those lacking both identification numbers, the state must assign a unique HAVA identifier. *See* 52 U.S.C. § 21083(a)(5)(A)(i)-(ii). Without the data including those identification numbers, the United States cannot evaluate the state's compliance with HAVA.

Similarly, HAVA requires list maintenance to "be conducted in a manner that ensures" the elimination of duplicate names from the statewide list. 52 U.S.C. § 21083(a)(2)(B)(iii). Unredacted voter files, including the three identification numbers described above, are needed to determine if the state has a reasonable program of identifying and removing duplicate voter registrations. That is why twenty-five states (including Colorado) share the identical information sought by the Attorney General here with a private organization known as the Electronic Registration Information Center ("ERIC"). Secretary Griswold routinely shares this data with ERIC.

---

[2] Section 306 provides:

> As used in this chapter, the term ''officer of election'' means any person who, under color of any Federal, State, Commonwealth, or local law, statute, ordinance, regulation, authority, custom, or usage, performs or is authorized to perform any function, duty, or task in connection with any application, registration, payment of poll tax, or other act requisite to voting in any general, special, or primary election at which votes are cast for candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico.

52 U.S.C. § 20706.

The same unredacted Federal election records, including the SVRL, are needed to assess Colorado's compliance with the NVRA. The use of unredacted voter data ensures that matches to identify deceased and duplicate voters are more accurate and complete.

Secretary Griswold has rejected the United States's written demand pursuant to the CRA to produce Colorado's statewide VRL, a federal election record. Consequently, the United States respectfully requests that this Court issue an Order compelling Secretary Griswold to immediately produce those records through a secure method. *See Lynd*, 306 F.2d at 226; *Coleman*, 313 F.2d at 868.

**B. The CRA does not permit Defendant to withhold federal elections because of privacy concerns.**

Defendant has refused to produce the federal election records demanded by the Attorney General under the CRA because he contends that Colorado's election law and the Federal Privacy Act prohibit cooperation without an appropriate purpose stated by the Attorney General. First, the May 12 letter provided Secretary Griswold with the Attorney General's purpose for the demand. Second, the Supremacy Clause of the Constitution says otherwise. It is a basic tenet of our federal system that when Federal and State law conflict, the federal law governs. *See* U.S. Const. art. VI. As this Circuit has explained, If the federal voting laws and state law "do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to 'alter' the state's regulation, and that regulation is superseded." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc*. ("ITCA"), 570 U.S. 1 (2013).

A South Carolina court recently confronted the same argument from an individual voter seeking to enjoin state officials from cooperating with the Department. Addressing Federal preemption over state statutes governing privacy, the court explained, "Federal law likely requires the Election Commission to provide the requested information to DOJ, and while DOJ has also pointed to the National Voter Registration Act and the Help America Vote Act, Title III [of the Civil Rights Act] alone is sufficient to reach that conclusion." *Crook v. S.C. Election*

*Comm'n*, No. 2025-CP-40-06539 (Richland Cty. Comm. Pleas Oct. 1, 2025), attached to the Declaration of Eric Neff as Ex. 4, at 10. The court noted, "Title III requires that, for 22 months after a federal election, a state election official 'retain and preserve' 'all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.' 52 U.S.C. § 20701." *Id.* at 10-11. The court reasoned:

> Title III has long been understood to "encompass[], among other things, voting registration records," *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985), which is not surprising given the scope of the statutory text. And since HAVA's enactment two decades ago, registration records must include either "the applicant's driver's license number" or "the last four digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A). The Attorney General (or his representative) may demand in writing "[a]ny record or paper" that a state election official must keep under § 20701. *Id.* § 20703. That demand must simply "contain a statement of the basis and the purpose therefor." *Id.*

*Id.* at 11. As a result, the court found, "DOJ's request for South Carolina's voter registration list fits comfortably within this legal framework" and denied the voter's request to enjoin the state's production of its list to the Department. *Id.* at 11-12. For those reasons, *id.*, any state-law privacy right to the contrary is preempted by the CRA's broad grant of access to the Attorney General. *See* 52 U.S.C. § 20703; *Summers*, 769 F. Supp. 3d at 461 Consequently, the Attorney General is entitled to the federal election records she has demanded from Secretary Griswold under the CRA, notwithstanding any conflicting state privacy laws.

### C. The Attorney General is entitled to relief under the CRA's summary proceeding for obtaining federal election records.

The CRA displaces the Federal Rules of Civil Procedure and creates a "special statutory proceeding" under which Secretary Griswold, as an officer of election for Colorado, must produce the voter-registration lists and other federal election records demanded by the Attorney General.[3] *Lynd*, 306 F.2d at 225. The court in *Lynd* reasoned that a special proceeding was

---

[3] Although this Motion for an Order to Compel Production is made under the CRA, the United States notes that the NVRA includes a similar requirement for production of Federal election

necessary to obtain federal election records because no other procedural device or maneuver was available:

> There is no place for a motion for a bill of particulars or for a more definite statement under F.R.Civ.P. 12(e), 28 U.S.C.A. There is no place for any other procedural device or maneuver— either before or during any hearing of the application— to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand. [52 U.S.C. § 20703]. Thus with respect to the reasons why the Attorney General considers the records essential, there is no place, either as a part of pleadings, discovery, or trial, for interrogatories under F.R.Civ.P. 33, oral depositions of a party under F.R.Civ.P. 26(a), 30, production of documents under F.R.Civ.P. 34, or request for admissions as to facts or genuineness of documents or other things under F.R.Civ.P. 36, 37.

*Id.* at 226.

The "special statutory proceeding" of these statutes is "a summary proceeding." *Id.* at 225-26. To institute this proceeding, the United States need only file a "simple statement" describing its written demand for the federal election records and explaining that Secretary Griswold, acting as an officer of election for Colorado, "failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Id.* at 226 (citation omitted). Accordingly, the Court "should grant the relief sought or, if the respondent-custodian opposes the grant of such relief, the matter should be set down without delay for suitable hearing on the matters open for determination." *Id.* The Attorney General's right to reproduction and copying of Federal election records is not dependent upon any other showing. *Id.* Therefore, the United States respectfully requests that this Court issue an Order directing Secretary Griswold to produce the federal election records described in the Attorney General's written demand.

---

records. *See* 52 U.S.C. § 20507, 20510(a). "[W]hen Congress uses the same language in two statutes having similar purposes … it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion).

## IV. CONCLUSION

For the foregoing reasons, the United States requests that this Court enter an Order directing Defendant to comply with the Attorney General's Demand pursuant to the CRA an electronic copy of Colorado's SVRL including the name, date of birth, driver's license number, last four digits of the social security number or the HAVA unique identifier. Those records should be provided electronically to the United States within five days.

Dated: December 11, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

/s/ *Brittany E. Bennett*
ERIC NEFF
Acting Chief, Voting Section
BRITTANY E. BENNETT
Trial Attorney, Voting
Section Civil Rights Division
4 Constitution Square
150 M Street, Room 8.141
Washington, D.C. 20002
brittany.bennett@usdoj.gov Tel.
(202) 704-5430
Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

# EXHIBIT 1

U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington, DC 20530*

May 12, 2025

*Via E-Mail to:* elections@coloradosos.gov
The Honorable Jena Griswold
Secretary of State
1700 Broadway, Suite 550
Denver CO 80290

Dear Secretary Griswold:

We write to you as the Chief Election Official for the Commonwealth of Colorado to request information regarding the State's procedures for compliance with the Voting Rights Act, 52 U.S.C. §20701, titled Retention and preservation of records and papers by officers of elections. 52 U.S.C §20701 requires the preservation of all records relating to any application, registration or other act requisite to voting in an election for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, member of the House of Representatives.

We recently received a complaint alleging noncompliance by your office with the duties outlined in 52 U.S.C §20507. Additionally, 52 U.S.C. 52 U.S.C §20703 provides that any record required to be preserved by Section §20701, shall upon demand in writing by the Attorney General or her representative directed to the person having custody, possession or control of such record or paper, be made available for inspection, reproduction, and copying. As the State's Chief Election Official, we direct our inquiry to you. See Col. Rev. Statutes 1-1-107(b).

To assist our efforts in evaluating the complaint, we respectfully request that you provide us with the following information related to the above requirements:

- All records, as outlined in 52 U.S.C. § 20701, and a certification that no record required for preservation has been deleted, destroyed or altered from its original format.

- All statutes, regulations, written guidance, internal policies, or database user manuals that set out the procedures Colorado has put in place relating to implement the requirements of 52 U.S.C. §20701.

If your office or any state agent still has custody of 52 U.S.C. §20701 records pertaining to the November 2000 federal election, please preserve those records.

Please provide this information within 14 days of the date of this letter. The materials may be sent by email to: Maureen.riordan2@usdoj.gov. We appreciate your cooperation in our efforts to monitor compliance with federal election laws.

Sincerely,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

# EXHIBIT 2

**From:** Neff, Eric (CRT)
**To:** andrew.kline@coloradosos.gov
**Cc:** judd.choate@coloradosos.gov
**Subject:** Voter Registration List request follow up
**Date:** Monday, December 1, 2025 11:34:00 AM
**Attachments:** 20250512 Griswold from CRT.pdf
image001.png
VRLData Sharing Agreement DOJ-CO.pdf
83.pdf
SOS Letter DOJ-DHS 11.18.25 Digital (002).pdf

---

Mr. Kline,

I am the new contact for the Voting Section for our request for Colorado's voter registration list. This is a follow up from original correspondence that began in May (see attached letter).

The United States is prepared at this early stage to enter into an MOU with the State of Colorado regarding the sharing of the nonpublic, unredacted voter registration list. I have attached that MOU, which we believe cures all potential concerns a state might rightfully raise regarding its citizens' private data and identifying information.

However, given that Colorado has signed on to both the November 18 letter to the Attorney General and a potential amicus filing in the California litigation (both attached), I hope you find it fair that I suspect an MOU such as the one attached will not alleviate the State's various concerns such that your State will produce those records in short order (within 7 days).

As such, I would ask that by end of business tomorrow you respond with your State's intent to either refuse to enter into such an agreement and produce the requested records or to comply with our request in short order.

Thank you,
Eric

**Eric Neff**
Trial Attorney
Civil Rights Division
Department of Justice
150 M St. NE, Ste. 8-139
Washington, DC 20002
Eric.Neff@usdoj.gov
Cell: 202-532-3628

# EXHIBIT 3

**From:** Andrew Kline
**To:** Neff, Eric (CRT)
**Cc:** Judd Choate
**Subject:** [EXTERNAL] RE: Voter Registration List request follow up
**Date:** Tuesday, December 2, 2025 10:58:00 PM
**Attachments:** image002.png
image003.png

---

We received your request. We will not be producing unredacted voter files or signing the MOU.

Thank you.

**Andrew Kline**
Deputy Secretary of State
Andrew.Kline@coloradosos.gov

***Our Core Values are To serve • To innovate • To act with integrity • To strive for excellence • To be inclusive***

---

**From:** Neff, Eric (CRT) <Eric.Neff@usdoj.gov>
**Sent:** Monday, December 1, 2025 9:34 AM
**To:** Andrew Kline <Andrew.Kline@ColoradoSOS.gov>
**Cc:** Judd Choate <Judd.Choate@coloradosos.gov>
**Subject:** [EXTERNAL] Voter Registration List request follow up

Mr. Kline,

I am the new contact for the Voting Section for our request for Colorado's voter registration list. This is a follow up from original correspondence that began in May (see attached letter).

The United States is prepared at this early stage to enter into an MOU with the State of Colorado regarding the sharing of the nonpublic, unredacted voter registration list. I have attached that MOU, which we believe cures all potential concerns a state might rightfully raise regarding its citizens' private data and identifying information.

However, given that Colorado has signed on to both the November 18 letter to the Attorney General and a potential amicus filing in the California litigation (both attached), I hope you find it fair that I suspect an MOU such as the one attached will not alleviate the State's various concerns such that your State will produce those records in short order (within 7 days).

As such, I would ask that by end of business tomorrow you respond with your State's intent to

either refuse to enter into such an agreement and produce the requested records or to comply with our request in short order.

Thank you,
Eric

**Eric Neff**
Trial Attorney
Civil Rights Division
Department of Justice
150 M St. NE, Ste. 8-139
Washington, DC 20002
Eric.Neff@usdoj.gov
Cell: 202-532-3628

# EXHIBIT 4

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
COUNTY OF RICHLAND ) FIFTH JUDICIAL CIRCUIT

Civil Action No. 2025-CP-40-06539

ANNE CROOK,

*Plaintiff*,

vs.

SOUTH CAROLINA ELECTION COMMISSION A/K/A STATE ELECTION COMMISSION,

*Defendant*,

HENRY DARGAN MCMASTER, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF SOUTH CAROLINA,

*Intervenor-Defendant*.

**ORDER**

This matter is before the Court on a Motion for Temporary Injunction filed by Plaintiff, Anne Crook. The motion seeks to prevent or limit the Election Commission's dissemination to DOJ of certain information from the South Carolina statewide voter registration list (VRL), containing Plaintiff's personal information. The Court heard this matter on September 26, 2025, and took the matter under advisement. For the reasons stated below, the Motion is **DENIED**.

**Introduction**

Plaintiff is requesting an injunction to prevent the South Carolina Election Commission (Election Commission) from releasing any protected election data to the Department of Justice (DOJ) until there is a memorandum of understanding (MOU) between the two parties. Additionally, Plaintiff requests that this Court review any MOU. In the Election Commission's memorandum in opposition, as well as at oral arguments by their counsel, they have stated point-

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

blank that they will not release the data to the DOJ without an MOU between the two government agencies. Additionally, counsel stated that the contents of the MOU would be discussed and voted on in open session by the commissioners. This Court denies the drastic remedy of granting injunction for several reasons.

**First**, Plaintiff has failed to prove she will suffer an irreparable harm because the Election Commission has stated it will not release the data without an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission.

**Second**, Plaintiff has failed to prove there are no adequate remedies at law because she could avail herself to the state and federal tort claims acts if any data is negligently handled in the future.

**Finally**, Plaintiff is not likely to succeed on the merits for several reasons. **1.** The Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin; specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data. **2.** The "right to privacy" constitutional provision does not encompass the sharing of data between the State and the federal government to secure federal elections. **3.** Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission, which would offend foundational separation of powers principles. **4.** Federal law likely requires the Election Commission to provide the requested information to DOJ.

**Factual Background**

On August 6 and 14, 2025, the Department of Justice Civil Rights Division (DOJ) sent letters to the Election Commission, requesting, in sum, South Carolina's VRL. Specifically, in the second letter, DOJ requested "an electronic copy of the statewide voter VRL[, which] should contain *all fields*, which means, [the] state's VRL must include the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number . . . ." *See* Compl. at 7–11 (Letter from Harmeet K. Dhillon, Assistant Attorney General Civil Rights Division to Howard Knapp, then-Executive Director, State Election Commission).

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

On August 27, 2025, the Election Commission met to address DOJ's requests. Wooten Aff. ¶ 4. Specifically, the Election Commission directed its staff to confer with DOJ about the prospect of entering into a data sharing agreement as authorized by section 7-5-186(C) of the South Carolina Code of Laws. *Id.* After additional communications with DOJ, on September 3, 2025, the Election Commission and DOJ held a conference call to discuss a possible data sharing agreement. *Id.*¶ 5. Based on that conference call, the Election Commission understands that DOJ is currently developing a Memorandum of Understanding (MOU) that identifies the requested information and addresses the security and privacy concerns raised by the Election Commission. *Id.* ¶ 6. The Election Commission has not yet received the MOU. *Id.* The Election Commission has stated that it will not share any data without a proper MOU in place.

Contesting dissemination of the VRL to DOJ, Plaintiff filed a complaint with a request for injunctive relief and a declaratory judgment in Calhoun County. Ultimately, the case was transferred to Richland County and assigned to the Honorable Daniel M. Coble. The Election Commission filed its Answer on September 25, 2025.

## Legal Standard

An injunction is a "drastic" remedy that "ought to be applied with caution." *Strategic Res. Co. v. BCS Life Ins. Co.*, 367 S.C. 540, 544, 627 S.E.2d 687, 689 (2006). A plaintiff "must establish three elements" to obtain a preliminary injunction: (1) irreparable harm, (2) likelihood of success on the merits, and (3) no adequate remedy at law. *Compton v. S.C. Dep't of Corr.*, 392 S.C. 361, 366, 709 S.E.2d 639, 642 (2011).

### 1. Irreparable harm

Plaintiff submits to the Court that she would suffer irreparable harm "if either 1) more of her [personal information] is shared than is permissible under the law or 2) the information is shared without adequate protection." Motion for Temporary Injunction at 11 (Sept. 23, 2025). Transmitting her personal information within the defined confines of an MOU protects against either scenario. Therefore, Plaintiff has failed to identify any sufficient harm—let alone an irreparable harm—she would suffer absent an injunction.

The Election Commission stated in court and in the filings with this Court that they will enter into an MOU with the DOJ that complies with all state law and ensure the protection of any

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

personal information. Additionally, the Election Commission stated that the contents of the MOU would be discussed and voted on at an open hearing. The Election Commission stated in their Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction:

> Specifically, in recognition of the significant privacy concerns involved, the Election Commission will fulfill its statutory obligations to protect private information and share voter information with DOJ only pursuant to an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission. Indeed, this explains why the Election Commission has not transmitted the requested information since DOJ first inquired in early August. To appease her concerns, Plaintiff need not look any further than to the MOUs into which the Election Commission routinely perfects when exercising its statutory authority to share voter registration data to carry out its obligation "to maintain accurate voter registration records." *See* Wooten Aff. ¶ 4; S.C. Code Ann. §§ 7-3-20(D)(11), 7-5-186(A). As is standard practice, those MOUs outline the limited purpose for which the shared voter information will be used and the steps taken to protect the confidentiality of that data upon disclosure. For example, such documents ordinarily set forth data use limitations and provide secure transmission protocols and storage and destruction procedures. Any perfected MOU with DOJ should be no different.

Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction at 5 (Sept. 26, 2025).

Further, Plaintiff's alleged irreparable harm rests on the premise that the Election Commission will not act in good faith or properly carry out the law. Public officials are, absent evidence to the contrary, presumed to act in good faith and follow the laws. *S.C. Jurisprudence*, Evidence § 29 (1999*); see also Toporek v. S.C. State Election Comm'n*, 362 F. Supp. 613 (D.S.C. 1973) (stating that without an evidentiary basis, courts will not assume that state election officials will act arbitrarily in the future). The only evidence in this case is that the Election Commission has acted in good faith in enacting the MOUs with other states to fulfill its statutory duty to maintain accurate voter lists—that is, to prevent voter fraud. Plaintiff has not alleged, and the Court cannot assume, that the Election Commission will do anything other than adhere to state law in any negotiations with DOJ.

**2. Adequate remedies**

Actions for injunctive relief are equitable in nature. *Grosshuesch v. Cramer*, 367 S.C. 1, 4, 623 S.E.2d 833, 834 (2005) (citation omitted). Generally, equitable relief is available only where there is no adequate remedy at law. *Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n*, 298

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

S.C. 179, 185, 379 S.E.2d 119, 123 (1989). Specifically, "An 'adequate' remedy at law is one which is as certain, practical, complete and efficient to attain the ends of justice and its administration as the remedy in equity." *Id.* In the unlikely event that Plaintiff's private information somehow falls in the hands of a "bad actor" as a result of the Election Commission's fulfillment of its statutory obligations under S.C. Code Ann. § 7-5-186(C) as she hypothesizes, she could avail herself to the state and federal tort claims acts. Such claims are more than adequate vehicles for relief such that an injunction is improper.

**3. Success on the Merits**

***Statutory Authorization***

Because the Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin, Plaintiff cannot possibly establish she is likely to succeed on the merits. More specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data.

The South Carolina Constitution mandates the General Assembly to enact legislation providing for the regulation of elections (article II, section 1), the registration of voters (article II, section 8), and "the fulfillment and integrity of the election process" (article II, section 10). Pursuant to that authority, the General Assembly enacted Title 7 of the South Carolina Code of Laws, in turn establishing the Election Commission to oversee the administration of elections and to maintain fair and fraud-free elections. *See* S.C. Code Ann. § 7-3-10(F) (charging the Election Commission with "promulgat[ing] regulations to establish standardized processes for the administration of elections and voter registration that must be followed by the county boards of voter registration and elections").

To that end, relevant here, section 7-5-186(A) requires the Election Commission to establish and maintain a statewide voter registration database and to "conduct an annual general registration list maintenance program to maintain accurate voter registration records in the statewide voter registration system." S.C. Code Ann. § 7-5-186(A). Included in that list is the information the Election Commission collects pursuant to its statutory mandate for contents of voter registration applications. In particular, the application (and therefore the VRL) must contain a registrant's name, sex, race, social security number, date of birth, residential address and may

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

also include driver's license numbers, state-issued identification numbers, telephone numbers, email addresses, mailing addresses, location of prior voter registrations, voter registration agencies, and other data incident to voter registrations. S.C. Code Ann. § 7-5-170(2); *see also* S.C. Code Ann. § 7-5-185(B)(5) (requiring the same information for electronic applications for voter registration).

Furthermore, section 7-5-186(C) expressly provides,

> The State Election Commission *may enter into agreements to share information or data* with other states or groups of states, *as the commission considers necessary*, in order to maintain the statewide voter registration database established pursuant to this section. Except as otherwise provided in this subsection, the commission shall ensure that any information or data provided to the commission that is confidential in the possession of the state providing the data remains confidential while in the possession of the commission. *The commission may provide such otherwise confidential information or data to persons or organizations that are engaging in legitimate governmental purposes related to the maintenance of the statewide voter registration database.*

S.C. Code Ann. § 7-5-186(C) (Emphasis added). The plain language of the statute permits the Election Commission to share the requested information with "organizations" such as DOJ. Before perfecting the agreement, the Election Commission determines whether the DOJ MOU meets the state's statutory requirements for disclosure of voter personal information. If it does not, the Election Commission will not enter the agreement or share the VRL.

Much of the Family and Personal Identifying Information Privacy Protection Act is not relevant to this action. For instance, it requires state agencies to have privacy policies and to inform people that collected information might be disclosed, and it prohibits anyone from using personal information obtained from a government agency from using that information for commercial solicitation. *See* S.C. Code Ann. §§ 30-2-20, -40, -50(A). Specific to the section Crook cites in the heading of her motion, section 30-2-20 permits agencies to share personal information to "fulfill a legitimate public purpose." *Id.* § 30-2-20. Surely protecting the voter rolls fits that description. *See id.* § 7-3-10(G) (Commission must "comply with applicable state and federal election law").

Put simply, the statute's plain text authorizes the Election Commission to engage in the conduct Plaintiff hopes to enjoin. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Under the plain meaning rule, it is not the province of the court to change the meaning of a clear and unambiguous statute.").

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

***Right to Privacy***

A statute gives a plaintiff the right to sue only if the General Assembly intended to create that right. *Denson v. Nat'l Cas. Co.*, 439 S.C. 142, 151, 886 S.E.2d 228, 233 (2023). "Generally, when a statute does not expressly create civil liability, a duty will not be implied unless the statute was enacted for the special benefit of a private party." *Id.* at 151–52, 886 S.E.2d at 233. Nothing in section 7-5-170 (or section 7-5-186) is for any special benefit of an individual. Instead, these statutes provide the framework how voters register and how the Election Commission handles the voter registration database. Bolstering this conclusion are other parts of Title 7, which expressly provide a person the right to challenge certain Election Commission actions. *See, e.g.*, S.C. Code Ann. §§ 7-5-230(C), 7-5-240.

Because there is no private cause of action conferred under these election statutes, the Plaintiff's standing hinges on whether or not her "right to privacy" has been implicated under South Carolina's Constitution. Article I, section 10 prohibits "unreasonable invasions of privacy." S.C. Const. art. I, § 10. That provision was intended "to take care of the invasion of privacy through modern electronic devices." Committee to Make a Study of the Constitution of South Carolina, 1895, *Minutes of Committee Meeting* 6 (Sept. 15, 1967). It sought "to protect the citizen from improper use of electronic devices, computer data banks, etc." Committee to Make a Study of the Constitution of South Carolina, 1895, *Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895*, at 15 (1969). As originally understood then, this provision has nothing to do with the sharing of data between the State and the federal government to secure federal elections.

This constitutional provision's current jurisprudence is not precisely clear, and there is limited case law on the issue. Therefore, this Court must look to several recent cases to ascertain and interpret the provision in light of the facts of this case. In *Planned Parenthood I*, the South Carolina Supreme Court interpreted the right to privacy as more than merely a search or seizure related protection. However, *Planned Parenthood I* was not directly overruled, but it was clearly supplanted by *Planned Parenthood II*. The first case's two dissenting opinions viewed the right to privacy in a more limited fashion, with Justice James' opinion keeping the provision within the search and seizure framework. *Planned Parenthood II* made it clear that while the majority

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

opinion ruled that the right to privacy encompassed more than the search and seizure context, it did so only for the purposes of that opinion.

> Second, *Planned Parenthood I* is a highly fragmented decision with five separate opinions. …we likewise decline to revisit the fragmented decision regarding the proper scope of the privacy provision. Rather, in the interest of unity, we will assume only for purposes of our analysis and decision **today** that the privacy provision reaches beyond the search and seizure context to include bodily autonomy. Accordingly, we go no further **today** than referencing *Singleton v. State*, which held that the interests protected by the privacy clause extend to bodily autonomy and integrity.

*Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023), *reh'g denied* (Aug. 29, 2023) (emphasis added). The Supreme Court made clear that in that case they were not making a definitive ruling as to the interpretation of the history and meaning of the constitutional provision in question. *Id.* at 481 n.9 ("We elect not to address those threshold differences: for purposes of our analysis and decision today, we will cast aside a review of the history and relevance of the 1971 amendments to the state constitution that included the privacy provision, including the work of the West Committee.").

Courts will attempt to avoid making legal interpretations when they are unwarranted and superfluous to the ultimate decision. The judiciary is not in the business of creating business but rather tasked with the simple job of making decisions related to past conduct and stating rules for predictability of future conduct. It is often not necessary – and usually unproductive – to create more rules, more interpretations, and more disagreements on issues that are not directly impacted by the ultimate decision. However, because the standing of this Plaintiff hinges on whether or not her right to privacy could be violated, this Court must draw an interpretation as to what the constitutional provision means.

This trial court will never say what the law is or what it ought to be – but it will say what it believes the law is as promulgated by the South Carolina Supreme Court and the South Carolina General Assembly. Following along the lines of the several opinions in *Planned Parenthood I*, in conjunction with prior precedent, this Court does not believe that this provision is implicated with the sharing of election data. In his well-reasoned and thoroughly analyzed opinion, Justice James walks through the history and times of the constitutional amendments during the 1960s and 1970s, and particularly, how the right to privacy provision came about. Without quoting verbatim the

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

opinion, this Court notes several passages to explain why it believes the right to privacy does not encompass the voter election data at issue in this case.

First, in a letter from the attorney general to West Committee Staff Consultant Robert H. Stoudemire, the attorney general explains the reason why the right to privacy needed to be added to the constitutional protections:

> In the first paragraph, General McLeod acknowledged that the proposed privacy provision "relate[d] to interception of communication which is generally done by electronic means." Letter from Daniel R. McLeod, S.C. Att'y Gen., to Robert H. Stoudemire, Staff Consultant, Comm. to Make a Study of the S.C. Const. (Oct. 2, 1967), 1967 WL 12658, at *1. He then noted an "additional factor [that] may be taken into consideration" is the "protection of privacy in areas such as information gotten through data processing." *Id.* The letter as a whole speaks solely in terms of "securing individual privacy in the field of data processing" and in terms of protecting against intrusions into privacy occasioned by (1) interception of communication and information by electronic means, (2) mass collection of data, (3) unguarded income tax and health information, and (4) unguarded information stored in computers. *Id.*

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 339–40, 882 S.E.2d 770, 851–52 (2023), *reh'g denied* (Feb. 8, 2023). Second, the final report related to this constitutional provision discusses the purpose of the added language:

> **Section J. Searches and seizures.** The Committee recommends that the historic provision on searches and seizures be retained. In addition, the Committee recommends that the citizen be given constitutional protection from an unreasonable invasion of privacy by the State. <u>This additional statement is designed to protect the citizen from improper use of electronic devices, computer databanks, etc.</u> Since it is almost impossible to describe all of the <u>devices</u> which exist or which may be perfected in the future, the Committee recommends only a broad statement on policy, leaving the details to be regulated by law and court decisions.

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 338, 882 S.E.2d 770, 850–51 (2023), *reh'g denied* (Feb. 8, 2023).

But even as expanded in *Singleton v. State*, 313 S.C. 75, 89, 437 S.E.2d 53, 61 (1993), article I, section 10 still does not reach the sharing of the voter registration list. That case holds no more than that this provision might extend to "bodily autonomy and integrity." *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023). This Court would thus break new ground by applying article I, section 10 to the voter registration list—and with no way

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

to reconcile that conclusion with the "intent of [article I, section 10's] framers and the people who adopted it." *State v. Long*, 406 S.C. 511, 514, 753 S.E.2d 425, 426 (2014).

And of course, article I, section 10 "draws the line at *unreasonable* invasions of privacy." *Planned Parenthood S. Atl.*, 440 S.C. at 482, 892 S.E.2d at 131 (emphasis added). So even if this provision were implicated by the sharing of voter registration lists, this provision would be violated only if the Commission would act unreasonably to provide information to the federal government. This Court does not believe there would be an unreasonable invasion of privacy for the Election Commission to turn over its data to the DOJ.

***Separation of Powers***

Plaintiff seeks an injunction preventing the Election Commission from sharing any such information absent an "adequate" MOU, subject to review by this Court. This Court cannot supersede the Election Commission's discretion to enter such agreements specifically conferred by statute. In a similar vein, in the first instance, the Election Commission alone is charged with ensuring that an MOU "adequately protects" the rights of the South Carolina electorate, including Plaintiff. Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission. Such involvement would offend foundational separation of powers principles (article 1, section 8 of the South Carolina Constitution) and undermine the independence of the executive agency by inserting judicial oversight into the Election Commission's discharge of its statutory duties and responsibilities. *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982) ("One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances. The legislative department makes the laws; the executive department carries the laws into effect; and the judicial department interprets and declares the laws.").

***Federal law***

Federal law likely requires the Election Commission to provide the requested information to DOJ, and while DOJ has also pointed to the National Voter Registration Act and the Help America Vote Act, Title III alone is sufficient to reach that conclusion. Title III requires that, for

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

22 months after a federal election, a state election official "retain and preserve" "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Title III has long been understood to "encompass[], among other things, voting registration records," *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985), which is not surprising given the scope of the statutory text. And since HAVA's enactment two decades ago, registration records must include either "the applicant's driver's license number" or "the last four digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A). The Attorney General (or his representative) may demand in writing "[a]ny record or paper" that a state election official must keep under § 20701. *Id.* § 20703. That demand must simply "contain a statement of the basis and the purpose therefor." *Id.*

DOJ's request for South Carolina's voter registration list fits comfortably within this legal framework. For starters, the voter registration list from the 2024 election is a "record" in a state election official's possession "relating to" the "registration" of voters for the 2024 election. *Id.* § 20701. And that registration now includes either a driver's license number or the last four digits of a Social Security number. *Id.* § 21083(a)(5)(A). DOJ made this request "in writing" and explained its "basis" and "purpose" of ensuring that the State was complying with HAVA and the NVRA. *Id.* § 20703; *see* Compl. Exs. 1 & 2 (DOJ letters).

## **Conclusion**

### ***State Sovereignty***

This Court finds that federal law likely preempts state law in this area simply because of how this Court has to frame the issue. This case is about whether a citizen can likely succeed on the merits of challenging a State action in compliance with its own interpretation of federal law. And the State at this point has interpreted the law as requiring compliance with the federal request. It is not framed as the State *challenging* the federal request to a state agency. This Court has grave concerns about federal overreach and encroachment over this State's sovereignty. However, because this Court rules on the issue at hand, it does not discuss this issue further. As stated by Chief Justice John Roberts of the United States Supreme Court:

> Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments and pursuing legislative objectives. Indeed, the

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

> Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens. Amdt. 10. This "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States." *Bond v. United States,* 564 U.S. ——, ——, 131 S.Ct. 2355, 2364, 180 L.Ed.2d 269 (2011). But the federal balance "is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Ibid.* (internal quotation marks omitted). More specifically, " 'the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.' " *Gregory v. Ashcroft,* 501 U.S. 452, 461–462, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)

*Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S. Ct. 2612, 2623, 186 L. Ed. 2d 651 (2013).

For the reasons stated above, the Motion for Temporary Injunction is **DENIED**. The Governor's Motion to Dismiss is continued.

**AND IT IS SO ORDERED.**

______________________________

The Honorable Daniel McLeod Coble

October 1, 2025

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

Richland Common Pleas

| | |
|---|---|
| **Case Caption:** | Anne Crook vs South Carolina Election Commission , defendant, et al |
| **Case Number:** | 2025CP4006539 |
| **Type:** | Order/Other |

So Ordered

s/ Daniel Coble, 2774

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,<br><br>Defendant. | CASE NO: 1:25-cv-03967<br><br>DECLARATION OF ERIC NEFF IN SUPPORT OF THE DEMAND TO COMPEL PRODUCTION OF RECORDS PURSUANT TO 52 U.S.C. § 20701, *et seq*. |

**DECLARATION**

I, Eric Neff, declare, pursuant to 28 U.S.C. § 1746, that:

1. I am currently Acting Chief to the Assistant Attorney General of the Civil Rights Division and oversee the Voting Section within the Civil Rights Division of the United States Department of Justice. I am fully and personally familiar with the facts stated herein. I make this declaration in support of the United States's motion to compel production of election records pursuant to the Civil Rights Act codified at 52 U.S.C. § 20701, *et seq*.

2. The National Voter Registration Act, ("NVRA") 52 U.S.C. § 20501, *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq.*, require each state to perform voter-list maintenance to ensure that only eligible voters remain on the statewide voter registration list. Under Section 11 of the NVRA and Section 401 of HAVA, the Attorney General is charged with the responsibility for enforcement of the list maintenance requirements of both statutes. *See* 52 U.S.C. § 20510(a) and 52 U.S.C. § 21111. This enforcement responsibility has been delegated to the Civil Rights Division by Congress.

3. One of the Justice Department's responsibilities is monitoring states' compliance with the requirements of the NVRA and HAVA, including the filing of enforcement actions for noncompliance.

4. The Attorney General recently received a complaint alleging noncompliance of Secretary Griswold's office with the duties outlined in 52 U.S.C. § 20507.

5. On May 12, 2025, the Attorney General sent a letter to Secretary Griswold seeking information regarding Colorado's compliance with federal election law. See Letter from Attorney General to Secretary Griswold ("May 12 Letter"). Secretary Griswold did not respond to the May 12 Letter.

6. On December 1, 2025, I followed up by email to Secretary Griswold requesting Colorado's Statewide Voter Registration list ("SVRL") (the December 1 Email). The December 1 Email also stated that:

> The United States is prepared at this early stage to enter into an MOU with the State of Colorado regarding the sharing of the nonpublic, unredacted voter registration list. I have attached that MOU, which we believe cures all potential concerns a state might rightfully raise regarding its citizens' private data and identifying information.

7. On December 3, 2025, Secretary Griswold responded by email stating "We received your request. We will not be producing unredacted voter files or signing the MOU." December 3 Email.

8. The May 12 Letter also informed Secretary Griswold that the purpose of the demand for these records was to assist in the Attorney General's efforts in evaluating the complaint.

9. The request specified a deadline for responses of 14 days of the May 12 Letter.

10. On December 3, 2025, Secretary Griswold refused to provide the Attorney General with an electronic copy of Colorado's statewide VRL.

11. True and correct copies of the Justice Department letter dated May 12, 2025, the December 1 Email, and the reply email by Secretary Griswold dated December 3, 2025, are attached to the Memo in support of this Motion. Exhibits 1-3.

12. A true and correct copy of the Order denying a temporary injunction in *Crook v. S.C. Election Comm'n*, No. 2025-CP-40-06539 (Richland Cty. Comm. Pleas Oct. 1, 2025) as cited in the Memorandum of Support is attached hereto as Exhibit 4.

I declare under the penalty of perjury that the above statements are true and correct. Executed on December 11, 2025.

Dated: December 11, 2025, at Washington, DC.

/s/____*Eric Neff*_________

Eric Neff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03967-PAB-TPO

THE UNITED STATES OF AMERICA,
Plaintiff,

v.

JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,
Defendant.

---

**THE COLORADO SECRETARY OF STATE'S RESPONSE TO MOTION TO COMPEL**

---

Facts still matter. According to the United States Department of Justice ("DOJ"), this action is necessary because last May DOJ requested certain information from Colorado and "Secretary Griswold did not respond." Decl. of Eric Neff (Docket No. 5-2) ¶ 5. As a result, DOJ now asks this Court to order the Secretary to turn over Colorado's voter roll, including each voter's "name, date of birth, address," and either their driver's license number, last four digits of their social security number, or unique Help America Vote Act ("HAVA") identifier. Mot. for Order to Compel Records ("Mot. to Compel") (Docket No. 2) at 2-3.

But DOJ's declarant, who is also an attorney entered in this matter,[1] is wrong. Secretary Griswold not only responded to the May 2025 letter but also produced voluminous records including a copy of Colorado's voter registration list that included each voter's name, birth year, address, and unique HAVA identifier. *See* Ex. B to Ex. A ("Borochoff-Porte Decl."). That same day, DOJ acknowledged receipt of the Secretary's response. Ex. C to Borochoff-Porte Decl. Two

[1] In filing this Response the Secretary reserves all rights relating to Mr. Neff's role in this matter including the right to seek his disqualification as counsel based on his role as a fact witness.

weeks later DOJ downloaded the files shared by the Secretary. Ex. E to Borochoff-Porte Decl. This action is built on a faulty premise. DOJ has received the materials it asked for.

But even if that were not the case, DOJ's motion is procedurally premature and legally insufficient. First, relying on a single, outdated, out-of-circuit opinion, DOJ mistakenly asserts that it is entitled to a summary proceeding not governed by the Federal Rules of Civil Procedure. Second, DOJ's request fails under the plain text of the Civil Rights Act of 1960 ("CRA") and violates both state and federal privacy laws. Third, even if DOJ were entitled to additional records under the CRA—which it is not—the Secretary need not provide those records electronically under the act's plain language.

The audacity of DOJ's unconstitutional effort to insert the executive branch into State voter registration list maintenance is alarming; especially considering recent comments that the President is seeking to "nationalize" or "take over the voting" in State or local jurisdictions.[2] Regardless, for all the reasons above, DOJ's request to compel production of the sensitive personal information of Colorado voters merits dismissal on both procedural and legal grounds.

## BACKGROUND

### I. Colorado maintains a statewide voter registration list.

In Colorado, the electronic, statewide voter registration database required by HAVA, 52 U.S.C. § 21083(a)(1)(A), is known as "SCORE." Ex. B ("Rudy Decl.") ¶ 2. SCORE is a real-time database that is updated in real-time. *Id.* ¶ 3. Each time State election officials receive relevant information from or about a voter, SCORE is updated. *Id.* Among other things, these

---

[2] Reid J. Epstein and Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, The New York Times, (Feb. 2, 2026), https://tinyurl.com/mpsze8zj.

updates happen based on correspondence with voters, information supplied from the federal government, and National Change of Address checks. *Id.* ¶¶ 4-8. And because Colorado is an automatic voter registration state, much of the information in SCORE comes directly from the State division of motor vehicles. *See* Rudy Decl. ¶ 13; *see also* § 1-2-213.3, C.R.S.

SCORE includes fields for a voter's name, address, date of birth, driver's license number, and the last four digits of the voter's social security number. *Id.* ¶ 9. However, the Secretary makes a public version of the database generally available. *Id.* ¶ 11. That public version includes the unique HAVA identifier for each voter, as well as the voter's name, address, and birth year, but does not include license numbers, social security numbers, or birth dates. *Id.* The public version also does not include a small number of voters who have been granted confidential status because they are first responders or who have reason to fear criminal harassment or bodily harm from the release of their name and address. *Id.* ¶ 12; *see also* § 24-72-204(3.5), C.R.S.

## II. The Secretary voluntarily responded DOJ's request for records.

On May 12, 2025, the Secretary received a letter from Harmeet Dhillon, the senior official at DOJ in charge of enforcing the CRA. Ex. A to Borochoff-Porte Decl. According to DOJ, the letter arose out of "a complaint alleging noncompliance by [the Department of State] with the [NVRA]." *Id.* "To assist [its] efforts in evaluating the complaint," DOJ requested: (1) "All records, as outlined in 52 U.S.C. § 20701," and (2) "All statutes, regulations, written guidance, internal policies, or database user manuals that set out the procedures Colorado has put in place relating to implement the requirements of 52 U.S.C. § 20701." *Id.*[3]

[3] The letter inaccurately referred to "the Commonwealth of Colorado" and referenced records relating to the "2000" election, instead of the 2020 election. Ex. A to Borochoff-Porte Decl.

The Secretary responded on May 27, 2025. Ex. B to Borochoff-Porte Decl. As part of the response, the Secretary voluntarily produced over one hundred reports generated from the SCORE database, including a copy of the public statewide voter registration list, and copies of statutes and rules responsive to DOJ's request. Rudy Decl. ¶ 14. The registration list included each voter's name, address, and birth year, as well as the unique identifier assigned to each voter under HAVA. *Id.* DOJ acknowledged receipt of that data the same day, Ex. C to Borochoff-Porte Decl., and downloaded that data on June 12, 2025, Ex. E to Borochoff-Porte Decl.

After months of noncommunication, and after public reports that DOJ was seeking to build a nationwide voter registration database,[4] on December 1, 2025, Eric Neff, the Acting Chief of the Voting Rights Section at DOJ, sent "follow up" correspondence to the May communications requesting a copy of Colorado's "nonpublic, unredacted voter registration list." Ex. F to Borochoff-Porte Decl. Neff also asked the Secretary to sign a Memorandum of Understanding. *Id.* That MOU would have allowed DOJ to dictate the state's voter list maintenance activities. Ex. G to Borochoff-Porte Decl at 5-7. The Secretary did not sign the MOU. Compl. (Docket No. 1) ¶ 25.

Less than two weeks later, DOJ initiated this action. *Id.* In its Complaint, DOJ invokes the CRA, inaccurately alleging that its May 2025 letter requested records and included a "statement of the basis and the purpose therefor." *Id.* ¶¶ 26-27 (quoting 52 U.S.C. § 20703). The Complaint also inaccurately alleges that the Secretary did not respond to the May 2025 letter from DOJ. Compl. ¶ 23. *But see* Ex. B to Borochoff-Porte Decl. As a remedy, DOJ asks for an

[4] *See* Devlin Barrett and Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, The New York Times, (Sep. 9, 2025), https://tinyurl.com/c9tujz9f.

order compelling production of "the current electronic copy of Colorado's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier[.]" *Id.* at 6-7. Alongside its Complaint, DOJ filed a Motion to Compel, requesting an order compelling the production of the same information. Mot. to Compel at 2-3.

Although DOJ claims its request for Colorado's nonpublic voter registration list stems from a complaint, DOJ has made similar requests of nearly every State.[5] And on January 24, 2026, Attorney General Pamela Bondi attempted to coerce the state of Minnesota to provide DOJ unredacted voter rolls or face a continued surge of immigration enforcement in the state.[6]

Finally, last month, Deputy Assistant Attorney General Ronald J. Lampard referenced DOJ's May 2025 request to Colorado in a letter to California Senator Alex Padilla, stating that "[u]nder the NVRA, states are *required* to disclose their voter rolls" under certain circumstances, and that "[a]ccordingly" DOJ requested that information from Colorado. Ex. H to Borochoff-Porte Decl. at 2. According to Lampard, Colorado disclosed its list in response to that request, and DOJ is analyzing it "for duplicates, and for individuals who are deceased, have moved to another state, registered elsewhere, or are otherwise ineligible to vote." *Id.*

---

[5] *See* Kaylie Martinez-Ochoa et al., *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (updated Feb. 6, 2026), https://tinyurl.com/dye26wk9.

[6] *See* Letter from Pamela Bondi to Tim Walz (Jan. 24, 2026), https://tinyurl.com/52hsebkv.

## ARGUMENT

### I. DOJ's dispositive motion is premature.

The Motion to Compel is a dispositive motion that would grant DOJ all the relief it seeks. Given that the Secretary has not even answered the Complaint, such a motion is premature.

Under the Federal Rules, there "is one form of action—the civil action." Fed. R. Civ. P. 2. And the Federal Rules of Civil Procedure "govern the procedure in all civil actions and proceedings in the United States district courts," with a single exception not relevant here. Fed. R. Civ. P. 1. Nonetheless, DOJ claims that the CRA "displaces the Federal Rules of Civil Procedure by creating a special statutory proceeding." Mem. in support of Mot. to Compel (Docket No. 5) at 8. DOJ is mistaken for several reasons.

First, the "Federal Rules are the default rules in civil litigation." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023). Although Congress may exempt a statutory proceeding, courts "do not lightly infer that Congress has done so; and silence on the subject is seldom enough." *Id. See also United States v. Oregon*, -- F. Supp. 3d --, 2026 WL 318402, at *8 (D. Or. Feb. 5, 2026) (holding that text of CRA does not displace civil rules).

Where a statute grants courts jurisdiction "by appropriate process," the Federal Rules apply. *United States v. Powell*, 379 U.S. 48, 52 & n.10 (1964). In *Powell*, the Court considered a statute authorizing the government to bring an action "by appropriate process" to compel records. *Id.* (citing 26 U.S.C. § 7604(a)). Because that statute "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction," the Supreme Court held that "the Federal Rules of Civil Procedure apply." *Id.* at 58 n.18.

So too here. The CRA contains almost identical language, granting district courts "jurisdiction by appropriate process to compel the production" of records. 52 U.S.C. § 20705.

Like the statute in *Powell*, Section 20705 does not specify what procedures should be followed. In such cases, *Powell* dictates that the Rules of Civil Procedure apply. *See also Becker v. United States*, 451 U.S. 1306, 1307-08 (1981); *cf.* Fed. R. Civ. P. 81(a)(5) (stating that the Federal Rules of Civil Procedure "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute[.]").

DOJ's motion for extraordinary and preliminary relief does not address *Powell* or its progeny. Instead, its sole authority for displacing the Federal Rules is an out-of-circuit case decided over eighty years ago. Mem. in support of Mot. to Compel at 2 (citing *Kennedy v. Lynd*, 306 F.3d 222, 225 (5th Cir. 1962)). But *Kennedy* is not binding on this Court, *United States v. Carson*, 793 F.2d 1141, 1147 (10th Cir. 1986), and its holding is inconsistent with the later holdings in *Powell* and *Polansky*.

Under the Federal Rules, DOJ's Motion is improper. The parties have not conferred under Rule 26 and there has been no scheduling order issued under Rule 16. A dispositive motion at this stage, when the Secretary has not responded to the Complaint, let alone sought discovery, would violate due process. *See generally Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000) ("The Federal Rules of Civil Procedure are designed to further the due process of law that the Constitution guarantees."). The Motion to Compel should be denied.

## II. DOJ is not entitled to a production of records beyond what the Secretary has already voluntarily produced.

Even if DOJ's Motion were procedurally proper, it should still be denied on its merits. First, the Secretary has already produced what DOJ asks this Court to compel. Second, Colorado's Voter Registration List is not a record subject to review under the CRA. Third, DOJ

has not satisfied the elements of a claim under the CRA. And finally, compelling production of an unredacted voter registration list would violate state and federal privacy laws.

**A. The Secretary has already sufficiently responded to DOJ's request.**

Under the CRA, the Attorney General may request to review "[a]ny record or paper required by [52 U.S.C. § 20701] to be retained or preserved." 52 U.S.C. § 20703. If a custodian refuses, DOJ can initiate a civil action to compel production. 52 U.S.C. § 20705.

In this Motion, DOJ asks for an Order compelling the Secretary to produce "an electronic copy of the Colorado statewide Voter Registration List." Mot. to Compel at 2. Specifically, DOJ asks for that list to include for each registrant: (1) name; (2) date of birth; (3) address; and (4) "the last four digits of the registrant's social security number, driver's license/state identification number *or* the unique HAVA identifier." Mot. to Compel at 2-3 (emphasis added).

The Secretary has already voluntarily produced to DOJ a copy of the statewide voter roll, and that list included each registrant's[7] name, address, and HAVA unique identifier. Rudy Decl. ¶ 14. It did not include each registrant's full date of birth. But it did include each registrant's birth year, and nothing in DOJ's Motion explains why birth date, instead of year, is relevant.

The Department of Justice's declarants and attorneys act unaware that the Secretary has already produced this information. *See* Compl. ¶ 23; Neff Decl. (Docket No. 5-2) ¶ 5 (swearing that "Secretary Griswold did not respond to the May 12 Letter."). But DOJ confirmed receipt of the Secretary's response and downloaded the responsive records. *See, e.g.*, Exs. C and E to Borochoff-Porte Decl. Moreover, DOJ's assertions in this lawsuit are flatly contradicted by its

[7] The list also omitted a small number of confidential voters. But DOJ again does not explain why this difference is material to its supposed purposes.

own representations to Congress. Last month, DOJ told Senators that it had received Colorado's voter registration list last May, and implied that what it received is sufficient to enable whatever (unlawful) list maintenance review it seeks conduct. Ex. H to Borochoff-Porte Decl. at 2.

Because the Secretary has substantially complied with DOJ's request, the Motion to Compel should be denied.

### B. The Voter Registration List is not a "record" subject to retention, preservation, and review under the Civil Rights Act.

The CRA was designed, in relevant part, to address the "persistent voter suppression" faced by Black Americans during Jim Crow. *United States v. Weber*, -- F. Supp. 3d --, 2026 WL 118807, at *1 (C.D. Cal. Jan. 15, 2026). In 1959, the Commission on Civil Rights concluded that many Black Americans "find it difficult, and often impossible, to vote."[8] Often, this difficulty arose from arbitrary rejection of registration applications. *See, e.g.*, *id.* at 61. The Commission also concluded that many jurisdictions failed to maintain records, and that "lack of uniform provision for the preservation and public inspection of all records pertaining to registration and voting hampers and impedes investigation of alleged denials of the right to vote." *Id.* at 137.

The result of the Commission's findings and recommendations was the CRA. *See* 52 U.S.C. §§ 20701-20705. Under the CRA, an election official "shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary [federal] election, . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C.

[8] Report of the United States Commission on Civil Rights at 134 (Sept. 9, 1959), https://tinyurl.com/553yzrhd.

§ 20701. Once retained, DOJ may request that these records and papers "be made available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

Both the text and the historical background underscore that the CRA only requires retention of records generated by or about individual voters. The SCORE database, which is an accumulation of data and information relating to all registered voters, does not qualify.

Beginning with the text, the CRA only applies to a specific voter's "application," "registration," and "payment of poll tax," and only then when those documents "come into [the] possession" of election officials. 52 U.S.C. § 20701. Following these specific examples, the catchall phrase "other act requisite to voting" must also apply only to records about an individual voter that are provided to election officials. *See, e.g.*, *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 217 (2024) ("[A] catchall phrase . . . must be . . . read to embrace only objects similar in nature to the specific examples preceding it.") (quotations omitted). It does not apply to databases, like SCORE, that are created by election officials *based* on records concerning individual voters. *See United States v. Benson*, -- F. Supp. 3d --, 2026 WL 362789, at *9 (W.D. Mich. Feb. 10, 2026) (citing 52 U.S.C. § 20701). The CRA requires officials "to preserve records that voters submit to them—not records that states create." *Id.*

This text reflects the purpose of the CRA, which was to remedy disenfranchisement. The records retention provision ensured the federal government could effectively police local governments who were systemically denying Black Americans the right to vote. Section 20701 requires retention of records that reflect whether officials are engaging in that type of discrimination. And as the Secretary explained in her response to DOJ's initial request, Colorado

law designates county election officials as the custodians of those records. *See* Ex. B to Borochoff-Porte Decl. at 1 (citing § 1-7-802, C.R.S.).

Finally, the purpose of SCORE, compared to the specific examples of records in the CRA also confirms that it is not a record subject to retention. The CRA covers records that are static and requires those static records to be retained for 22 months. 52 U.S.C. § 20701.

SCORE, on the other hand, is a dynamic, real-time database. Each time a voter registers, moves, or dies, the list must be updated; HAVA requires as much. *See, e.g.*, 52 U.S.C. § 21083(a)(2)(A). If SCORE is a "record" under the CRA, then it must be preserved—and cannot be altered—for 22 months. 52 U.S.C. § 20701. But both federal law and election administration require otherwise. Because SCORE cannot, under federal law, be maintained in a static form for 22 months, the database is not a record subject to preservation and inspection. *Padilla-Caldera v. Gonzales*, 453 F.3d 1237, 1241 (10th Cir. 2005), *rev'd on other grounds*, 637 F.3d 1140 (10th Cir. 2011) ("[C]onflicting statutes should be interpreted so as to give effect to each but to allow a later enacted, more specific statute to amend an earlier, more general statute.") (quotations omitted); *United States v. Bigford*, 365 F.3d 859, 871 (10th Cir. 2004) ("[W]e construe a statutory term so that it fits most logically and comfortably into the body of both previously and subsequently enacted law.") (quotations omitted).

**C. DOJ has not articulated a sufficient basis and purpose for its request.**

As the Secretary explains at length in her Motion to Dismiss, filed contemporaneously with this Response, DOJ has not satisfied the elements of a claim under the CRA because it has not articulated a legal basis and purpose for the records it seeks. The Secretary incorporates those arguments here. Specifically, as both courts to have already addressed DOJ's claims have held, a

valid "purpose" under the CRA "must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *10; *Weber*, 2026 WL 118807, at *9. Here, DOJ's stated purpose of needing these records to evaluate Colorado's compliance with the NVRA, is not a valid justification for invoking the CRA.

**D. Producing the nonpublic database would violate federal and state privacy laws.**

DOJ's sweeping and unprecedented demand also intrudes on the privacy of Colorado voters. Sensitive personal information like social security numbers and driver's license numbers are protected under both state and federal law, both of which prohibit disclosure of this information under the circumstances presented here.

**1. The Department of Justice's demand violates the Privacy Act.**

First, DOJ has not proven it has complied with the Privacy Act of 1974. *Ritter v. United States*, 177 Fed. Cl. 84, 87 (2025) ("The Privacy Act exists to protect individuals from disclosure of government-collected information."). The Act contains several safeguards to prevent unjustified disclosure of private information. For example, the Act prohibits federal agencies from maintaining any record "describing how any individual exercises rights guaranteed by the First Amendment," subject to narrow exceptions. 5 U.S.C. § 552a(e)(7). The Act also requires federal agencies to first publish a System of Records Notice ("SORN") in the Federal Register before they seek to "establish[ ] or revis[e]" a "system of records." *Id.* § 552a(e)(4).

A "system of records" is a "group of any records under the control of any agency from which information is retrieved by the name of the individual" or other individual personal identifier. *Id.* § 552a(a)(5). Voter information from SCORE qualifies. But DOJ offers no indication it has published a SORN, which independently warrants denial of its Motion.

**2. The Department of Justice's demand violates the E-Government Act.**

DOJ's demand for the unredacted voter list also violates the E-Government Act of 2002. Pub. L. No. 107-347, § 208(b)(1) (2002) ("E-Government Act"). As relevant here, the E-Government Act requires agencies to prepare a "privacy impact assessment" prior to "initiating a new collection of information" that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual" if the information encompasses "10 or more persons." *Id.* § 208(b); *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 665 n.11 (S.D.N.Y. 2025). The Act's procedural requirements must be satisfied "*before* the agency initiates a new collection of information." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017) (emphasis in original). The voter registration "information" contained in Colorado SCORE is subject to the Act. Pub. L. No. 107-347, § 208(b)(1)(A)(ii)(II). Yet DOJ fails to even cite the E-Government Act, let alone address the applicable requirements.

**3. The Department of Justice's demand violates the Driver's Privacy Protection Act.**

Finally, DOJ has failed to demonstrate its compliance with the Driver's Privacy Protection Act ("DPPA"). 18 U.S.C. § 2721, *et seq*. The DPPA prohibits the disclosure of "personal information" obtained in connection with a "motor vehicle record." 18 U.S.C. § 2721(a)(1). *See Reno v. Condon*, 528 U.S. 141, 143 (2000). The DPPA defines "personal information" to include, among other things, an individual's "social security number" and "driver identification number." 18 U.S.C. § 2725(3). DOJ's request for the "state driver's license number" unquestionably falls within this definition. Once again, DOJ fails to address its compliance with the DPPA.

**4. The Department of Justice's demand violates Colorado law.**

Colorado law bars the Secretary from disclosing social security numbers, driver's license or state-issued identification numbers, and month and date of birth. §§ 1-2-302(8); 24-72-204(8), C.R.S. These prohibitions accord with other State laws protecting personal identifying information ("PII"), *see generally* §§ 24-72-501, *et seq*., 24-73-101, *et seq*., 24-74-101, *et seq*., including a law prohibiting disclosure of PII for the purpose of "investigating for, participating in, cooperating with, or assisting in federal immigration enforcement," § 24-74-103(1), C.R.S.

Neither the CRA nor the NVRA preempt these laws. First, courts have consistently held that the more specific statute—the NVRA—does not require disclosure of unredacted voter lists. *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (affirming order to redact social security numbers before disclosure under NVRA); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 45-49, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information").

Second, preemption is appropriate only where a state law "interferes with or is contrary to federal law." *Free v. Bland*, 369 U.S. 663, 666 (1962). Colorado's privacy protections coexist alongside the NVRA and the CRA because the former does not obstruct either of the latter. Nothing in the NVRA prevents redaction of sensitive voter information, nor does anything in the CRA require disclosure of aggregated personal information. Therefore, Colorado privacy law protects the personal information DOJ requests. *See also Oregon*, 2026 WL 318402, at *12 (concluding that the CRA does not preempt state prohibitions on producing sensitive voter data); *Weber*, 2026 WL 118807, at *13-14 (same).

**III. Even if DOJ is entitled to view the records, it is not entitled to electronic production.**

Finally, the Motion asks for an Order requiring the Secretary to "submit the demanded records electronically to the Attorney General[.]" Mot. to Compel at 3. DOJ's motion should be denied because it seeks relief beyond the scope of relief afforded by the statute.

Section 20703 is explicit about what it requires. Upon request from the Attorney General, election officials must make records "available for inspection, reproduction, and copying *at the principal office*" of the custodian. 52 U.S.C. § 20703 (emphasis added). Requiring electronic production would go beyond the text.

In a similar context, the Tenth Circuit has held that local jurisdictions are not required to produce records electronically. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1086 (10th Cir. 2025); *see also Greater Birmingham Ministries v. Sec'y of State for Ala.*, 105 F.4th 1324, 1334 (11th Cir. 2024). *Torrez* applies here and confirms that although the Secretary may produce requested records electronically, the statute does not require her to do so.

**CONCLUSION**

The Secretary respectfully requests that the Court deny the Motion to Compel.

Dated: February 10, 2026

PHILIP J. WEISER
Attorney General

/s Peter G. Baumann

***Peter G. Baumann***, Senior Assistant Attorney General
***Lane Towery***, Assistant Attorney General
1300 Broadway, Denver, CO 80203
Telephone: (720) 508-6000
Email: peter.baumann@coag.gov; lane.towery@coag.gov
Attorneys for Secretary Jena Griswold

# **Exhibit A**

to Opp. to Mot. to Compel

*Declaration of Nathan Borochoff-Porte*

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

February 10, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03967-PAB-TPO

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,

Defendant.

---

**DECLARATION OF NATHAN BOROCHOFF-PORTE**

---

I, Nathan Borochoff-Porte, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746.

1. I am over 21 years of age and employed as a Legal Assistant at the Colorado Department of State. Among my responsibilities is the maintenance, organization, and supervision of files related to legal requests, including those made by the United States Department of Justice. I am duly authorized to certify records produced from the Department's files in this matter.

2. I am familiar with the records discussed below and am the custodian, or other qualified witness, of the Department of State's records referenced below. Those records are regularly maintained in the ordinary course of business, and it is regular practice of the Department to generate, store, and maintain such records.

3. Attached as **Exhibit A** is a true and correct copy of the letter the Department of State received from Harmeet Dhillon, Assistant Attorney General Harmeet K. Dhillon on May 12, 2025.

4. Attached as **Exhibit B** is a true and correct copy of the response letter from Deputy Secretary of State Andrew Kline to Assistant Attorney General Dhillon dated May 27, 2025.

5. Attached as **Exhibit C** is a true and correct copy of the email I received from Maureen Riordan, Senior Counsel and Acting Chief, Voting Section, Civil Rights Division, in response to my sending Deputy Secretary Kline's response letter on May 27, 2025.

6. As part of my responsibilities, I also share files using the Department's secure sharing system, Virtu.

7. On May 27, 2025, I shared 103 separate zip files with Maureen Riordan. Attached as **Exhibit D** is a true and accurate copy of the email I received from Virtu indicating I shared those files, which consisted of Colorado's statewide voter registration list. In total, this constituted 11.2 GBs of data.

8. On June 12, 2025, I received an email from Chris Hayes, an IT Specialist at the U.S. Department of Justice, Civil Rights Division. In the email, Hayes indicated that he was "in and downloading" the files from Virtu. A true and accurate copy of that email is attached as **Exhibit E**.

9. Attached as **Exhibit F** is a true and correct copy of the email sent from Eric Neff to Andrew Kline on December 1, 2025.

10. Attached as **Exhibit G** is a true and correct copy of the draft Memorandum of Understanding attached to the email sent by Eric Neff to Andrew Kline on December 1, 2025.

11. Attached as **Exhibit H** is a true and correct copy of the letter sent by Ronald J. Lampard to Senator Alex Padilla on January 26, 2026.

12. I attest that Exhibits A, B, C, D, E, F, G, and H, were saved to the Department's files at or near the time they were received or sent, were made, sent, and/or received by a person with knowledge of the event, are kept in the course of regularly conducted Department business, and are made as a part of the Department's regular practice.

13. To the best of my knowledge and belief, Exhibits A, B, C, D, E, F, G, and H, are true, accurate, and complete copies of the originals maintained by the Department.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 10th day of February, 2026, at Denver, Colorado.

_*/s/ N. B. Porte*_________
Nathan Borochoff-Porte
Legal Assistant
Colorado Department of State

# Exhibit B

## to Borochoff-Porte Declaration

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

February 10, 2026

**STATE OF COLORADO**
**Department of State**
1700 Broadway, Suite 550
Denver, CO 80290

**Jena M. Griswold**
**Secretary of State**

Andrew Kline
Deputy Secretary of State
Andrew.Kline@ColoradoSoS.gov
303-860-6946

May 27, 2025

Harmeet K. Dhillon
Assistant Attorney General, Civil Rights Division
Office of the Assistant Attorney General
950 Pennsylvania Ave, NW-RFK
Washington, DC 20530
Via email

RE: U.S. Department of Justice, Civil Rights Division's Request for Records

Dear Assistant Attorney General Dhillon:

The Colorado Department of State (the "Department") is in receipt of your letter dated May 12, 2025, requesting documents and information pursuant to 52 U.S.C. §§ 20701; 20703. As you are aware, 52 U.S.C. § 20701 ("§ 20701") permits states to "designate[] a custodian to retain and preserve these records." Colorado has expressly designated its local county clerks as the custodian of the majority of § 20701 records through C.R.S. § 1-7-802.

The Department does possess certain records responsive to your document request, predominantly in the form of information that is maintained in Colorado's statewide voter registration database, known as SCORE. The Department's production thus includes comprehensive reports generated from SCORE. Since your request was not timebound, the Department has provided SCORE records from the previous two years. SCORE is a dynamic, living database.

With respect to your second request concerning the state of Colorado's procedures regarding compliance with § 20701, the Department's production includes an addendum identifying certain potentially responsive statutes and regulations.

The Department has made best efforts to respond to your request. Nonetheless, the production of documents and information by the Department in response to your instant request should not be construed as an admission or waiver of any kind.

If you have any questions, please contact us at Andrew.Kline@coloradosos.gov.

Sincerely,

/s/ *Andrew Kline*

**ANDREW KLINE**
Deputy Secretary of State

# Exhibit C

## to Borochoff-Porte Declaration

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

February 10, 2026

**From:** Riordan, Maureen (CRT)
**To:** Nathan Borochoff-Porte
**Subject:** Re: [EXTERNAL] CDOS record access
**Date:** Tuesday, May 27, 2025 10:47:07 AM
**Attachments:** image001.png
image002.png
image003.png

---

Received. Thank you
Maureen Riordan
Senior Counsel
Acting Chief, Voting Section, Civil Rights Division
Maureen.riordan2@usdoj.gov
202-702-6110

On May 27, 2025, at 12:44 PM, Nathan Borochoff-Porte <Nathan.Borochoff-Porte@coloradosos.gov> wrote:

Good morning,

As referenced in the Deputy Secretary of State's email Friday, May 23rd 2025, the responsive records have been sent through our secure file sharing system, Virtru. Follow the steps below to retrieve these records. Please reach out if you encounter any issues with access.

1. Click View Files in the email you received
2. A new tab will open. On the sign in page, choose you sign in method. You may do so via your provider or a one-time verification link.

<image001.png>

If you selected the one-time verification link, you will receive an email from verify+XXXXXXXX@virtru.com (with each X being a random digit). Select Verify me to complete the process.

<image002.png>

Sincerely,
*Mr. Nathan B. Porte*
Legal and Policy Analyst | Department of State
1700 Broadway, Suite 550
Denver, CO 80290
Visit us at ColoradoSOS.gov
<image003.png>

# **Exhibit D**

to Borochoff-Porte Declaration

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

February 10, 2026

**From:** nathan.borochoff-porte
**To:** Nathan Borochoff-Porte
**Subject:** [EXTERNAL] Secure content shared with maureen.riordan2@usdoj.gov
**Date:** Tuesday, May 27, 2025 10:43:47 AM

logo

Great job! You have securely shared file(s) with maureen.riordan2@usdoj.gov by using the following link: https://coloradososgov.secure.virtru.com/secure-share/outbound?recipients=nathan.borochoff-porte%40coloradosos.gov

**Manage Files**

EX-003_20250325.zip
Registered_Voters_List_ Part1.zip
Registered_Voters_List_ Part2.zip
Registered_Voters_List_ Part3.zip
Registered_Voters_List_ Part4.zip
Registered_Voters_List_ Part5.zip
Registered_Voters_List_ Part6.zip
Registered_Voters_List_ Part7.zip
Registered_Voters_List_ Part8.zip
Registered_Voters_List_ Part9.zip
2024_General_EX-002_Public_Congressional_District_1_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_1_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_1_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_1_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part1.zip

2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part2.zip

2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part3.zip

2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part4.zip

2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part5.zip

2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part6.zip

2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part7.zip

2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part1.zip

2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part2.zip

2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part3.zip

2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part4.zip

2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part5.zip

2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part1.zip

2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part2.zip

2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part3.zip

2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part4.zip

2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part5.zip

2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part6.zip

2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part7.zip

2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part8.zip

2024_General_EX-002_Public_Congressional_District_3_Voter_Details_List_Part1.zip

2024_General_EX-002_Public_Congressional_District_3_Voter_Details_List_Part2.zip

2024_General_EX-002_Public_Congressional_District_3_Voter_Details_List_Part3.zip

2024_General_EX-

002_Public_Congressional_District_3_Voter_Details_List_Part4.zip

2024_General_EX-
002_Public_Congressional_District_3_Voter_Details_List_Part5.zip

2024_General_EX-
002_Public_Congressional_District_3_Voting_History_List_Part1.zip

2024_General_EX-
002_Public_Congressional_District_3_Voting_History_List_Part2.zip

2024_General_EX-
002_Public_Congressional_District_3_Voting_History_List_Part3.zip

2024_General_EX-
002_Public_Congressional_District_3_Voting_History_List_Part4.zip

2024_General_EX-
002_Public_Congressional_District_3_Voting_History_List_Part5.zip

2024_General_EX-
002_Public_Congressional_District_3_Voting_History_List_Part6.zip

2024_General_EX-
002_Public_Congressional_District_3_Voting_History_List_Part7.zip

2024_General_EX-
002_Public_Congressional_District_3_Voting_History_List_Part8.zip

2024_General_EX-
002_Public_Congressional_District_4_Voter_Details_List_Part1.zip

2024_General_EX-
002_Public_Congressional_District_4_Voter_Details_List_Part2.zip

2024_General_EX-
002_Public_Congressional_District_4_Voter_Details_List_Part3.zip

2024_General_EX-
002_Public_Congressional_District_4_Voter_Details_List_Part4.zip

2024_General_EX-
002_Public_Congressional_District_4_Voter_Details_List_Part5.zip

2024_General_EX-
002_Public_Congressional_District_4_Voting_History_List_Part1.zip

2024_General_EX-
002_Public_Congressional_District_4_Voting_History_List_Part2.zip

2024_General_EX-
002_Public_Congressional_District_4_Voting_History_List_Part3.zip

2024_General_EX-
002_Public_Congressional_District_4_Voting_History_List_Part4.zip

2024_General_EX-
002_Public_Congressional_District_4_Voting_History_List_Part5.zip

2024_General_EX-
002_Public_Congressional_District_4_Voting_History_List_Part6.zip

2024_General_EX-
002_Public_Congressional_District_4_Voting_History_List_Part7.zip

2024_General_EX-
002_Public_Congressional_District_4_Voting_History_List_Part8.zip

2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_6_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_6_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_6_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_6_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part2.zip

2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part7.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part8.zip
2024_General_EX-002_Public_Congressional_District_8_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_8_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_8_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_8_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part5.zip

Do you have other documents or messages you need to share securely? You can protect your emails, files, and other data with Virtru's secure encryption for Gmail, Outlook, and other data-sharing platforms.

Learn How

secured by

© Copyright 2025 Virtru Corporation | Terms of Service | Privacy Policy | About Virtru | Support

# **Exhibit E**
to Borochoff-Porte Declaration

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

February 10, 2026

**From:** Hayes, Chris (CRT)
**To:** Nathan Borochoff-Porte
**Cc:** Riordan, Maureen (CRT)
**Subject:** RE: [EXTERNAL] nathan.borochoff-porte@coloradosos.gov has shared secure files with you
**Date:** Thursday, June 12, 2025 11:32:16 AM
**Attachments:** image002.png
image003.png
image004.png

---

Mr. Nathan B. Porte,
I'm in and downloading.

Thanks for your assistance!

-Chris

*Chris Hayes – PMP; FAC-COR II*
*IT Specialist*
*U.S. Department of Justice, Civil Rights Division*
*Administrative Management Section*
*950 Pennsylvania Ave, N.W., 4CON 11.1114b*
*Washington, DC 20530*
*Tel: 202 532-3879*

---

**From:** Nathan Borochoff-Porte <Nathan.Borochoff-Porte@ColoradoSOS.gov>
**Sent:** Thursday, June 12, 2025 12:42 PM
**To:** Hayes, Chris (CRT) <Chris.Hayes2@usdoj.gov>
**Cc:** Riordan, Maureen (CRT) <Maureen.Riordan2@usdoj.gov>
**Subject:** RE: [EXTERNAL] nathan.borochoff-porte@coloradosos.gov has shared secure files with you

Good morning, Chris,

You should now have access to these files. Follow the steps below to retrieve these records. Please reach out if you encounter any issues with access.

1. Click View Files in the email you received

2. A new tab will open. On the sign in page, choose you sign in method. You may do so via your provider or a one-time verification link




If you selected the one-time verification link, you will receive an email from verify+XXXXXXXX@virtru.com (with each X being a random digit). Select Verify me to complete the process.




Sincerely,
*Mr. Nathan B. Porte*
Legal and Policy Analyst | Department of State
1700 Broadway, Suite 550
Denver, CO 80290
Visit us at ColoradoSOS.gov
Colorado
**Secretary of State**

---

**From:** Hayes, Chris (CRT) <Chris.Hayes2@usdoj.gov>
**Sent:** Thursday, June 12, 2025 9:00 AM
**To:** Nathan Borochoff-Porte <Nathan.Borochoff-Porte@ColoradoSOS.gov>
**Cc:** Riordan, Maureen (CRT) <Maureen.Riordan2@usdoj.gov>
**Subject:** RE: [EXTERNAL] nathan.borochoff-porte@coloradosos.gov has shared secure files with you

Mr. Borochoff-Porte,

Good morning!

Could you please add the following DOJ support staff to the Colorado data download link?

- Chris Hayes (Litigation Support) – Chris.Hayes2@usdoj.gov

Thank you!

Best regards,

Chris

*Chris Hayes – PMP; FAC-COR II*
*IT Specialist*
*U.S. Department of Justice, Civil Rights Division*
*Administrative Management Section*
*950 Pennsylvania Ave, N.W., 4CON 11.1114b*
*Washington, DC 20530*
*Tel: 202 532-3879*

---

**From:** nathan.borochoff-porte <secure-reply@virtru.com>
**Sent:** Tuesday, May 27, 2025 12:44 PM
**To:** Riordan, Maureen (CRT) <Maureen.Riordan2@usdoj.gov>
**Subject:** [EXTERNAL] nathan.borochoff-porte@coloradosos.gov has shared secure files with you

**nathan.borochoff-porte@coloradosos.gov**

has shared 103 file(s) with you via Secure Share.

Click the button below to view the files.

**View Files**

EX-003_20250325.zip

Registered_Voters_List_ Part1.zip
Registered_Voters_List_ Part2.zip
Registered_Voters_List_ Part3.zip
Registered_Voters_List_ Part4.zip
Registered_Voters_List_ Part5.zip
Registered_Voters_List_ Part6.zip
Registered_Voters_List_ Part7.zip
Registered_Voters_List_ Part8.zip
Registered_Voters_List_ Part9.zip
2024_General_EX-002_Public_Congressional_District_1_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_1_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_1_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_1_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_1_Voting_History_List_Part7.zip
2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_2_Voter_Details_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part7.zip
2024_General_EX-002_Public_Congressional_District_2_Voting_History_List_Part8.zip
2024_General_EX-002_Public_Congressional_District_3_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_3_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_3_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_3_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_3_Voter_Details_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_3_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_3_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_3_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_3_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_3_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_3_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_3_Voting_History_List_Part7.zip
2024_General_EX-002_Public_Congressional_District_3_Voting_History_List_Part8.zip
2024_General_EX-002_Public_Congressional_District_4_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_4_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_4_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_4_Voter_Details_List_Part4.zip

2024_General_EX-002_Public_Congressional_District_4_Voter_Details_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_4_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_4_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_4_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_4_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_4_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_4_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_4_Voting_History_List_Part7.zip
2024_General_EX-002_Public_Congressional_District_4_Voting_History_List_Part8.zip
2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_5_Voter_Details_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_5_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_6_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_6_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_6_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_6_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_6_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_7_Voter_Details_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part5.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part6.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part7.zip
2024_General_EX-002_Public_Congressional_District_7_Voting_History_List_Part8.zip
2024_General_EX-002_Public_Congressional_District_8_Voter_Details_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_8_Voter_Details_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_8_Voter_Details_List_Part3.zip
2024_General_EX-002_Public_Congressional_District_8_Voter_Details_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part1.zip
2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part2.zip
2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part3.zip

2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part4.zip
2024_General_EX-002_Public_Congressional_District_8_Voting_History_List_Part5.zip

secured by

© Copyright 2025 Virtru Corporation

Terms of Service | Privacy Policy | About Virtru | Support

Terms of Service

Privacy Policy

About Virtru

Support

© Copyright 2025 Virtru Corporation

**From:** chris.hayes2
**To:** Nathan Borochoff-Porte
**Subject:** [EXTERNAL] Secure message viewed by chris.hayes2@usdoj.gov
**Date:** Thursday, June 12, 2025 11:15:22 AM

logo

chris.hayes2@usdoj.gov has viewed the file(s) you securely shared. Remember, you can manage your file permissions at any time.

Manage Files

Do you have other documents or messages you need to share securely? You can protect your emails, files, and other data with Virtru's secure encryption for Gmail, Outlook, and other data-sharing platforms.

Learn How

secured by

© Copyright 2025 Virtru Corporation | Terms of Service | Privacy Policy | About Virtru | Support

# **Exhibit G**

to Borochoff-Porte Declaration

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

February 10, 2026

**U.S. Department of Justice**

Civil Rights Division

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I. PARTIES & POINTS OF CONTACT.

Requester
Federal Agency Name: Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

VRL/Data Provider
State Agency Name:
Custodian:
Title:
Address:
Phone:

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Colorado ("You" or "your state").

### II. AUTHORITY.

By this Agreement, the State of Colorado ("You" or "your state") has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department"). The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or

the last four digits of the registrant's social security number as required under the HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.
- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20501(a).
- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq.*
- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.
- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.
- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III. PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a state – often from information submitted by counties – containing a list of all the state's *eligible* voters. Regardless of the basis for ineligibility, ineligible voters do not appear on a state's VRL when proper list maintenance is performed by states. The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law. In the event the Justice Department's analysis of a VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify your state's point of contact of the issues to assist your state with curing.

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

**IV. TIMING OF AGREEMENT – TIME IS OF ESSENCE.**

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you. Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

**V. TIMING OF VRL/DATA TRANSFER.**

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

**VI. METHOD OF VRL/DATA ACCESS OR TRANSFER.**

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS"). A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk. JEFS implements strict access controls to ensure that each user can only access their own files. All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII. LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use. The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

the stored information. However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII. NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX. CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data. Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage. In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

## X. LOSS OR BREACH OF DATA.

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

## XI. DESTRUCTION OF DATA.

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);
2. Archive and store electronic data containing confidential information offline in a secure location; and

3. All other data will be erased or maintained in a secured area.

## XII. OTHER PROVISIONS.

A. Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B. Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C. Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU. To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D. Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E. Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq*., as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F. Confidentiality of MOU. To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

by the parties as "confidential." Any disclosures therefore could be made, if at all, pursuant to applicable laws or court orders requiring such disclosures.

**SIGNATURES**

VRL/Data Provider
State Agency Name:
Signature: ________________________________________ Date of Execution:_________________

Authorized Signatory Name Printed:________________________________

Title: ________________________________

Requester
Federal Agency Name: Civil Rights Division, U.S. Department of Justice

Signature: ________________________________________ Date of Execution:_________________

Authorized Signatory Name Printed:________________________________

Title: ________________________________

# **Exhibit H**

to Borochoff-Porte Declaration

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

February 10, 2026

**U.S. Department of Justice**

Office of Legislative Affairs

*Office of the Assistant Attorney General* *Washington, DC 20530*

The Honorable Alex Padilla
Ranking Member
Committee on Rules and Administration
United States Senate
Washington, DC 20510

Dear Senator Padilla:

This responds to your letter to the Department of Justice (Department) dated July 17, 2025, regarding concerns about the mission and activities of the Civil Rights Division's Voting Section.

The Civil Rights Division is uniquely designated by Congress to enforce the National Voter Registration Act (NVRA) of 1993, signed by President Clinton, and the Help America Vote Act (HAVA) of 2002, signed by President Bush, to ensure that states put proper voter registration procedures in place and that states have programs to, and do, maintain clean voter registration lists through mandatory "list maintenance" programs. As you know, such list maintenance is to be conducted on a regular basis by states and is designed to remove all ineligible voters from the voter rolls. The Civil Rights Division is not charged with criminal enforcement related to elections.

Historically, enforcement of the NVRA and HAVA has been minimal, allowing many states to register voters and conduct elections without any accountability for the voter registration process and without any assurances that the voter registration lists contain *only* eligible voters. Under the current Administration, the Department is making the enforcement of these statutes a high priority and is prepared to work with states to correct illegal or ineffective voter registration programs and statewide list maintenance programs. For the first time, the Department is working to bring all 50 states into full compliance with our election laws, which will not only ensure voter eligibility, but will ensure that the voter rolls are reliable. This too will build confidence in the American public's view of our election results.

Under the NVRA, states are *required* to disclose their voter rolls in addition to any other documents or information that would demonstrate their voter list maintenance program.[1] Accordingly, the Department requested election data from the state of Colorado that is squarely within its statutory authority and no different than other requests to any other state. Since our request, Colorado has disclosed its voter registration list. This voter registration list will be analyzed and assessed for duplicates, and for individuals who are deceased, have moved to another state, registered elsewhere, or are otherwise ineligible to vote. All state voter registration information will be handled securely, discreetly, and according to law.

In Arizona, the Department is also actively enforcing the election integrity statutes assigned to the Department by Congress. Arizona's voter registration program runs afoul of the NVRA and HAVA because its federal voter registration form does not require the driver's license number or the Social Security number.[2] A federal court recently entered a consent decree to remedy a similar problem raised by the Department in North Carolina.[3] North Carolina had not been registering voters properly by failing to require a driver's license or at least the last four digits of a Social Security number upon registration. This violation placed over 190,000 voters on the North Carolina statewide voter registration list without this critical proof/verification of eligibility. North Carolina has done well to admit to the error and to commit to remedying the violations by, among other things, conducting outreach to affected voters to update their voter registrations.

The Department also determined that Wisconsin is violating HAVA by refusing to provide an administrative procedure to enable voters to file a complaint regarding an HAVA violation they may observe or experience while voting.[4] Violating HAVA in this way subjects Wisconsin to loss of HAVA funding. Since 2003, Wisconsin has received $77 million in federal HAVA dollars to conduct elections. HAVA compliance is a condition of receiving funding from the Elections Assistance Commission. In June, the Department sent a letter to the Election Commissioners notifying them of their failure to follow federal election laws.

We appreciate the opportunity to provide information and clear up any misunderstanding or misapprehension about what the Department does to rightly enforce the federal elections statutes that Congress has charged the Civil Rights Division to enforce. With the enforcement work the Department is undertaking now, the entire Nation can take comfort in knowing that future elections will be a result of proper voter registration and proper statewide voter registration list maintenance.

---

[1] 52 U.S.C. § 20507(i)(1)–(2) (requiring each State to "make available for public inspection... all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters").

[2] *See* 52 U.S.C. § 21083(a)(5)(A)(i); *and see* Ariz. Sec'y of State, *Arizona Registration Form* (rev. May 2024), https://elections.maricopa.gov/asset/jcr:31c22f9a-8dbe-4c8e-b14e-2ef42ff39e8f/az_voter_registration_form_standard_20241120.pdf (designating driver's license and Social Security information optional).

[3] Office of Public Affairs, U.S. Dep't of Just., *Court Enters Consent Order Requiring North Carolina to Fix Inaccurate Voter List*, Press Release No. 25-928 (Sept. 9, 2025), https://www.justice.gov/opa/pr/court-enters-consent-order-requiring-north-carolina-fix-inaccurate-voter-list.

[4] 52 U.S.C. § 21112(a)(1)–(2).

We hope this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Ronald J. Lampard
Deputy Assistant Attorney General

cc:

The Honorable Mitch McConnell
Chair
Committee on Rules and Administration
United States Senate
Washington, DC 20510

The Honorable Richard J. Durbin
United States Senate
Washington, DC 20510

The Honorable Peter Welch
United States Senate
Washington, DC 20510

The Honorable Richard Blumenthal
United States Senate
Washington, DC 20510

The Honorable Jeffrey A. Merkley
United States Senate
Washington, DC 20510

The Honorable Raphael Warnock
United States Senate
Washington, DC 20510

The Honorable Amy Klobuchar
United States Senate
Washington, DC 20510

The Honorable Adam B. Schiff
United States Senate
Washington, DC 20510

The Honorable Angus S. King, Jr.
United States Senate
Washington, DC 20510

The Honorable Brian Schatz
United States Senate
Washington, DC 20510

The Honorable Christopher A. Coons
United States Senate
Washington, DC 20510

The Honorable Chris Van Hollen
United States Senate
Washington, DC 20510

The Honorable Ron Wyden
United States Senate
Washington, DC 20510

The Honorable Mazie K. Hirono
United States Senate
Washington, DC 20510

The Honorable Cory A. Booker
United States Senate
Washington, DC 20510

The Honorable Bernard Sanders
United States Senate
Washington, DC 20510

# Exhibit B

to Opp. to Mot. to Compel

*Declaration of Hilary Rudy*

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

February 10, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03967-PAB-TPO

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,

Defendant.

---

**DECLARATION OF HILARY RUDY**

---

I, Hilary Rudy, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746.

1. I am over 21 years of age and employed as the Deputy Director of the Elections Division within the Colorado Department of State. In this role, among other responsibilities, I oversee and supervise the operation of SCORE, Colorado's statewide voter registration database. In that role I am familiar with SCORE, including the information it contains as to individual voters, and with the list maintenance activities conducted by county clerk and recorders and the Department of State.

2. Colorado maintains a statewide voter registration database as mandated by the federal Help America Vote Act ("HAVA"). In Colorado, that database is known as SCORE.

3. SCORE is constantly updated. Each time a county clerk and recorder receives new information concerning a voter, that information is updated in SCORE. For example, if a clerk receives notice that a voter has moved to a new address, the clerk will update the voter's address in SCORE. A report produced from SCORE prior to the change will show the old address, whereas a report produced from SCORE after the change will show the new address.

4. Under Colorado law, every county is required to send each active registered elector a ballot before each election. This affects our list maintenance activities in many ways, two of which are:

5. First, it makes accurate voter lists crucial, both for the Secretary and for counties. Accurate, up-to-date information about each registered elector is the cornerstone of Colorado's mail ballot process and saves counties substantial sums in returned postage.

6. Second, Colorado's mail ballot system increases the frequency with which Colorado counties communicate with their voters. This frequent communication enables counties to know when voters move, for example if a ballot sent to their prior address is returned as undeliverable.

7. In addition to these frequent mailings, the Department of State also provides counties with data on a monthly basis from the United States Post Office's National Change of Address ("NCOA") database to identify electors who have moved.

8. Counties also update SCORE based on a monthly basis to remove deceased voters using information supplied by the Colorado Department of Public Health and Environment and the federal government's Social Security Death Index.

9. SCORE has dozens of fields associated with each voter. Relevant here, SCORE includes a voter's name, address, date of birth, driver's license number, and the last four digits of the voter's social security number.

10. In SCORE, each voter is also assigned a "Voter ID." This is the unique identifier required under HAVA. *See* 52 U.S.C. § 21083(a)(1)(A)(iii).

11. Under Colorado law, the Department of State makes a public copy of the statewide voter registration list available to the public for a minor fee. Consistent with state and federal law, in this public version, we do not provide an elector's driver's license number, the last four digits of the voter's social security number, or the voter's full date of birth. The public version does include the unique HAVA identifier for each voter, the "Voter ID," as well as the voter's name, address, and birth year. It also includes information about the voter's party registration, and the public can request a version of the public voter registration list that includes vote history.

12. Colorado has a law allowing voters to request "confidential" status if they believe that being included on the public voter registration list will expose them or their immediate family to criminal harassment or bodily harm. § 24-72-204(3.5)(b), C.R.S. If a voter is a "confidential" voter, they are withheld from the public copy of the statewide voter registration list.

13. Colorado is an automatic voter registration state. When a person who is not a registered voter applies for the issuance, renewal, or correction of a driver's license or identification card and provides a document that demonstrates United States citizenship, the Department of Revenue automatically provides the Department of State with the person's information, including name, date of birth, and address. The Department then provides that information to counties. If the person is over the age of 18, they are automatically registered to vote. *See* § 1-2-213.3. In this case, the information in SCORE comes directly from information provided to the Division of Motor Vehicles at the Colorado Department of Revenue.

14. I am familiar with the information produced to the United States Department of Justice in response to the May 12, 2025 letter from Harmeet Dhillon to Secretary Griswold and referenced in the May 27, 2025 letter from Andrew Kline to Harmeet Dhillon. The Department produced two copies of the public voter registration list. For each elector, excluding confidential voters, it included the elector's name, birth year, address, unique HAVA identifier. The Department also produced a copy of the public voter registration list that included vote history.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 10th day of February, 2026, at Denver, Colorado.

_/s/ Hilary Rudy_______________________
Hilary Rudy
Deputy Director of the Elections Division
Colorado Department of State

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03967-PAB-TPO

THE UNITED STATES OF AMERICA,
Plaintiff,

v.

JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,
Defendant.

---

**THE COLORADO SECRETARY OF STATE'S MOTION TO DISMISS**

---

Without a valid legal basis, the U.S. Department of Justice asks the Court to order the Colorado Secretary of State to turn over confidential, sensitive information regarding Colorado's voters. Colorado maintains accurate, current voter registration lists, consistent with federal law, and has already provided DOJ with the publicly available version of its voter registration list. DOJ's Complaint misrepresents the Secretary's actions, inaccurately stating that Colorado failed to respond to its earlier requests. Moreover, DOJ attempts to turn the Civil Rights Act of 1960, a law designed to curb overt racial discrimination, into a wide-reaching tool that would allow the federal government to access all State-held voter information without justifiable purpose. whenever and on whatever terms it wants. But federal law does not allow such unfettered access.

The Constitution's framers recognized that power over election rules could be abused, either to destroy the national government or to prevent the people from acting as a check on their elected representatives. *See, e.g.*, The Federalist No. 59 (A. Hamilton); Federal Farmer No. 3. Accordingly, they entrusted this power to the parts of our government most responsive to the will of the people: first to the States, and then, in some instances, to Congress, but not to the

president. *See* U.S. Const. art. I, § 2, cl. 1; U.S. Const. art. I, § 4, cl. 1. *See League of United Latin Am. Citizens v. Exec. Office of the President*, -- F. Supp. 3d --, 2026 WL 252420, at *1 (D.D.C. Jan. 30, 2026). Without a basis in law or fact, DOJ seeks to subvert that balance and wrest critical election oversight and voter information out of the hands of the State.

To state a claim under the Civil Rights Act of 1960 ("CRA"), DOJ must allege it issued a written demand, setting forth a statement of the basis and the purpose of the demand, to the Secretary, for records or papers required to be preserved under the Act. 52 U.S.C. § 20703. Because the Complaint fails to allege that DOJ requested a "record" under the CRA, fails to allege the basis and purpose of the demand, and seeks a remedy outside the CRA, the Complaint does not state a plausible claim under the CRA and should be dismissed in full.

## BACKGROUND

### I. Colorado maintains voter registration lists compliant with the NVRA and HAVA.

Colorado maintains accurate and current voter registration rolls in compliance with the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501-511, and the Help America Vote Act ("HAVA"), 52 U.S.C. §§ 20901-21145. To maintain "accurate and current voter registration rolls," 52 U.S.C. § 20501(b)(4), the NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" due to death or a change in residence. *Id.* § 20507(a)(4). And HAVA requires states to implement "in a uniform and nondiscriminatory manner" a "single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." *Id.* § 21083(a)(1)(A).

HAVA also requires every state to verify a prospective voter's identity and eligibility, including by requiring applicants to provide their driver's license number or, if none, the last four digits of their social security number. *Id.* § 21083(a)(5)(A)(i). If an applicant has neither, each state must assign that voter a unique identification number, which, if the state's voter registration database already assigns each voter a unique identifying number, "shall be the unique identifying number assigned under the list." *Id.* § 21083(a)(5)(A)(ii).

Federal law imposes these voter list requirements within a broader legal scheme intended to promote voting rights and increase voter participation. Congress passed the NVRA in 1993, "to promote the exercise" of the right to vote, and in recognition that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation." 52 U.S.C. § 20501(a). At its core, the NVRA establishes and encourages programs to increase voter registration, including through simultaneous registration upon submission of a driver's license application. *Id.* § 20504.

In the wake of the 2000 presidential election, HAVA established certain election administration standards. *See* Help America Vote Act of 2002, PL 107–252, 116 Stat 1666. Alongside the creation of a centralized, computerized database discussed above, HAVA requires states to implement "safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(B).

Colorado, an exemplar in election management, implements programs that comply with the NVRA and HAVA. Among many continuous list maintenance activities, the Secretary conducts regular searches of the National Change of Address database to identify voters who may have moved jurisdictions, consistent with Colorado law implementing the NVRA. C.R.S.

§ 1-2-302.5(1); 8 CCR 1505-1, Rule 2.11. Similarly, the state registrar of vital statistics sends a monthly report to the Secretary of all persons eighteen or older who died the prior month, and the Secretary and/or county clerks cancel voter registrations of deceased voters. C.R.S. § 1-2-602. In accordance with HAVA, the Secretary maintains a centralized, digital master list of registered electors, known as SCORE. C.R.S. § 1-2-301.

SCORE is a real-time database, constantly changing, and updated constantly. Rudy Decl. (Docket No. 37-10) ¶ 3. Under state law, Colorado allows the public to purchase reports that are created from information in the SCORE database. *Id.* ¶ 11. Public data sets include state-wide voter registration lists with voter name, HAVA voter ID number, address, birth year, precinct, and voting history. *Id*. Other sensitive data maintained in SCORE is protected from disclosure by Colorado law. C.R.S. § 1-2-302(8); § 24-72-204(8). That protected data includes social security numbers, driver's license numbers, and full birth dates, none of which are disclosed. *Id.* Similarly, the publicly available reports entirely exclude certain "confidential" voters who are protected under state law if being included on the public voter registration list will expose them or their immediate family to criminal harassment or bodily harm (*e.g.*, judges, law enforcement, people with protection orders). C.R.S. § 24-72-204(3.5)(b); Rudy Decl. ¶ 12.

## II. The Civil Rights Act of 1960 protects against race-based voter suppression.

The Civil Rights Act was enacted at a time when persistent voter suppression prevented Black Americans from voting. *See, e.g.*, *Report of the United States Commission on Civil Rights* (Sept. 9, 1959).[1] States employed a variety of voter suppression tactics, including literacy tests, arbitrary registration practices, voter roll purges, and poll taxes, to suppress minority

[1] Available at https://tinyurl.com/553yzrhd.

voting. *See, e.g.*, *id*. at 34, 36-38, 130, 137-138, 144. Additionally, some state and local election officials destroyed or withheld records to stimy the federal government's investigation of illegal racial discrimination in voting. *Id.* at pp. 137-138.

To facilitate the investigation of race-based voter suppression, the CRA requires election officials to retain and preserve "all records and papers which come into [their] possession relating to "any application, registration, payment of poll tax, or other act requisite to voting" for 22 months after an election. 52 U.S.C. § 20701. By law, Colorado not only meets, but surpasses the CRA's requirements. *See* C.R.S. § 1-7-802 (requiring designated election officials to preserve all election records for 25 months). The CRA also facilitates "preliminary investigations of registration practices . . . in order to determine whether or not such practices conform to constitutional principles." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Atty. Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961); *also* 52 U.S.C. § 20703. To that end, upon a sufficient showing of purpose and basis, Section 20703 permits DOJ to inspect certain voter registration records identified under Section 20701.

## III. The DOJ requested Civil Rights Act records and, contrary to DOJ's allegations, the Secretary responded and produced publicly available data.

On May 12, 2025, the Secretary received a letter from Harmeet Dhillon, a senior official at DOJ. Ex. A to Borochoff-Porte Decl. (Docket No. 37-2). According to DOJ, the impetus for the letter was "a complaint alleging noncompliance by [the Department of State] with the [NVRA]." *Id.* "To assist [its] efforts in evaluating the complaint," DOJ requested: (1) "All records, as outlined in 52 U.S.C. § 20701," and (2) "All statutes, regulations, written guidance, internal policies, or database user manuals that set out the procedures Colorado has put in place relating to implement the requirements of 52 U.S.C. § 20701." *Id.*

On May 23, 2025, the Secretary responded.[2] Ex. B to Borochoff-Porte Decl. (Docket No. 37-3) The response explained that Colorado's 64 county clerks are the custodians of most Section 20701 records—as permitted under that Section—but also indicated that:

> The Department does possess certain records responsive to your document request, predominantly in the form of information that is maintained in Colorado's statewide voter registration database, known as SCORE. The Department's production thus includes comprehensive reports generated from SCORE. Since your request was not timebound, the Department has provided SCORE records from the previous two years. SCORE is a dynamic, living database.

In response to the second part of DOJ's request, the Secretary included an addendum identifying responsive statutes and regulations. *Id*. The Secretary concluded by stating the "Department has made best efforts to respond to your [May 12, 2025] request." *Id*.

As part of this response, the Secretary also produced two different public versions of the statewide voter registration list out of SCORE. Rudy Decl. ¶ 14. These copies of Colorado's voter registration list included each voter's name, address, birth year, and HAVA unique identifier, excluding confidential voters. *Id.* The DOJ confirmed receipt of those files in an email from the Civil Rights Division's Acting Chief of the Voting Section, stating "Received. Thank you[.]" Ex. C to Borochoff-Porte Decl. (Docket No. 37-4) The DOJ downloaded Colorado's voter registration list on June 12, 2025. Ex. E to Borochoff-Porte Decl. (Docket No. 37-6)

---

[2] The Complaint avers that "Secretary Griswold did not respond to the May 12 Letter." That is incorrect and contradicted by the undisputedly authentic copy of the Secretary's May 27, 2025, letter attached here as Ex. B to the Borochoff-Porte Decl. (Docket No. 37-3). Because the response "is referred to in the complaint and is central to the plaintiff's claim, [the] defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

After months of noncommunication, and after public reports that DOJ was seeking to build a nationwide voter registration database,[3] on December 1, 2025, Eric Neff sent a "follow up" to the May communications requesting a copy of Colorado's "nonpublic, unredacted voter registration list." Ex. F to Borochoff-Porte Decl. (Docket No. 37-7) In the email, Neff asked the Secretary to sign a Memorandum of Understanding. *Id.* That MOU, if executed, would have allowed DOJ to dictate Colorado's voter list maintenance activities, usurping the constitutional role of the State to oversee elections. Ex. G to Borochoff-Porte Decl. (Docket No. 37-8) at 5. The Secretary did not sign the MOU or provide additional information beyond what was produced in May. Compl. (Docket No. 1) ¶ 25.

## IV. Procedural history

On December 11, 2025, DOJ initiated this action. In total, DOJ has brought similar suits against 24 states and the District of Columbia.[4] The three cases that have proceeded to an order at the Motion to Dismiss stage have all been dismissed. *United States v. Weber*, -- F. Supp. 3d --, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, -- F. Supp. 3d --, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, -- F. Supp. 3d --, 2026 WL 362789, (W.D. Mich. Feb. 10, 2026).

In its Complaint, DOJ invokes the CRA, alleging that its May 2025 letter requested records outlined under that law and included a "statement of the basis and the purpose therefore." Compl. ¶¶ 26-27 (quoting 52 U.S.C. § 20703). The Complaint also inaccurately alleges that the

---

[3] Devlin Barrett and Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, The New York Times, (Sep. 9, 2025), https://tinyurl.com/c9tujz9f.

[4] *See Justice Department Sues Virginia for Failure to Produce Voter Rolls*, Department of Justice Office of Public Affairs (Jan. 16, 2026), *available at* https://tinyurl.com/3znn6da2.

Secretary did not respond to DOJ's May 2025 letter, and asks the Court to order the Secretary to provide it with "the current electronic copy of Colorado's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their social security number, or HAVA unique identifier[.]" Compl. at 6-7.

Contemporaneous with the Complaint, DOJ filed a Motion to Compel, demanding the same voter roll production as the Complaint. Mot. to Compel (Docket No. 2) at 2-3. The Secretary opposes that Motion in a contemporaneously filed brief.

**RULE 12(b)(6) STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). Plausibility, in the context of a motion to dismiss, means the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court may consider certain documents outside the pleadings, consistent with Tenth Circuit precedent.[5]

[5] The Court may consider three types of documents relevant to the Motion to Dismiss without converting it to a motion for summary judgment. First, a court can take judicial notice of "documents and docket materials filed in other courts." *Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1298 n.2 (10th Cir. 2014). Second, a court may consider documents that are a matter of public record. *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006). Third, if a "document is referred to in the complaint and is central to the plaintiff's claim, a defendant may

## ARGUMENT

### I. Because DOJ is not entitled to Colorado's nonpublic voter registration list under the Civil Rights Act, the Complaint fails to allege a plausible claim to relief.

To state a claim under the CRA, DOJ must allege that (1) it demanded in writing, (2) with a statement of the basis *and* the purpose of the demand, (3) of the person having custody, possession, or control of the records, (4) to inspect, reproduce or copy at the custodian's office (5) records or papers required to be preserved under Section 20701. 52 U.S.C. § 20703. DOJ's claim fails for several reasons. First, a CRA claim must involve a request for specific "records" required to be preserved under Section 20701 of the CRA. Because the nonpublic statewide voter roll is not a CRA record, DOJ has not adequately alleged this element. Second, DOJ fails to allege two other statutory elements of a CRA claim: sufficient basis and valid purpose. Third, the CRA permits only in-person inspection of covered records. A request for an electronic copy of unredacted confidential data exceeds the remedy available under the CRA.

#### A. The Voter Registration list is not a record subject to retention and inspection under the Civil Rights Act.

The Complaint fails to state a claim to relief under the CRA for the most foundational reason: Colorado's voter registration list is not covered by the statutory text of the CRA. Congress enacted Section 20701 of the CRA as a preservation requirement to facilitate investigations of voter registration denials. The CRA requires election officials to preserve "records," which "come into [their] possession" of an individual voter's "application," a voter's "registration," a voter's "payment of poll tax," and a voter's "other act requisite to voting." *Id.*

---

submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp.*, 130 F.3d at 1384.

Statewide voter registration "lists" are not a "record" requisite to voting under Section 20701. *See Benson*, 2026 WL 362789, at *9-11 (holding Michigan voter registration list is not a CRA record). In fact, DOJ's Complaint does not even allege Colorado's voter registration list is a CRA record. Rather, the voter registration list is a real-time database of information updated nearly daily; it is a resource comprised of accumulated data about all registered voters in the possession of the Secretary. The list is not a static record of any individual act of registration which would have "come into" and stayed "in the possession" of county clerks. *Compare* LIST, Black's Law Dictionary (12th ed. 2024) ("A roll or register, as of names, usu. written one below the other so that it can be more easily consulted or remembered."); *and* DATABASE, Black's Law Dictionary (12th ed. 2024) ("A compilation of information arranged in a systematic way and offering a means of finding specific elements it contains, often today by electronic means."); *to* RECORD, Black's Law Dictionary (12th ed. 2024) ("A documentary account of past events, usu. designed to memorialize those events.").

Absurdly, if the voter rolls *were* a "record" under the CRA, states would violate the CRA's preservation requirement each time they update the voter list rather than maintaining it statically for 22 months. But HAVA explicitly requires such updates. 52 U.S.C. § 21083(a)(2)(A). Further, state-wide voter registration lists did not exist at the time of the CRA and were not contemplated by it; in fact, state-wide electronic voter lists were only authorized and mandated by HAVA in 2002. *Id.* § 21083(a)(1)(A). "[T]he existence of a statewide computerized voter list was not foreseeable to the Congress of 1960, and . . . a court is not a telepathic time-traveler, and thus it cannot rewrite Congressional legislation to cover a situation that Congress may not have foreseen." *Benson*, 2026 WL 362789, at *10 (citing Antonin Scalia

& Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 350 (2012)). The requested materials are not CRA records under the plain text of the act.

**B. DOJ has not articulated a sufficient basis and purpose for its request and thus fails to state a claim under the CRA.**

The Attorney General does not have an absolute right to inspect records. Rather, a necessary element of a CRA claim is that the Attorney General provide a written statement of *both* the "basis *and* the purpose" of its demand to inspect records. 52 U.S.C. § 20703 (emphasis added); *cf. Crooks v. Harrelson,* 282 U.S. 55, 58 (1930) (holding "and" in its "ordinary sense" is a conjunctive word, requiring "not one or the other, but both"); *also Oregon*, 2026 WL 318402 at *8-10 (analyzing basis and purpose separately). Here, DOJ failed to provide either.

In its May 12, 2025, communication, DOJ alleged it had "received a complaint alleging noncompliance" with the Secretary's duties under the NVRA, 52 U.S.C. § 20507. Ex. A to Borochoff-Porte Decl. (Docket No. 37-2) It did not provide any details regarding the nature of the complaint or the specific duties under the NRVA allegedly at issue. The DOJ then requested "[a]ll records" "as outlined in 52 U.S.C. § 20701," *id.*, which refers to the CRA's preservation requirement. In its December 1, 2025, email DOJ clarified that its request was for specifically a "nonpublic, unredacted voter registration list." Ex. F to Borochoff-Porte Decl. (Docket No. 37-7) A bare allegation that DOJ received a complaint about Colorado's NVRA compliance, however, provides neither a sufficient factual basis nor a valid legal purpose to state a CRA claim.[6]

---

[6] DOJ argues that the court "does not adjudicate" the "factual foundation" or "sufficiency" of DOJ's statement of basis and purpose. Compl. ¶ 4 (citing *Lynd*, 306 F. 2d at 226). But, as the Oregon district court reasoned, *Lynd* is not binding, has not been applied in over 60 years, and is contrary to Supreme Court precedent construing similar statutes. *See Oregon*, 2026 WL 318402 at *7-8 (concluding "[t]here is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding

*First*, DOJ fails to state a legal purpose within the scope of the CRA. The Civil Rights Act of 1960 was intended to enforce the earlier Civil Rights Act of 1957, which is to say it was meant to vindicate voting rights in the face of State attempts to deny them, as seen in courts' construction of the CRA shortly after its passage. *E.g.*, *Kennedy v. Lynd*, 306 F.3d 222, 228 (5th Cir. 1962) (explaining that the Attorney General "is entitled to inspect and copy all of the voter papers and records as defined" "in fulfillment of the duties imposed upon him by the Civil Rights Act of 1957 and 1960"). Valid statements of basis and purpose from the time of enactment were "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race and color have been made with respect to registration and voting within your jurisdiction." *Id.* at 231 n.6. Repeatedly addressing the issue, the Fifth Circuit "laid down the rule that the government is entitled to have an order of the trial court authorizing it to inspect the voting records" based on DOJ's "reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962).

DOJ alleges no valid civil rights purpose, not to mention no basis for a belief that *any* Coloradan's voting rights are being racially discriminated against. Read generously, the Complaint's stated purpose is to assess compliance with the NVRA.[7] Compl. ¶¶ 9, 19. But alleged noncompliance with the NVRA is not, and has never been, a valid justification for

---

Defendants' alleged failure to comply with Title III, including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place").

[7] DOJ also suggests a purpose of assessing compliance with HAVA. Compl, ¶ 9. But, as with the NVRA, HAVA compliance is not a valid civil rights purpose under the CRA. And DOJ alleges *no* factual basis related to HAVA compliance—it states only that it received an NVRA-related complaint. Finally, HAVA was never raised in any prior written communication from DOJ.

invoking the CRA. The NVRA passed 33 years after the CRA and was thus not contemplated by the CRA. By its own terms, the CRA only permits a demand for records relating to applications, registrations, payments of a poll tax, or other acts requisite to voting. 52 U.S.C. § 20701. By contrast, the NVRA, quite distinctly, requires a program to remove ineligible voters from the rolls. 52 U.S.C. § 20507(a)(4). A state's NVRA voter removal procedures have nothing to do with CRA voter registration records, and removing voters from the rolls has nothing to do with the CRA's purpose of protecting the right to register to vote. An allegation of noncompliance with voter removal requirements cannot form the basis for a CRA document demand.

Moreover, the NVRA permits DOJ to "bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out" the NVRA. 52 U.S.C.A. § 20510(a). Because DOJ may enforce the NVRA by bringing an authorized civil action, it cannot subvert that requirement by lodging a CRA demand. The NVRA, which specifically addresses the list maintenance activities DOJ purportedly wants to investigate, also includes a more recently enacted and more specific records retention and inspection provision. 52 U.S.C. § 20507(i)(1). By law, that statute controls DOJ's request. *See, e.g.*, *United States v. Estate of Romani*, 523 U.S. 517, 530 (1998) ("[A] specific policy embodied in a later federal statute should control our construction of the priority statute."). If DOJ is truly concerned about Colorado's NVRA compliance, DOJ's remedy lies with the enforcement provisions of the NVRA alone. DOJ fails to state a claim under the CRA.

*Second*, DOJ states no factual basis justifying its unredacted voter roll demand. It provided no evidence as to why it believed the NVRA was violated in its letter to the Secretary. Even if it had, DOJ provided no explanation as to why nonpublic, confidential voter information

(outside the already comprehensive public data set produced to DOJ) is necessary for or relevant to an NVRA-related investigation.

**C. The Civil Rights Act does not require the production of unredacted, electronic files.**

Even if DOJ's written statement of the "basis and the purpose" for its demand satisfied the CRA's requirements, 52 U.S.C. § 20703, DOJ fails to allege it is entitled to confidential, nonpublic voter information in electronic form. To the contrary, DOJ is not legally entitled to unfettered access to an unredacted version of "all fields" of Colorado's voter registration list, including such sensitive data as each registrant's full "date of birth" and "either their state drivers' license number, the last four digits of their Social Security number, or HAVA unique identifier." Compl. at 6–7.

First, nothing in the text of the CRA requires that Colorado produce confidential voter information. In fact, the specific confidential data that DOJ is requesting was not required to be collected until the passage of HAVA in 2002, and so was not contemplated as a "record" under the CRA. *See* above at Section I.A; 52 U.S.C. § 21803(a)(5)(A)(i). And an early interpretation of the Act clarifies that Section 20703 does not allow unfettered access to "confidential, private papers and effects," but instead is designed to allow DOJ to review "public records which ought ordinarily to be open to legitimate reasonable inspection and which by nature relate directly to the most vital of all public functions—the franchise of the citizen." *Lynd*, 306 F.2d at 231. Because the Secretary has provided DOJ access to public records, and because the CRA does not require disclosure of confidential personal information, DOJ fails to state a claim.

Second, under the later-enacted NVRA, which directly addresses list maintenance activities, courts have consistently held that states may redact sensitive voter information and

that this information is not relevant to the removal of ineligible voters from the voting rolls. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 57 (1st Cir. 2024) (holding "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information.") *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (affirming district court order to redact social security numbers before disclosure under NVRA).[8] Third, DOJ is not entitled to an "electronic copy" of Colorado's voter registration list. The CRA mandates only that covered records "be made available for inspection, reproduction, and copying at the principal office of" the custodian. 52 U.S.C. § 20703. Consistent with the statute, an electronic copy of the voter rolls is not required.

## CONCLUSION

The Secretary respectfully requests that the Court dismiss the Complaint in full.

Dated: February 10, 2026

PHILIP J. WEISER
Attorney General

/s Lane Towery

***Peter G. Baumann***, Senior Assistant Attorney General
***Lane Towery***, Assistant Attorney General
1300 Broadway, Denver, CO 80203
Telephone: (720) 508-6000
Email: peter.baumann@coag.gov; lane.towery@coag.gov
Attorneys for Secretary Jena Griswold

[8] *See also Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1016 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022): *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344–45 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) ; *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,<br><br>Defendant. | Case Number: 1:25-cv-03967-PAB-TPO |

**UNITED STATES' CONSOLIDATED MEMORANDUM IN OPPOSITION TO THE MOTIONS TO DISMISS BY DEF. GRISWOLD (DOC. 40), AND PROPOSED INTERVENORS COLORADO ALLIANCE FOR RETIRED AMERICANS (DOC. 38-1)**

## Table of Contents

**I. INTRODUCTION ........ 3**

**II. BACKGROUND ........ 5**

**III. MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND ........ 8**

A. The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA. ........ 9

b. Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights. ........ 14

c. Movants cannot challenge the Attorney General's basis and purpose to investigate Colorado's noncompliance with the CRA. ........ 19

d. Colorado's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections. ........ 22

e. The United States is entitled to unredacted "reproduction" and "copying" of Colorado's federal election records, including its SVRL. ........ 28

**IV. THE UNITED STATES IS COMPLYING WITH THE PRIVACY ACT ........ 31**

**V. CONCLUSION ........ 34**

Plaintiff United States of America respectfully submits this Memorandum of Law in opposition to the Motions to Dismiss by Defendant Secretary of State for the State of Colorado, Jena Griswold ("Secretary Griswold") (Doc. 40) and Proposed Intervenors Colorado Alliance for Retired Americans and Britton Deford ("Proposed Intervenors") (Doc. 38-1). Collectively, Secretary Griswold and Intervenors are referred to as the "Movants." The United States submits this consolidated Memorandum, instead of two separate opposition briefs, to facilitate the Court's review of the duplicative and overlapping arguments made by Movants.

## I. INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Colorado's compliance with federal election laws, including the retention of records under Title III of the Civil Rights Act of 1960 ("CRA"), the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). The United States sent correspondence to Secretary Griswold, requesting that she provide all federal election records as outlined in 52 U.S.C. § 20701; a certification that no record required for preservation has been deleted, destroyed, or altered from its original format; and all statutes, regulations, written guidance, internal policies, or database user manuals that set out Colorado's procedures. Secretary Griswold refused to produce the records as mandated by the CRA and necessary to evaluate compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

The CRA provides the principal statutory authority for the United States to immediately obtain federal election records, including Colorado's statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the officers of election relating to registration or other

acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[1]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703.

As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these requirements. In contrast, Secretary Griswold and Proposed Intervenors have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for their motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States' Motion to Compel (Doc. 2) should be granted, the Motions to

---

[1] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently two District Courts in the Ninth Circuit and one District Court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by erroneous applications of the statute. *See infra* at 11-14, 18-19, 23-26.

Dismiss (Docs. 38-1 & 40) should be denied, and an order compelling production of all responsive federal election records should be entered.

## II. BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish

"[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

Acting pursuant to the United States' authority to enforce these federal election statutes, on May 12, 2025, the Department of Justice ("DOJ") sent Secretary Griswold, Colorado's chief elections officer, a letter requesting, *inter alia*, a copy of all federal election records as outlined in 52 U.S.C. § 20701 ("May 12 Letter"). *See* May 12 Letter, Doc. 5-1, Ex. 1. As stated in the letter, the basis for the demand was Title III of the CRA of 1960 codified at 52 U.S.C. § 20701, *et seq,* and the factual basis for the demand was a complaint received by the Department of Justice alleging noncompliance by Secretary Griswold regarding retention of election records as required by Title III. The stated purpose of the letter was "[t]o assist [the DOJ's] efforts in evaluating the complaint" it recently received "alleging noncompliance by your office with the duties outlined in

52 U.S.C. §20507." *Id.* The letter further requested the records be provided within 14 days of the date of the letter. *Id.*

Secretary Griswold did not produce all the records the United States requested.[2] On December 1, 2025, DOJ attorney Eric Neff followed up by e-mail to Secretary Griswold requesting Colorado's SVRL ("December 1 Email"). *See* December 1 Email, Doc. 5-1, Ex. 2. The December 1 Email further stated that "[t]he United States is prepared at this early stage to enter into an MOU with the State of Colorado regarding the sharing of the nonpublic, unredacted voter registration list" and attached the MOU, which the United States "believe[d] cures all potential concerns a state might rightfully raise regarding its citizens' private data and identifying information." *Id.*

Secretary Griswold, through Deputy Secretary of State Andrew Kline, responded by email on December 3, 2025, that Colorado would not be producing unredacted voter files or signing the MOU. *See* Doc. 5-1, Ex. 3. On December 11, 2025, the Attorney General instituted these summary proceedings to compel production. *See* Compl., Doc. 1. In the Complaint, the United States indicated that the federal election records it seeks include an electronic copy of Colorado's SVRL, "with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier." *Id.* at 6-7.

As explained in the attached declaration of Eric Neff, the United States seeks these documents under the CRA to evaluate a complaint alleging Colorado failed to retain documents

---

[2] The United States acknowledges that Secretary Griswold responded on May 27, 2025 and provided public SVRLs. The Secretary did not, however, provide all the records requested, including the unredacted SVRL.

necessary to evaluate Colorado's the list maintenance duties under HAVA and the NVRA . *See* 2d Decl. of Eric Neff ("2d Neff Decl.") ¶¶ 2-5; Doc. 5-2. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number ("SSN4"). 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections, as provided by Section 8 of the NVRA. 52 U.S.C. § 20507; 2d Neff Decl. ¶¶ 3-4.

## III. MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND

Movants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. They incorrectly maintain that Title III of the CRA applies to only discrimination claims. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Movants invite the Court to narrow the mandate to encompass only publicly available records. For the reasons discussed below, the Motions to Dismiss by Secretary Griswold (Doc. 40), and Proposed Intervenors (Doc. 38-1) should be denied.

### A. The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA.

Movants argue that the Federal Rules of Civil Procedure govern these proceedings. *See* Def.'s Mot., Doc. 40 at 8; Proposed Intervenors' Mot., Doc. 38-1 at 5. They repeat what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Movants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[3] *Id.* at 230. That approach makes sense.

---

[3] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The

The United States cannot be expected to know whether the complaint it received that Colorado failed to retain all the necessary documents required under the CRA is true before it makes the demand to Colorado. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *See Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

---

investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

A recent decision issued by a District Court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Movants. *See United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG, slip op at 14 (W.D. Mich. Feb. 10, 2026) (attached to 2d Neff Decl. as Ex. 10). Instead, the *Benson* court construed "a request for records under the CRA as a form of administrative subpoena." *See* slip. op. at 14 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…" *Benson*, slip op. at 15. The court acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (citation omitted).

Two District Courts in the Ninth Circuit reached a different conclusion but erred in doing so. Both courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's holding in *Lynd* that Title III of the CRA is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply. *See United States v. Oregon*, Case No. 6:25-cv-01666-MTK, slip op. at 15 (D. Or. Feb. 5, 2026) (attached to 2d Neff Decl. as Ex. 12); *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, slip op. at 13 & n.15 (C.D. Cal. Jan. 15, 2026) (attached to 2d Neff Decl. as Ex. 11).[4] *Powell* applied the Federal Rules of Civil Procedure to an IRS administrative summons. There, the Supreme Court made the unremarkable observation that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction,

[4] Movants extensively cite to *Weber* and *Oregon* in their motions. *See* Defs.' Mot., Doc. 40 at 7, 11; Proposed Intervenors' Mot., Doc. 38-1 at 2, 5-6, 9, 11 & n.7, 14. As discussed below, *Benson* addressed many of the legal errors in both decisions that call into question whether they merit any consideration.

the Federal Rules of Civil Procedure apply…" 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, slip. op. at 15 (quoting *Powell*, 379 U.S. at 58). Although the quoted language from *Powell* is correct, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted that strong deference is given to the Government to investigate, and "'does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even because it wants assurance that it is not*.'" *Powell*, 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added). *Powell* is

completely consistent with *Lynd* and in no way restricts records demands under the CRA to the statutory limitations that Congress included in the IRC.[5]

In addition to *Powell*, the *Weber* court also referred to what it indicated was a decision of the United States Supreme Court. *See Weber*, slip op. at 13 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)"). That is incorrect. *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

Moreover, in *Becker*, which involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson v. United States*, 400 U.S. 517, 528-29 (1971)). Justice Rehnquist distinguished between agency efforts to "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence." *Id.* at 1308. Although "the need for summary enforcement of IRS summonses is clear and justifies dispensing with Federal

---

[5] The *Oregon* decision similarly misreads *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, slip op. at 15 n.1. *Lynd* does not say filing a pleading waives the expedited process under the CRA. Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." *Lynd*, 306 F.2d at 225-26.

Rules" in the latter context (gathering evidence), "the need to proceed summarily is less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the former context (seizing income-producing property). *Id.*; *see also id.* at 1310-11. When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS." *Id.* at 1311. In other words, far from supporting Movants' argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it.

Accordingly, the "usual notions under the Federal Rules of Civil Procedure" do not apply to the CRA's "special statutory proceeding" to compel production of federal election records. *Lynd*, 306 F.2d at 225-26; *see also Gallion*, 187 F. Supp. at 852 (same).

**B. Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Secretary Griswold argues that the only permissible purpose for a Title III request is if it is related "to curb over racial discrimination…" Defs.' Mot., Doc. 40 at 1. Proposed Intervenors similarly contend that the CRA is limited to discrimination based on race despite the absence of any language in Title III supporting their position. *See* Intervenors' Mot., Doc. 38-1 at 1, 8-10. Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* a case cited by Movants, *see* Def.'s Mot., Doc. 40 at 5; Proposed Intervenors' Mot., Doc. 38-1 at 9, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*,

313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Movants suggest that examining compliance with the requirements of HAVA and the NVRA is incompatible with securing an individual's right to vote. *See* Defs.' Mot., Doc. 40 at 13 (arguing that a "removing voters from the rolls has nothing to do with the CRA's purpose of protecting the right to register to vote"); Proposed Intervenors' Mot., Doc. 38-1 at 9 (arguing that the CRA "has nothing to do with investigating the administrative voter registration list requirements" in HAVA and the NVRA). They are mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2001) (excerpts provided as 2d Neff Decl., Ex. 13). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at

30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[6] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a

---

[6] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. 2d Neff Decl. ¶¶ 13-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as 2d Neff Decl., Ex. 8). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as 2d Neff Decl., Ex. 9).

statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Movants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. The court first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law – an error Movants repeat in their motions. *See* Def.'s Mot., Doc. 40 at 12-13; Proposed Intervenors' Mot., Doc. 38-1 at 9. *Benson* explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." Slip op. at 17. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text

includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fit neatly within the scope of Title III: "The CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Movants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id*.

**C. Movants cannot challenge the Attorney General's basis and purpose to investigate Colorado's noncompliance with the CRA.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records. As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election that relate to any prerequisite to voting in a federal election, including voter registration applications and records. 52 U.S.C. § 20701. Pursuant to Section 303 of the Act, to obtain those federal election records, the Attorney General need only make to an officer of election with custody, possession, or control of those records a "demand in writing" for "inspection, reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705.

In the May 12 Letter, the Attorney General made a written demand under Section 303 of the CRA for Colorado's federal election records, including its SVRL. May 12 Ltr., Doc. 5-1, Ex. 1. The CRA provided the basis for making the request, the complaint about Secretary Griswold

not preserving factual records as required by Title III also provided a factual basis for the request, and the letter explained that the purpose of the request was "[t]o assist [the DOJ's] efforts in evaluating the complaint" it recently received "alleging noncompliance by your office with the duties outlined in 52 U.S.C. §20507." *Id.*

Nevertheless, Movants argue that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records. Secretary Griswold criticizes the Attorney General's stated basis and purpose for demanding records not required to be retained under 52 U.S.C. § 20701. Def.'s Mot., Doc. 40 at 10. Secretary Griswold further argues that the May 12 Letter did not "articulate[] a sufficient basis and purpose for its request...." *Id.* at 11. Proposed Intervenors make related arguments. *See* Proposed Intervenors' Mot., Doc. 38-1 at 5-8.

Federal courts have rejected contentions that parallel those made by Movants. Movants' contention that the demand needs to include a factual basis showing an *extant* violation of federal law, fails for the reasons discussed above. *See supra* Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand). Instead, a reference to the statutory basis for making the demand, namely the CRA, suffices.

Similarly, Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed

"to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC). The United States satisfied that requirement by stating the purpose of the request was "[t]o assist [the DOJ's] efforts in evaluating the complaint" it had received. May 12 Ltr., Doc. 5-1, Ex. 1.

Contrary to what Movants argue, they are prohibited from using "any procedural device or maneuver," including Movants' motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, slip op. at 16-17 ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). Movants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fails under the plain language of the statute, as applied by federal courts.

### D. Colorado's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not categorically exclude production of SVRLs, as Secretary Griswold argues. *See* Def.'s Mot., Doc. 40 at 10-11. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election …' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the Secretary Griswold suggests.

The *Benson* court read Section 301 much more narrowly and denied production of a SVRL for a reason raised by Secretary Griswold: that it applies "only to documents that people *submit* to

the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." *See* Slip op. at 18-19 (emphasis added); *cf.* Def.'s Mot., Doc. 40 at 10 (arguing that the SVRL "is not a static record of any individual act of registration which would have 'come into' and stayed 'in the possession' of county clerks"). The United States respectfully disagrees; no other federal court has adopted such a limitation. Moreover, today many – and likely even most – voter registration applications are only in electronic form in a SVRL.[7] Such a reading would effectively carve out vast numbers of federal election records – or in Colorado's case nearly all its registration records – which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226. Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic…" Slip op. at 22. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress*…" *Id.* (emphasis in original).

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425,

---

[7] According to the data that Colorado reported to the U.S. Election Assistance Commission, it is doubtful that millions of its federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations, with most being added electronically by Colorado's automatic registration program. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 162, 164 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited Feb. 24, 2026).

434 (D. Md. 2019). The court rejected that contention. It explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a "voter list" is simply a partial compilation of voter registrations" encompassed by the Act. *Id*. at 442. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F. Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, slip op. at 22. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 20701, 20703. According to the *Benson* court, "'*come* into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. Slip op. at 19. (first emphasis added). That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). Here,

Secretary Griswold acquired the relevant records in the course of carrying out her duties as an officer of election.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision – and then only "for a period of twenty-two months from the date" of that same election.

Contrary to the *Benson* court, then, "distinction[s] between possessing something and having something come into one's possession," slip op. at 19, are temporal distinctions – not

distinctions between obtaining records from an outside source and through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if the *Benson* court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Secretary of State's office generated the requested record and, under the *Benson* court's view, therefore did not "come into … possession" thereof, any other "officer of election" within the same agency that acquires the record has indeed "come into … possession" of the record under that court's view and was obligated to "retain and preserve" it. 52 U.S.C. § 20701. And Secretary of State Griswold, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying." *Id.* § 20703.

Finally, Movants' construction would create absurd results. Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This

is not to say that this is Title III's sole purpose. It is not.) The United States previously has pursued successful matters, including in litigation, to obtain SVRLs under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[8] To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

---

[8] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Doc. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Doc. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Feb. 24, 2026). For the Court's convenience, the three documents are provided herein as 2d Neff Decl., Exs. 5-7.

**E. The United States is entitled to unredacted "reproduction" and "copying" of Colorado's federal election records, including its SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Movants ask the Court to legislate limitations conspicuously absent from Title III. Secretary Griswold contends that the CRA does not require disclosure of confidential personal information, arguing that states may redact such information under the NVRA. *See* Def.'s Mot., Doc. 40 at 14-15. Proposed Intervenors argue that Title III does not preempt state privacy laws prohibiting disclosure of sensitive information in voter files, including social security numbers and driver's license identification numbers. *See* Proposed Intervenor's Mot., Doc. 38-1 at 10-12.

These arguments miss the mark. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or

> paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet, Movants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position that they advance by its broad reference to "all records and papers…" 52 U.S.C. § 20701.

In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Colorado's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Secretary Griswold and Proposed Intervenors that non-public records are excluded fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[9] *See Lynd*, 306 F.2d at 230.

---

[9] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* 2d Neff Decl. ¶ 16. As of February 24, 2026, thirteen states have provided their SVRLs without any MOU. *Id.*

Finally, if Movants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter, that includes a driver's license number, SSN4, or other HAVA identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). That information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[10] There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA are for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose); *Benson*, slip. op. 17 (assessing compliance with the NVRA is a legitimate purpose under the CRA).

The data the United States has requested under the CRA is the same that twenty-five states (including Colorado) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[11] Similarly, private parties have been granted access to even more

---

Two states have agreed to provide their SVRL under the terms of the MOU. *Id.* Three other states have indicated their intention to provide the SVRLs in the near future. *Id.*

[10] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters.").

[11] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Feb. 24, 2026).

detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of Colorado's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

## IV. THE UNITED STATES IS COMPLYING WITH THE PRIVACY ACT

Proposed Intervenors argue that the United States must comply with the Privacy Act, and the United States is doing that. *See* Proposed Intervenors' Mot., Doc. 38-1 at 13-15. But they go even further, contending that "[t]he Privacy Act independently prohibits DOJ from obtaining Colorado's voter registration list." *Id.* at 13. Contrary to what Proposed Intervenors suggest, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. Proposed Intervenors – and *Weber* – incorrectly refer to only the three SORNs issued by the Civil Rights Division, without addressing any of the dozens of Department of Justice SORNS that are summarized in the table in the May 25, 2017 SORN. *See* Proposed Intervenors' Mot., Doc. 38-1 at 14 & n.10. Indeed, Proposed Intervenors go even further; although they acknowledge the May 25, 2017 SORN, they dismiss it out of hand, arguing it does not "contain[] a routine use that is remotely applicable" without any comment on the four pages of Department of Justice SORNs in the table published with that SORN. *Id.*

The SORNs and Privacy Policy issued by the Department of Justice elaborate on the procedures that the Proposed Intervenors have ignored. The statutes cited for routine use include HAVA, the NVRA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy. The United States made its requests pursuant to the CRA to investigate a complaint it received that Colorado was violating Section 8 of the NVRA. *See* May 12 Letter, Doc. 5-1, Ex. 1. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Also, contrary to what Proposed Intervenors contend through presumed third-party hearsay, the records the United States is seeking to compel under the CRA are not intended "to build a nationwide voter registration database." Proposed Intervenors' Mot., Doc. 38-1 at 1. Rather, the records sought from Colorado are necessary to perform an individualized assessment of the State's efforts to comply with Section 8 of the NVRA.[12] 2d Neff Decl. ¶ 5. Similar efforts to perform individualized assessments of HAVA and NVRA compliance are underway in all but one other state (North Dakota, which does not register voters). That approach is consistent with the Attorney General's enforcement function that Congress authorized in those statutes, performed in a neutral and non-partisan manner. *See* 52 U.S.C. § 21111 (HAVA); 52 U.S.C. § 20510(a) (NVRA). The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes in every state.

At bottom, Proposed Intervenors' arguments are grounded in their disagreement with the requirements codified in the CRA, HAVA, and the NVRA. But those statutes reflect policy choices made by Congress, not the federal courts. Because the United States is complying with the statutory mandates for protecting voter privacy contained in Section 304 of the CRA and in the Privacy Act, their motion to dismiss on privacy grounds should be denied.

---

[12] When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. 2d Neff Decl. ¶ 6.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss by Secretary Griswold (Doc. 40) and Proposed Intervenors (Doc. 38-1) be denied and the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (Doc. 2) be granted.

Dated: February 24, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

_/s/ *Jonathon P. Hauenschild*___________________
JONATHON P. HAUENSCHILD
Trial Attorney, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8.923
Washington, D.C. 20002
Jonathon.Hauenschild@usdoj.gov
Tel. (202) 307-2767
Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2026, a true and correct copy of the foregoing document was served via the email to all counsel of record.

/s/ *Jonathon P. Hauenschild*
JONATHON P. HAUENSCHILD
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20002
Telephone: (202) 307-2767

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,<br><br>Defendant. | Case Number: 1:25-cv-03967-PAB-TPO |

**DECLARATION OF ERIC NEFF IN SUPPORT OF THE UNITED STATES' MOTION TO COMPEL (DOC. ) AND IN OPPOSITION TO THE MOTIONS TO DISMISS BY DEFENDANT GRISWOLD (DOC. 40) AND PROPOSED INTERVENORS COLORADO ALLIANCE FOR RETIRED AMERICANS AND BRITTON DEFORD (DOC. 38-1)**

**<u>DECLARATION</u>**

I, Eric Neff, declare, pursuant to 28 U.S.C. § 1746, that:

1. I am currently Acting Chief to the Voting Section within the Civil Rights Division of the United States Department of Justice. I am fully and personally familiar with the facts stated herein. I make this declaration in support of the United States' Motion to Compel the production of election records pursuant to the Civil Rights Act codified at 52 U.S.C. § 20701, *et seq*. (Doc. 2) and in opposition to the Motions to Dismiss by Defendant Secretary of State for the State of Colorado, Jena Griswold ("Secretary Griswold") (Doc. 40) and Proposed Intervenors Colorado Alliance for Retired Americans and Britton Deford ("Proposed Intervenors") (Doc. 38-1).

2. As stated in the correspondence dated May 12, 2025, attached to Mot. to Compel (Doc. 2) as Exhibit 1 to my Declaration (Doc. 5-2), the United States seeks these documents under the CRA to evaluate a complaint alleging Colorado failed to retain documents necessary to

evaluate Colorado's list maintenance duties under HAVA and the NVRA. The United States also seeks to conduct routine list maintenance oversight as described in federal law.

3. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections.

4. To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic statewide voter registration list ("SVRL"), so as to assure herself that the applications are being properly processed and that reasonable and nondiscriminatory list maintenance efforts have been practiced.

5. Contrary to what Defendant-Intervenors contend through presumed third-party hearsay, the records the United States is seeking to compel are not intended "to build a nationwide voter registration database." Proposed Intervenors' Mot., Doc. 38-1 at 1. Rather, the records sought from Colorado are necessary to perform an individualized assessment of the State's efforts to comply with the list maintenance requirements of HAVA and the NVRA.

6. When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records.

7. An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON) system where personal identifying information associated with the United States' CRA demand is stored.

8. The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the Civil Rights Act ("CRA"). For example, in two of those CRA matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and last four digits of the registrant's social security number, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.

9. The Texas matter was resolved by a Memorandum of Understanding ("MOU") dated May 13, 2008, which required Texas to produce its SVRL to the United States. A true and accurate copy of the Texas MOU is attached as Exhibit 5.

10. A true and accurate copy of the Complaint filed in *United States v. Georgia*, Case No. 1:06-cv-02442-CC (N.D. Ga. filed Oct. 12, 2006), is attached as Exhibit 6.

11. On October 27, 2006, the Court entered a Consent Decree in *Georgia* requiring the state to produce its SVRL to the United States. A true and accurate copy of the *Georgia* Consent Decree is attached as Exhibit 7.

12. Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny, as Congress contemplated in authorizing the Attorney General to bring enforcement actions under HAVA and the NVRA.

13. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *See United States v. N. Carolina Bd. of Elections*, Case No. 5:25-cv-283-M (E.D.N.C.), Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025). Specifically, the State's HAVA List included over one hundred thousand active voter records that were missing one of the identification numbers required by HAVA: the registrant's driver's license number, the last four numbers of the registrant's social security number, or a unique identifying number if the registrant had neither a driver's license nor a social security number. A true and accurate copy of the *North Carolina* Consent Judgment and Order is attached as Exhibit 8.

14. As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from

103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026). A true and accurate copy of the Second Status Report from the *North Carolina* litigation is attached as Exhibit 9.

15. As stated in the initial Declaration, the United States has reached out to states to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law.

16. To that end, the United States has offered states, including Colorado, an MOU memorializing these requirements. As of February 23, 2026, thirteen states have provided their SVRLs without any MOU; two states have agreed to provide their SVRL under the terms of the MOU; and three states have indicated their intention to provide the SVRLs in the near future.

17. A true and accurate copy of the Opinion issued in *United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG (W.D. Mich. Feb. 10, 2026), is attached as Exhibit 10.

18. A true and accurate copy of the Order issued in *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal. Jan. 15, 2026), is attached as Exhibit 11.

19. A true and accurate copy of the Order issued in *United States v. Oregon*, Case No. 6:25-cv-01666-MTK (D. Or. Feb. 5, 2026), is attached as Exhibit 12.

20. A true and accurate copy of cited excerpts from the report by the National Commission on Federal Election Reform (the Ford-Carter Commission), entitled "To Assure Pride and Confidence in the Electoral Process (Aug. 2001)," is attached as Exhibit 13.

I declare under the penalty of perjury that the above statements are true and correct.

Executed on February 24, 2026.

Dated: February 24, 2026, at Washington, D.C.

*/s/Eric Neff*

Eric Neff

# Exhibit 5

**MEMORANDUM OF UNDERSTANDING**

The following memorandum of understanding ("MOU") is entered into by and between the United States Department of Justice ("DOJ") and Secretary of State Phil Wilson, acting in his official capacity as the Secretary of State ("SOS") of the State of Texas.

WHEREAS, in the absence of this MOU, DOJ would, pursuant to 42 U.S.C. §§ 1974b and 1974d, seek to compel the production of the current Texas voter registration list, including, *inter alia*, voters' driver license numbers, social security numbers, and other personal information, from the SOS in order to assess compliance by the State of Texas with the procedures for voter registration at motor vehicle licensing and other state agencies, as well as the list maintenance provisions of the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg *et seq*.; and

WHEREAS, Texas law, specifically TEX. ELEC. CODE §§ 13.004(c); 18.066(b), provides that information, including social security numbers and driver license numbers, furnished on a voter registration application is confidential and is not subject to public disclosure under the Texas Public Information Act, TEX. GOVT. CODE chapter 552; and

WHEREAS, the SOS has an interest, duty and desire to ensure compliance with these and other statutory provisions that are intended to protect the privacy of Texas residents; and

WHEREAS, DOJ and SOS acknowledge that DOJ is entitled to receive and that SOS is required to provide the requested information under the relevant statutes and pursuant to the Supremacy Clause of the United States Constitution; and

WHEREAS, neither DOJ nor the SOS consider DOJ's request under 42 U.S.C. § 1974b to be a request for public information for purposes of the Texas Public Information Act; and

WHEREAS, neither DOJ nor the SOS consider SOS's compliance with this request to be a release of public information to a member of the public for purposes of Tex. Elec. Code § 13.004(c), Tex. Elec. Code § 18.066(b) or the Texas Public Information Act; and

WHEREAS DOJ and SOS are desirous of resolving this matter without the need for litigation which, in the absence of this MOU, both DOJ and the SOS believe would be imminent;

ACCORDINGLY, DOJ and SOS have engaged in good faith negotiations and have agreed to the terms of this Memorandum of Understanding, as follows:

1. SOS shall immediately make available to DOJ the full statewide voter registration list including, where available, the following information: each registered voters' full name, address, full date of birth, social security number, driver license number, race, voter status (*i.e.*, active or inactive), and voting history. SOS shall produce such data in electronic format on a CD-ROM or DVD formatted in consultation and full agreement with DOJ.

2. DOJ shall use the voter registration list information to assess the State's compliance with the federal voting laws, including, but not limited to, the NVRA.

3. Pursuant to 42 U.S.C. § 1974c, unless otherwise ordered by a court of the United States, neither the Attorney General, nor any employee of DOJ, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to 42 U.S.C. § 1974, or any reproduction or copy, except to Congress and any committee thereof, or in the presentation of any case or proceeding before any court or grand jury; provided, however, that in the event that DOJ receives a request to provide or disclose this information to anyone outside of DOJ, then DOJ will make reasonable efforts to inform the SOS of this request, and provide SOS with the opportunity to take whatever action SOS considers necessary to ensure that this information remains confidential and is not disclosed to the public.

4. The DOJ shall retain exclusive possession and control over any and all voter registration records and information during the term of its use of the information, and shall then destroy the records and information pursuant to appropriate and approved DOJ procedures for destruction of sensitive data.

IN WITNESS WHEREOF, the parties have executed this MOU as of the date set forth below. Each party represents that its respective signatory is duly authorized to execute this MOU on its behalf.

FOR THE OFFICE OF THE TEXAS SECRETARY OF STATE

Phil Wilson

Date: 5/7/08

By: The Honorable Phil Wilson
Title: Texas' Secretary of State

FOR THE DEPARTMENT OF JUSTICE:

Christopher Coates

Date: 5/13/08

CHRISTOPHER COATES
Acting Chief
ROBERT POPPER
Acting Deputy Chief
AMANDA E. GREGORY
STEVEN WRIGHT
Trial Attorneys
Voting Section; Civil Rights Division
U.S. Department of Justice
Room 7254NWB
950 Pennsylvania Avenue
Washington, D.C. 20530
(202) 616-4227 (phone)
(202) 307-3961 (facsimile)
Attorneys for United States of America

# Exhibit 6

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 12 2006

JAMES N. HATTEN, Clerk
By: [signature] Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| The UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>The STATE of GEORGIA; and<br>CATHY COX, Secretary of State,<br>in her official capacity,<br><br>Defendants. | ) | Civil Action No.<br><br>1 06 CV 2442<br><br>CC |

## COMPLAINT

The plaintiffs UNITED STATES OF AMERICA herein, alleges:

1. The United States hereby files this action on behalf of the United States of America to enforce the requirements of the Civil Rights Act of 1960, 42 U.S.C. § 1974 *et seq*. ("CRA"), with respect to the production of voter registration data for federal office in the State of Georgia. 42 U.S.C. §§1974 and 1974b.

## JURISDICTION AND VENUE

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. § 1974d.

3. Venue for this action is proper in the United States District Court for the Northern District of Georgia, pursuant to 28 U.S.C. §§ 90 and 1391(b).

## PARTIES

4. Plaintiff the UNITED STATES OF AMERICA seeks to compel production of records pursuant to 42 U.S.C. §§ 1974b and 1974d, which authorize the Attorney General of the United States to bring suit when a jurisdiction fails to maintain and/or make available all records and papers relating to voter registration for federal elections.

5. Defendant STATE of GEORGIA is a State of the United States of America and is subject to the requirements of 42 U.S.C. § 1974.

6. Defendant CATHY COX is the Secretary of State and the chief State elections official for the defendant STATE of GEORGIA and is responsible for custody and maintenance of voter registration records for all persons eligible to vote under State law. O.C.G.A. § 21-2-210; 42 U.S.C. § 1974e.

## CLAIM FOR RELIEF

7. Under Section 1974, every officer of election shall retain and

preserve, for a period of twenty-two (22) months from the date of any federal election, all records and papers relating to voter registration. 42 U.S.C. § 1974.

8. Any record or paper required to be retained and preserved under 42 U.S.C. § 1974, upon written demand by the Attorney General or his representatives, must be made available to the Attorney General or his representatives for inspection, reproduction and copying. 42 U.S.C. § 1974b.

9. On July 11, 2006, attorneys for the Department of Justice ("Department"), representatives of the Attorney General, sent a letter ("demand letter"), pursuant to 42 U.S.C. § 1974b, to the Deputy Attorney General of Georgia, Counsel for the Secretary of State, formally demanding, among other things, the current Georgia voter registration list including the voters' social security numbers, and providing a basis for that demand, specifically to assess compliance by the State with the procedures for voter registration at motor vehicle licensing and other State agencies, as well as the list maintenance provisions of the National Voter Registration Act, 42 U.S.C. § 1973gg *et seq.* ("NVRA").

10. The July 11, 2006, demand letter requested the voter registration list including the full social security number for each voter regularly maintained by

the State as part of voter registration.

11. The State has declined to provide the records absent an Order from a Court of the United States in light of a State statute limiting access to such records. O.C.G.A. § 21-2-225. This statute is superseded, however, by the relevant federal statute. See 42 U.S.C. § 1974b; U.S. CONST. art VI, cl.2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the UNITED STATES OF AMERICA prays for an order:

1. Declaring that Defendants are in violation of 42 U.S.C. § 1974b with respect to the production of voter registration data, which they are required to provide upon demand in writing to the Attorney General;

2. Compelling Defendants to immediately make available for inspection, reproduction and copying, the requested voter registration records, in electronic format pursuant to 42 U.S.C. § 1974b.

3. Plaintiff further prays that this Court order such relief as the interest of justice may require, together with the costs and disbursements of this action.

Dated: October 12, 2006.

Respectfully submitted,

By:

DAVID E. NAHMIAS
United States Attorney

SHARON D. STOKES
GA Bar No. 227475
Assistant U.S. Attorney

ALBERTO R. GONZALES
Attorney General

WAN J. KIM
Assistant Attorney General
Civil Rights Division

JOHN TANNER
DC Bar No. 318873
Chief, Voting Section

ROBERT D. POPPER
NY Bar No. 2357275
Special Litigation Counsel
CHRISTY A. McCORMICK
VA Bar No. 44328
NICOLE S. MARRONE
PA Bar No. 89863
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-305-0526
Facsimile: 202-307-3961

# Exhibit 7

RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 12 2006

JAMES N. HATTEN, Clerk
By: Deputy Clerk

ORIGINAL
FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 27 2006

JAMES N. HATTEN, Clerk
By: Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| The UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>The STATE of GEORGIA; and CATHY COX, Secretary of State, in her official capacity,<br><br>Defendants. | ) | Civil Action No.<br>1 06 CV 2442<br><br>CC |

## CONSENT JUDGMENT AND DECREE

The United Stated filed the Complaint in this action on this date pursuant to 42 U.S.C. §§ 1974b and 1974d, which authorize the Attorney General of the United States to bring suit when a jurisdiction fails to maintain and/or make available all records and papers relating to voter registration for federal elections. The Attorney General alleges that the defendants violated 42 U.S.C. § 1974b by failing to make available upon written demand the Georgia voter registration list with any social security numbers collected by the state for voter registration purposes, for inspection,

reproduction and copying. The defendants seek a declaration authorizing such inspection, reproduction and copying from a Court of the United States.

The parties are desirous of resolving this matter without the need for litigation. Accordingly, they have engaged in good faith negotiations and have agreed to the terms of this Consent Judgment and Decree as an appropriate resolution of all claims alleged in this litigation.

This Court has jurisdiction over the parties and the subject matter of this litigation. This agreement is final and binding between the parties, their successors in office, and their agents regarding the claims raised in this action.

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that:

1. Defendants are enjoined to take the actions specified below to comply with 42 U.S.C. § 1974b and to make available to the United States all records and papers relating to voter registration for federal elections, specifically the State's voter registration list, including Social Security numbers that the State has collected for voter registration purposes.

## PROVISION OF INFORMATION BY THE STATE

2. Defendants shall immediately make available to the United States the full statewide voter registration list including each registered voters' full name, address, birth date and all additional voter identification information, including social security numbers or drivers license numbers as collected by the State for voter application and registration purposes. The State shall produce such data in electronic format on a CD-ROM or DVD formatted in consultation and full agreement with the United States.

## SCOPE OF USE OF INFORMATION

3. The United States shall use the voter registration list information to assess the state's compliance with the federal voting laws, including, but not limited to, the National Voter Registration Act, 42 U.S.C. §1973gg *et seq.* ("NVRA") and the Help America Vote Act of 2002, 42 U.S.C. § 15301 *et seq.* ( "HAVA").

4. Pursuant to 42 U.S.C. § 1974c, unless otherwise ordered by a court of the United States, neither the Attorney General, nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to 42 U.S.C. § 1974, or

any reproduction or copy, except to Congress and any committee thereof, or in the presentation of any case or proceeding before any court or grand jury.

5. The United States shall retain any and all records concerning the subject matter of this Decree during the term of its use of the information, and shall then destroy the information and any copies pursuant to appropriate and approved Department of Justice procedures for destruction of sensitive data.

6. In the event that the United States identifies information indicating an issue as to compliance with federal law, the United States agrees to provide the State with such information as is necessary and appropriate to offer an opportunity to address and correct such issue. Provision of such information will not be deemed to waive any attorney-client or attorney work product privileges. Plaintiff retains the right to take legal redress at any time, if necessary, to compel the State and/or the Secretary of State to comply with federal law.

7. Any notices sent by the respective parties pursuant to provisions of this Decree shall be sent to:

For the United States:

John K. Tanner
Chief, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Room 7254-NWB
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
Email: robert.popper@usdoj.gov
Email: christy.mccormick@usdoj.gov
Email: nicole.marrone@usdoj.gov

For the Defendants:

Dennis R. Dunn, Esq.
Deputy Attorney General
Department of Law
State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334
Phone: (404) 656-5614
Fax: (404) 657-9932
Dennis.Dunn@LAW.State.GA.US

The provisions of this Decree shall expire on December 31, 2009. The Court retains jurisdiction of this action to enforce the terms of this Decree during the effective period of this Decree.

Entered this 27th day of October, 2006.

Clarence Cooper
JUDGE

Approved as to form and content:

**For the Plaintiff, United States of America:**

ALBERTO R. GONZALES
Attorney General

DAVID E. NAHMIAS
United States Attorney

WAN J. KIM
Assistant Attorney General
Civil Rights Division

SHARON D. STOKES
GA Bar No. 227475
Assistant U.S. Attorney

JOHN TANNER
DC Bar No. 318873
Chief, Voting Section

ROBERT D. POPPER
NY Bar No. 2357275
Special Litigation Counsel
CHRISTY A. McCORMICK
VA Bar No. 44328
NICOLE S. MARRONE
PA Bar No. 89863
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-305-0526
Facsimile: 202-307-3961

**For the Defendants, the State of Georgia and Cathy Cox, Secretary of State, in her official capacity::**

Thurbert E. Baker
Attorney General
State of Georgia

Dennis R. Dunn
Deputy Attorney General
State of Georgia
Department of Law
40 Capitol Square SW
Atlanta, GA 30334
Telephone: 404-656-5614
Facsimile: 404-657-9932

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil No. 5:25-cv-00283-M-RJ

UNITED STATES OF AMERICA,

Plaintiff, v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; SAM HAYES, in his official capacity as Executive Director of the North Carolina State Board of Elections; FRANCIS X. DE LUCA, JEFF CARMON, STACY EGGERS IV, SIOBHAN O'DUFFY MILLEN, and ROBERT RUCHO, in their official capacities as Members of the North Carolina State Board of Elections; and STATE OF NORTH CAROLINA,

Defendants.

**CONSENT JUDGMENT AND ORDER**

Plaintiff United States of America initiated this action on May 27, 2025, against the North Carolina State Board of Elections (the "NCSBE"); Sam Hayes, in his official capacity as Executive Director of the NCSBE; Francis X. De Luca, Jeff Carmon, Stacy Eggers IV, Siobhan O'Duffy Millen, and Robert Rucho, in their official capacities as Members of the NCSBE (the "State Board Defendants"); and the State of North Carolina, acting through the North Carolina's chief State elections official as defined in 52 U.S.C. § 21083, to enforce the requirements of Section 303(a) of the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 21083(a).

Section 303(a) requires, among other things, that a voter registration application for an election for Federal office may not be accepted or processed by a State unless it includes a driver's

license number from the applicant, or if the applicant does not have a driver's license, the last four digits of the applicant's social security number ("SSN4"). If an applicant has not been issued a current and valid driver's license or social security number, the State must assign a special identifying number for voter registration. *See* 52 U.S.C. § 21083(a)(5)(A)(ii). The information for each record must be timely entered into the State's computerized voter registration list after it is received.

Compliance with the computerized statewide voter registration list requirements in Section 303 of HAVA facilitates voter list maintenance procedures to ensure the accuracy of voter records used for Federal elections.

The United States' Complaint alleges, among other things, that Defendants did not comply with the requirements of Section 303(a) of HAVA. Compl. ¶¶ 5, 15-19, Doc. 1. Specifically, the Complaint alleges that Defendants used state voter registration forms and instructions that did not explicitly require a voter to provide a driver's license or the last four digits of a social security number and then the county boards of elections registered a significant number of North Carolina voters who did not provide one of those two identification numbers. *Id.* ¶¶ 35-37, 39(b)-(d), 45(a)-(c). The Complaint further alleges that in some cases in which a driver's license or the last four digits of a social security number were later obtained by the county boards of elections from some voters, that information was not timely added to update voter records in the State's computerized statewide voter registration list. *Id.* ¶¶ 33(d)-(e), 38, 39(d)-(e).

The United States and State Board Defendants, through counsel, have conferred in good faith and agree that this action should be settled without protracted and costly litigation. The United States and State Board Defendants therefore propose to resolve this lawsuit through the terms of this Consent Judgment and Order ("Order"). Accordingly, the United States and State Board Defendants hereby consent to the entry of this Order, as indicated by the signatures of counsel at the end of

this Order. The United States and State Board Defendants waive a hearing and the entry of findings of fact and conclusions of law on all issues specific to State Board Defendants in this matter, and all claims are dismissed without prejudice in consideration for the entry of this Order.

North Carolina law makes the State Board Defendants responsible for carrying out the State's duties under HAVA. Therefore, the remedies in this Order apply only to the State Board Defendants and their agents, employees, contractors, successors, and all other persons representing the interest of State Board Defendants.

As part of their commitment to full compliance with Section 303 of HAVA, State Board Defendants agree to each provision of this Order to resolve the issues in this case. Accordingly, the United States and State Board Defendants stipulate and agree that:

1. This action is brought by the Attorney General on behalf of the United States pursuant to Section 303 of HAVA, 52 U.S.C. § 21083.

2. The Attorney General is authorized to bring a civil action against any state or jurisdiction to enforce the requirements of HAVA, 52 U.S.C. § 21111, and this Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 2201(a) and 52 U.S.C. § 21111.

3. State Board Defendants are proper parties in this action.

4. Section 303 of HAVA sets certain minimum standards for a statewide voter registration list used for Federal elections ("HAVA List"). The HAVA List functions as the single system for storing and managing the official list of registered voters throughout the State. 52 U.S.C. § 21083(a)(1)(A)(i). The HAVA List must contain the name and registration information of, and must assign a unique identifier to, each legally registered voter in the State who votes in Federal elections. 52 U.S.C. §§ 21083(a)(1)(A)(ii)-(iii).

5. The HAVA List must be coordinated with other agency databases within the State. 52 U.S.C. § 21083(a)(1)(A)(iv). Any election official in the State, including any local election

official, must be able to obtain immediate electronic access to the information contained in the list, and all voter registration information obtained by any local election official must be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local election official. 52 U.S.C. §§ 21083(a)(1)(A)(v)-(vi). The State must provide the necessary support so that local election officials are able to enter voter registration information on an expedited basis. 52 U.S.C. § 21083(a)(1)(A)(vii).

6. The HAVA List serves as the official voter registration list for the conduct of all elections for Federal offices in the State. 52 U.S.C. § 21083(a)(1)(A)(viii). No application for voter registration to be included in the HAVA List can be accepted or processed unless it includes a driver's license number, for those who have a driver's license number, or SSN4 for those who do not have a driver's license number; except, for those who do not have one of these numbers, the application may be accepted and processed and the State must assign a unique identifier. 52 U.S.C. § 21083(a)(5)(A).

7. State Board Defendants have maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5).

Signatures on the following page:

**STIPULATED AND AGREED TO:**

For the United States of America:

HARMEET K. DHILLON

Assistant Attorney General
Civil Rights Division

MICHAEL E. GATES

Deputy Assistant
Attorney General

*/s/ James Thomas Tucker*
MAUREEN RIORDAN
Acting Chief, Voting Section
TIMOTHY F. MELLETT
JAMES THOMAS TUCKER
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Telephone: (202) 307-2767
E-mail: james.t.tucker@usdoj.gov

For State Board Defendants and the State acting through the Chief State Elections Official:

Sam Hayes
Executive Director of the State Board
Chief State Election Official

NORTH CAROLINA
DEPARTMENT OF JUSTICE

*/s/Terence Steed*
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
Email: tsteed@ncdoj.gov

*/s/Mary L. Lucasse*
Mary L. Lucasse
Special Deputy Attorney General
N.C. Bar No.: 39153
Email: mlucasse@ncdoj.gov

*/s/Ryan C. Grover*
Ryan C. Grover
Special Deputy Attorney General
N.C. Bar No.: 53703
Email: rgrover@ncdoj.gov

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6567
Facsimile: (919) 716-6763

Space left blank intentionally.

The Joint Motion for Entry of Consent Judgment and Order [DE 70] is GRANTED. It is ORDERED, ADJUDGED, and DECREED that:

1. State Board Defendants are subject to the requirements of Section 303(a) of HAVA. 52 U.S.C. §§ 21083(a), 21141.

2. The terms of this Order apply to all elections for Federal office held in North Carolina.

3. State Board Defendants, their agents, employees, contractors, successors, and all other persons representing the interest of State Board Defendants are required to ensure that North Carolina's voter registration forms and instructions and the State's HAVA List used for elections for Federal office fully complies with Section 303(a)(5) of HAVA, 52 U.S.C. § 21083(a)(5).

4. State Board Defendants are further enjoined from engaging in any act or practice that fails to comply with the requirements of Section 303(a) of HAVA, 52 U.S.C. § 21083(a), including:

   a. For elections for Federal offices, the use of any voter registration forms or instructions that do not comply with the requirements of Section 303(a)(5) of HAVA, including any such materials provided in languages other than English;

   b. For elections for Federal offices, the use of any training materials provided to elections officials that include information or instructions that do not comply with the requirements of Section 303(a)(5) of HAVA, 52 U.S.C. § 21083(a)(5);

   c. For elections for Federal offices, acceptance or processing any application for voter registration to be entered into the State's HAVA List unless it includes a driver's license number, for persons who have an current and valid driver's license number; or the last four digits of the social security number, for

persons who do not have a driver's license number and have a social security number, as required by 52 U.S.C. § 21083(a)(5)(A); or for registration applicants that have neither a driver's license number or a social security number, failing to assign a unique identifier as required by 52 U.S.C. § 21083(a)(5)(A);

d. For elections for Federal offices, failing to enter "all voter registration information obtained by any local election official," including any update to the Section 303(a)(5) identification number provided by a registrant into the State's HAVA List "on an expedited basis at the time the information is provided to the local official" as required by 52 U.S.C. §§ 21083(a)(1)(A)(v)-(vi). Consistent with the requirements of the National Voter Registration Act of 1993 ("NVRA") for the timely transmission of voter registration applications to State election officials, 52 U.S.C. §§ 20504(e), 20506(d), the State Board Defendants agree to define "expedited basis" in this Order as "not later than 10 days after the date of acceptance" except that if voter registration information obtained by any local election official "is accepted within 5 days before the last day for registration to vote in an election," then it shall mean "not later than 5 days after the date of acceptance"; and, if voter registration information is submitted to any local election official between the day after the last day that voter registration applications may be accepted prior to an election under state law and the county canvass, then it shall mean no later than 10 days after the county canvass, unless otherwise provided by state law; and

e. For elections for Federal offices, when any update to the Section 303(a)(5) identification number is entered into the State's HAVA List by the State or county elections board, that update will include comparing the updated record

with existing records to identify and remove any duplicates.

5. State Board Defendants have proposed and are implementing a remedial plan to update records included in the State's HAVA List so that all records comply with the requirements of Section 303(a) of HAVA. That plan, as modified by agreement of the Plaintiff and State Board Defendants, includes the terms in this Order ("Remedial Plan").

6. Voters who registered without supplying the information required by HAVA. State Board Defendants have identified records of voters who appear to have registered to vote after HAVA's effective date without providing a driver's license number, for those who had a driver's license number, or SSN4, for those who did not have a driver's license number and had a social security number, in violation of 52 U.S.C. § 21083(a)(5)(A).

a. First mailing. On or before August 31, 2025, State Board Defendants will mail a form to voters in this group requesting the voter provide their driver's license number if the voter has a current and valid driver's license, or SSN4 if the voter does not have a current and valid driver's license. If the voter does not have a current and valid driver's license number or a social security number, the voter may indicate that on the form. The mailing will include a self-addressed, postage- prepaid return envelope to return the form to the voter's county board of elections. The mailing will include instructions to the voter regarding how they can update their record securely online through the North Carolina Division of Motor Vehicles registration portal.

b. Second mailing. On or before December 15, 2025, State Board Defendants will send a follow-up mailing with the same material and information in Paragraph 6(a) to voters who did not respond to the first mailing.

c. Election Day procedure. Voters identified in Paragraph 6 who have not updated their registration record to include the information required by Section 303(a)(5) of HAVA by the next Federal election will vote by provisional ballot using a form requesting their driver's license number if the voter has a current and valid driver's license, or SSN4 if the voter does not have a current and valid driver's license. If the voter does not have a current and valid driver's license number or a social security number, the voter may indicate that on the provisional ballot.

d. Provisional ballot to be counted for Federal elections. State Board Defendants will instruct the county boards of elections that for all provisional ballots issued pursuant to Paragraph 6(c), the vote cast for each Federal office on the provisional ballot will be counted, notwithstanding the presence of or validation of identification information supplied by the voter on the provisional ballot form, so long as the voter is otherwise eligible to vote under state law.

e. Provisional voting will not result in removal from voter rolls. The provisional voting process outlined in this Section shall not, by itself, result in any voter being removed from the official list of registered voters in state or Federal elections in North Carolina.

7. County Boards of Election updates to voter records.

a. State Board Defendants will direct county boards of elections that on or before August 31, 2025, each board will review and update records in the HAVA List for active or inactive status voters who provided a current and valid driver's license number or SSN4, but that information was not entered into their record, or who confirmed that they did not have a current and valid driver's license

number or a social security number, but that information was not entered into their record.

b. State Board Defendants will further direct county boards of elections that on or before August 31, 2025, each board will review and correct records in the HAVA List for voters who registered before HAVA's effective date of January 1, 2004 but whose current records indicate an incorrect registration date.

8. List-maintenance procedures unaffected by the Remedial Plan. Pursuant to 52 U.S.C. § 21083(a)(2)(A)(i), nothing in the Order or the Remedial Plan alters the requirement that for any "individual… to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993," 52 U.S.C. §§ 20501 *et seq.*, "including subsections (a)(4), (c)(2), (d), and (e) of section 8" of the NVRA, 52 U.S.C. § 20507.

9. Training, instructions, and oversight. State Board Defendants will ensure that county boards of elections and all appropriate election officers and officials receive appropriate training and instructions on voter registration procedures that comply with Section 303(a)(5) of HAVA, including use of HAVA-compliant registration forms and instructions and timely entry into the HAVA List of any updates or changes to a voter record within the time provided for in Paragraph 4(d). State Board Defendants will monitor compliance with Section 303(a)(5) requirements, as set forth in Paragraphs 9 and 10, and take any other steps necessary, as provided by law, to ensure the State's HAVA List is maintained consistent with the requirements of Federal law.

10. Reporting requirements.

a. On or before August 31, 2025, State Board Defendants will file with the court and provide to the United States a copy of all materials mailed to voters

pursuant to Paragraph 6(a) of the Order.

b. On or before December 1, 2025, State Board Defendants will file with the court and provide to the United States a written report indicating the number of voters sent the first mailings identified in Paragraph 6(a) of the Order, the date the mailings went out, and the number of and date of all records subject to the mailings that were updated.

c. On or before February 1, 2026, State Board Defendants will file with the court and provide to the United States a written report indicating the number of voters sent the second mailings identified in Paragraph 6(b) of the Order, the date the mailings went out, and the number of and date of all records subject to the mailings that were updated.

d. On or before October 15, 2025, State Board Defendants will file with the court and provide to the United States a written report of the updates to the HAVA List made by the county boards of elections pursuant to Paragraph 7 of the Order.

e. Annual report. Beginning in 2026, on or before April 30th, State Board Defendants will file with the court and provide to the United States a written report of all steps taken to comply with the Order and with Section 303(a)(5) of HAVA since the previous report that State Board Defendants filed under this Order.

11. State Board Defendants will make available to the United States upon request any non-privileged documents created or maintained by State Board Defendants regarding compliance with this Order or compliance with Section 303(a)(5) of HAVA, including voter records in the State's HAVA List and any relevant documents that the State Board Defendants may be required to produce or retain under North Carolina State law. As used herein, "voter records" means an

electronic copy of the State's HAVA list including each registrant's full name, date of birth, residential address, his or her driver's license number or state identification number or the last four digits of the registrant's social security number, which is the information required under HAVA to register individuals for Federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i). All records and data received by the United States from the State Board Defendants will be kept securely and treated consistently with the Privacy Act, 5 U.S.C. § 552a, et seq. To the extent confidential records or data is requested, the State Board Defendants reserve the right to seek a protective order from the court.

12. Upon entry of this Order, Plaintiff's claims shall be dismissed without prejudice. Plaintiff and Defendants shall bear their own costs and fees for this litigation.

13. This Order is final and binding between the United States and State Board Defendants and their successors in office regarding the claims raised in this action.

14. The Order shall take effect immediately upon being approved by the court and entered upon the docket ("the effective date").

15. This Order shall remain in effect from its effective date until June 30, 2027, unless a party obtains an extension pursuant to Paragraph 16.

16. This court shall retain jurisdiction of this case to enter further relief or such other orders as may be necessary for the effectuation of the terms of this Order and to ensure compliance with Section 303(a)(5) of HAVA. For good cause shown, any party may move to extend the Order or to reopen the case.

17. As set forth herein, the court finds that all interests are adequately represented by the parties in this enforcement action, and the matters raised in the action are fully and finally settled. Therefore, the motions to intervene [DE 7, 34, and 39] are DENIED AS MOOT.

18. The Clerk of the Court shall administratively close this case.

SO ORDERED this 8th day of September, 2025.

Richard E. Myers II

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

# Exhibit 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**NO. 5:25-CV-00283-M**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; SAM HAYES, in his official capacity as Executive Director of the North Carolina State Board of Elections; FRANCIS X. DE LUCA, JEFF CARMON, STACY EGGERS IV, SIOBHAN O'DUFFY MILLEN, and ROBERT RUCHO, in their official capacities as Members of the North Carolina State Board of Elections; and STATE OF NORTH CAROLINA,<br><br>Defendants. | ) | **DEFENDANTS' SECOND STATUS REPORT [D.E. 72, ¶ 10 (c)]** |

NOW COMES Defendants North Carolina State Board of Elections, its Executive Director  and its Members (collectively "State Board Defendants" or "Defendants"), and provides the Court with a Second Status Report as contemplated by paragraph 10 of the Court's September 8, 2025 Consent Judgment and Order ("Order")]. [D.E. 72, ¶ 10 at (c)] The information required by the Order is set forth below:

Pursuant to Paragraph 10(c) of the Order, the State Board provides the following information.

- 74,333 voters were sent the second mailing identified in Paragraph 6(b) of the Order.
- The second mailing went out on November 24, 2025.[1]

1 This corrects the date the second mailing was sent out which was referred to in the first Status Report. [D.E. 84]

- From December 1, 2025 to January 30, 2026, 2,355 records subject to the first and second mailings were updated to include the missing identification information.[2]
- Since the beginning of the Registration Repair Project on July 17, 2025 to the date of this filing, the total number of voters missing this information has decreased from 103,329 to 70,709. *See* State Board webpage, "Registration Repair Search Tool," https://dl.ncsbe.gov/RegistrationRepair/index.html, last visited January 30, 2026.

The State Board Defendants remain willing to provide additional information on these issues if requested by the Court.

Respectfully submitted this the 30th day of January, 2026.

NORTH CAROLINA
DEPARTMENT OF JUSTICE

/s/ Mary L. Lucasse

Mary L. Lucasse
Special Deputy Attorney General
N.C. Bar No.: 39153
Email: mlucasse@ncdoj.gov

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6567
Facsimile: (919) 716-6763

*Counsel for State Board Defendants*

[2] The State Board reports that during this time period an additional 554 voters' records were removed from the voter registration list due to their own cancellation or other regular list maintenance processes. None of these voters were removed due to being in the Registration Repair Project.

# Exhibit 13

# To Assure Pride and Confidence *in the Electoral Process*

August 2001



## *The* National Commission *on* Federal Election Reform

*Organized by*
Miller Center of Public Affairs, University of Virginia
The Century Foundation

*Supported by*
The David and Lucile Packard Foundation
The William and Flora Hewlett Foundation
The John S. and James L. Knight Foundation

## Miller Center of Public Affairs

University of Virginia
P.O. Box 400406
2201 Old Ivy Road
Charlottesville VA 22904-4406

*tel* 804-924-7236
*fax* 804-982-2739
*web* http://millercenter.virginia.edu

## The Century Foundation

41 East 70th Street
New York NY 10021

*tel* 212-535-4441
*fax* 212-879-9190
*web* http://www.tcf.org

www.reformelections.org

## The Commission

### Honorary Co-Chairs
President Gerald R. Ford
President Jimmy Carter

### Co-Chairs
Robert H. Michel
Lloyd N. Cutler

### Vice-Chairs
Slade Gorton
Kathleen M. Sullivan

### Commissioners
Griffin Bell
Rudy Boschwitz
John C. Danforth
Christopher F. Edley, Jr.
Hanna Holborn Gray
Colleen C. McAndrews
Daniel Patrick Moynihan
Leon Panetta
Deval L. Patrick
Diane Ravitch
Bill Richardson
John Seigenthaler
Michael Steele

### Executive Director
Philip D. Zelikow

## Public Hearings

### March 26, 2001
*Citizen Participation*
The Carter Center
Atlanta, Georgia

### April 12, 2001
*Election Administration*
The Ronald Reagan Presidential Library
Simi Valley, California

### May 24, 2001
*What Does the Law Require?*
Lyndon B. Johnson Library and Museum
Austin, Texas

### June 5, 2001
*The American and International Experience*
Gerald R. Ford Library
Ann Arbor, Michigan

# To Assure Pride and Confidence *in the Electoral Process*

August 2001

## *The* National Commission *on* Federal Election Reform

*Organized by*
Miller Center of Public Affairs,
University of Virginia
The Century Foundation

*Supported by*
The David and Lucile Packard Foundation
The William and Flora Hewlett Foundation
The John S. and James L. Knight Foundation

# Letter

## *to the American People*

In 2000 the American electoral system was tested by a political ordeal unlike any in living memory. From November 7 until December 12 the outcome of the presidential election was fought out in bitter political and legal struggles that ranged throughout the state of Florida and ultimately extended to the Supreme Court of the United States. The American political system proved its resilience. But we must think about the future.

The ordinary institutions of election administration in the United States, and specifically Florida, just could not readily cope with an extremely close election. Many aspects of the election process were put under a microscope and viewed by an anxious nation. With dismay and growing anger we saw controversial ballot design; antiquated and error-prone voting machines; subjective and capricious processes for counting votes; voter rolls that let unqualified voters vote in some counties and turned away qualified voters in others; confusion in the treatment of overseas military ballots; and a political process subjected to protracted litigation.

Stepping back from Florida, the picture is no more encouraging. The chief election official of Georgia, Cathy Cox, testified to our Commission that: "As the presidential election drama unfolded in Florida last November, one thought was foremost in my mind: there but for the grace of God go I. Because the truth is, if the presidential margin had been razor thin in Georgia and if our election systems had undergone the same microscopic scrutiny that Florida endured, we would have fared no better. In many respects, we might have fared even worse." Across America, we have heard from official after official who feels the same way.

There is good news, though. In the last few years, and now spurred by the events last year, election reform has returned to the legislative agenda in many states. In much of the country cadres of able and dedicated election administrators are in place who can show what is possible and carry reforms into practice. In a world of problems that often defy any solution, the weaknesses in election administration are, to a very great degree, problems that government actually can solve.

In this report we and our colleagues offer very specific recommendations on what should be done. In other words, Americans can and should expect their electoral system to be a source of national pride and a model to all the world.

Gerald R. Ford

Jimmy Carter

Robert H. Michel

Lloyd N. Cutler

*Co-chairs of the National Commission on Federal Election Reform*

Eleven states and the District of Columbia have already implemented statewide registration systems that cover all their jurisdictions. Seven more states have adopted them and are in the process of implementing them; three more are close to adoption. A statewide registration system was part of the reform program adopted earlier this year in Florida. These 21 states and D.C. include 39.2% of the voting-age population in the United States. In its June 2001 report to Congress, the bipartisan Federal Election Commission, after consulting with state and local election officials, recommended that states "1) develop and implement a statewide computerized voter registration database; 2) insure that all local registration offices are computerized; and 3) link their statewide computerized system, where feasible, with the computerized systems of the collateral public agencies relevant to the NVRA (motor vehicle offices, public assistance offices, etc.)"[19]

With a sense of how voter registration has evolved over the past century, we believe four factors weigh heavily in favor of placing the core responsibilities for voter registration in the hands of state governments.

**The constitutional allocation of responsibilities.** Under the U.S. Constitution, voter qualifications are defined primarily by state governments. So it makes sense to center registration responsibility at this same level of government. Local issues and ballots may vary, but a resident of a given state, voting in a state or presidential election, will find the same voter eligibility rules and the same candidates at the top of the ballot anywhere within the state.

**The nature of the data.** The most important source of applications for new voter registration has become the application for a driver's license. This is already a statewide database, and it is estimated that 92% of all registered voters also have a driver's license. The most effective systems have made DMV (Department of Motor Vehicles) information congruent, and thus interoperable, with the voter information called for by the state's election code. When people move within a state, they are still in the database even if they are slow to get a new license. When they move from one state to another, one of the first—and perhaps the only—civic act they must accomplish is to get a driver's license valid for that state. DMV change-of-address information is thus considered even more comprehensive and reliable than the useful National Change of Address database maintained by the U.S. Postal Service.[20]

**Accuracy can mean access.** People are mobile, but more than three-quarters of all moves are within the same state. An effective statewide database can therefore be quite useful, including its capacity to address such common issues as the registration of in-state college students and people with second homes within a state. But perhaps the most important beneficiaries of statewide registration systems will be members of lower-income groups, who are more likely to move than higher-income groups

and, when they do move, are much more likely to move from one place to another within the same state. They are thus more likely to fall off local voter rolls and bear the burden of re-registration.

**Accountability.** A clear statewide registration system will be more transparent and accountable to outside scrutiny. Some advocates for disadvantaged groups are uneasy about statewide registration proposals, fearing that these will turn into still more powerful tools for "purging." Yet one of the clearest findings from the U.S. Civil Rights Commission's investigation in Florida is that, with purely local administration of list maintenance, local variations on statewide guidelines can be critical yet difficult to track.



Georgia Secretary of State Cathy Cox

Beyond the general recommendation in favor of statewide registration systems, several specific policy issues deserve mention. One is the question of whether to require voters to display some proof of identification at the polls.

All states hope that precinct officials and poll watchers will have at least some familiarity with the residents of their precincts. Seven states, all but one of them rural, do nothing more. In the rest, the most common practice now is to require voters to sign their names in an official registry or on a ballot application. About a third of the states require poll workers to check signatures against those provided at registration. Fourteen states insist that voters produce some form of identification.[21]

Most states that have histories of strong party rivalry or election fraud require signature verification or voter identification at the polls. Signature verification puts an extra burden upon administrators, and especially on often ill-trained poll workers practicing a very subjective, often impossible, task while voter lines lengthen. Also, many polling places lack the means to provide poll workers with accurate copies of the voter's actual signature (the one the voter used in order to register) and a signature may change over time.

One alternative, favored by several Commissioners, is to require those who are registering to vote and those who are casting their ballot to provide some form of official identification, such as a photo ID issued by a government agency (e.g., a driver's license). A photo ID is already required in many other transactions, such as check-cashing and using airline tickets. These Commissioners point out that those who register and vote should expect to identify themselves. If they do not have photo identification then they should be issued such cards from the government or have available alternative forms of official ID. They believe this burden is reasonable, that voters will understand it, and that most democratic nations recognize this act as a valid means of protecting the sanctity of the franchise.

A small percentage of adults, perhaps about 5 to 7%, do not possess a driver's license or other photo identification. They are disproportionately poor and urban (since they may use public transit rather than drive a car). Some Commissioners also object to requiring voters to produce a photo ID or some alternative form to verify their identity because some members of minority groups believe such a process can be used to intimidate voters or turn them away in a racially discriminatory fashion.



Election Day, Gloucester, MA, November 7, 2000

We believe that an assessment of how to strike the right balance between administrative burden and voter responsibility turns too much on the assessment of local conditions to be amenable to any categorical recommendation by this Commission. We do believe, however, that states should be able to verify a voter's identity.

In recommending the adoption of statewide voter registration systems, we looked at the experience of those states that have adopted them. The outstanding models appear to be Michigan and Kentucky. Michigan deserves particular scrutiny because it is the most populous state to have fully implemented such a system and it is also a state with a larger number of separate election jurisdictions, more than 1600, than any other. The Michigan system is new, having been put in place just in the last few years, and it passed the test of the 2000 election with flying colors. The software solution developed in Michigan has been inexpensive and is not exclusive to a particular vendor. Any state can copy it. A more complete description of the Michigan voter registration system is attached in Appendix B to this report.[22]

Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form.

An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier.[23] The Federal Election Commission has made the same recommendation.



Commissioner John Seigenthaler

Some states also seek added identifiers, such as information on the place of birth and prior residential address. We take no position on the value of having this added information, but we do believe that federal law and regulations should be amended over time where state experience provides evidence that a change is needed. Used cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida.

Our policy recommendation need not require any immediate amendment of the NVRA. The NVRA specifies how voters can be registered. In general, those provisions will benefit from and work much more effectively with a statewide registration system. The NVRA also specifies how voter lists should be maintained. We believe those provisions do not take adequate account of the kind of statewide voter registration system we recommend. But we see no need to amend the list of maintenance provisions of the NVRA either to add more safeguards or pare them back until more and wider experience with new systems can give us more evidence about just what is needed.

All states require voters to declare, by their signature, that they are U.S. citizens and meet other criteria for eligibility to vote. Twelve states require applicants at least to check a box specifically affirming they are a citizen, though most of these accept the national mail-in and NVRA forms that do not have such a box. Inability to verify citizenship is a weakness in every state's voter registration system. The problem is not hypothetical. Non-citizens do vote, albeit illegally.[24] We therefore recommend that a specific enforceable affirmation of citizenship be included in all voter registration applications. Combined with enforcement of the relevant state and federal vote fraud laws, this should be sufficient to contain this potential problem.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03967-PAB-TPO

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,

Defendant.

---

**REPLY IN SUPPORT OF MOTION TO DISMISS (DOCKET NO. 40)**

---

The pretextual nature of the Department of Justice's request for Colorado's voter registration list—which Secretary Griswold has already provided—is laid bare by DOJ's Opposition ("DOJ Opp'n"). Docket No. 49. Despite claiming that an unredacted copy of Colorado's voter roll is necessary to investigate a complaint filed against Colorado, DOJ offers shifting descriptions of what the complaint is about. And even absent the shifting descriptions of this complaint, DOJ's argument that it is the reason for requesting this information from the Secretary is undermined by its admission that DOJ has sought the same information from every other state in the country. DOJ Opp'n at 33. Whatever DOJ's purpose is in collecting this information, it is plainly not to investigate a complaint specific to Colorado. This alone merits dismissal—because DOJ has not articulated its actual basis and purpose for its request, it has not satisfied the elements of the Civil Rights Act ("CRA"). 52 U.S.C. § 20703.

DOJ's Opposition also fails to address the Colorado-specific facts that preclude relief in this instance. Most importantly, Secretary Griswold has already provided DOJ with almost

exactly what it asks the Court to order her to produce. As a result, this action does not present an actionable controversy, and DOJ's opposition does not even address, let alone rebut, this fundamental fact. Indeed, DOJ only acknowledges that the Secretary provided it with terabytes of responsive data in a footnote of their Response.

Ultimately, that DOJ is resorting to pretext to obtain state voter registration lists is troubling. But the Court need not address those concerns. Instead, it can—and should—grant the Secretary's Motion to Dismiss on the narrow grounds that DOJ has not satisfied requisite statutory elements and has already received what it previously demanded.

## ARGUMENT

### I. The Civil Rights Act does not insulate DOJ's request from standard procedures.

Title III does not authorize summary proceedings. Shortly after the passage of the CRA, the Supreme Court held that whether a statute exempts courts from the default Rules of Civil Procedure is a question of statutory analysis. *See United States v. Powell*, 379 U.S. 48, 52–58 (1964) (analyzing whether the statutory phrase "by appropriate process" exempted such proceedings from the Federal Rules of Civil Procedure and concluding it did not). More recently, the Court explained that the "Federal Rules are the default rules in civil litigation," and although Congress can exempt a statutory proceeding from the Civil Rules, courts "do not lightly infer that Congress has done so; and silence on the subject is seldom enough." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023) (citing *Jones v. Bock*, 549 U.S. 199, 212 (2007) and *Marek v. Chesny*, 473 U.S. 1, 11–12 (1985)). Title III is silent on the subject. *See* 52 U.S.C. § 20705 (giving federal courts "jurisdiction by appropriate process"). Thus, the Civil Rules apply, by default, in this case.

DOJ evades this straightforward conclusion with two unavailing arguments. *First*, DOJ attempts to distinguish *Powell* by arguing that the IRS statute at issue there is different from the CRA. DOJ Opp'n at 11–12. But any difference in the statutes is immaterial. The Court's analysis in *Powell* was simply that because the IRS statute "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. The same is true here. Further, even if this Court decided that *Powell* is distinguishable, the Court should still apply the analysis more recently articulated by *Polanksy* and its predecessors, *Jones* and *Marek*. Namely, the text of Title III must justify a departure from the ordinary Civil Rules. Tellingly, DOJ fails to even muster an argument that it does so.

Instead, and *second*, DOJ relies on one out-of-Circuit case concluding that Title III permits summary proceedings, *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See generally*, DOJ Opp'n at 9–14. *Lynd* is not binding. *See United States v. Carson*, 793 F.2d 1141, 1147 (10th Cir. 1986). Nor is *Lynd* persuasive. *Lynd* offers no statutory analysis, and scant explanation beyond reference to prior decisions within the Fifth Circuit. *Lynd*, 306 F.2d at 225. Those cases offer little-to-no statutory analysis as to the Civil Rules and instead rely on a functionalist understanding of Title III and its historic purpose. *See United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (summarizing that prior cases "clearly laid down the rule that the government is entitled to have an order of the trial court authorizing it to inspect the voting records" "upon the simple assertion by the Attorney General of the United States that there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county."); *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd*

*sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961) ("Title III provides—if properly applied and enforced—an effective means whereby preliminary investigations of registration practices can be made in order to determine whether or not such practices conform to constitutional principles.").[1] All of which is to say that *Lynd* and its predecessors stand less for the procedural proposition that the Civil Rules do not apply to CRA document demands and more for the substantive proposition that a proper request under the CRA arises where DOJ alleges "reasonable grounds for the belief that certain voters are being discriminatorily denied their voting rights in a given county." 301 F.2d at 822. This reasoning is no answer to *Powell*'s and *Polansky*'s instruction to determine the applicable procedure from the statutory text, and does not justify a departure from the Civil Rules.

DOJ's effort to avoid application of the Civil Rules masks a more extreme premise: that that the "sufficiency" of the Attorney General's stated basis and purpose "is not open to judicial review or ascertainment." DOJ Opp'n at 21 (quoting *Lynd*, 306 F.2d at 226). To the contrary, a textual analysis of Title III—demanded by *Powell* and *Polansky*—shows why judicial scrutiny of each of the CRA's required elements, applying traditional civil procedure, is necessary.

---

[1] The recent decision in *United States v. Benson*, which DOJ invokes, erroneously "construe[d] a request for records under the CRA as a form of administrative subpoena" without reference to *Powell* or *Polansky*. No. 25-cv-1148, 2026 WL 362789, at *7 (W.D. Mich. Feb. 10, 2026). In any event, even if this demand were an administrative subpoena, the Federal Rules of Civil Procedure still apply pursuant to Rule 81, and no statute, local rule, or court order has modified any rule. *See* Fed. R. Civ. P. 81(a)(5). Notably, the *Benson* court went on to "apply the Rule 12(b)(6) standard to evaluate the United States' CRA claim" in part because DOJ there, as here, filed "a traditional civil complaint, not a petition for summary enforcement." *Id*. The court in *Benson* also emphasized that even under an administrative procedure process, the court must be assured that DOJ has shown "that its investigation has a legitimate purpose, that its inquiry may be relevant to that purpose, that it does not already have the requested information and that it otherwise has followed any statutory requirements." *Id*. (text only).

Title III establishes the elements for a records claim, one of which is that DOJ must identify the "basis and purpose" for its demand. 52 U.S.C. § 20703; Docket No. 40 at 9. That element imposes a limit on DOJ's authority to inspect voter registration records. If a court could not interrogate DOJ's stated basis and purpose, the statute's limiting principle would be made hollow. *Cf. Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) ("The canon against surplusage indicates that we generally must give effect to all statutory provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning." (citation omitted)).

That limiting principle should apply all the more forcefully where, as here, DOJ offers the novel theory that Title III in fact permits the Attorney General to inspect *any* voter-related databases (like electronic voter rolls) to assess compliance with *any* federal election law (like the NVRA) and without *any* procedure for ascertaining the basis and purpose of the demand. That theory is a far cry from even the Fifth Circuit's functionalist view that "reasonable grounds" for the belief that certain voters are being "discriminatorily denied their voting rights" justify an order to inspect voter registration records. *See Lynd*, 301 F.2d at 822. That theory also, by ridding itself of any judicial oversight, creates the potential for absurd applications.[2]

DOJ's demand makes even less sense considering the NVRA contains its own enforcement mechanism, which *is* subject to the Civil Rules. 52 U.S.C. § 20510(a) (authorizing DOJ to "bring a civil action in an appropriate district court for such declaratory or injunctive

[2] For example, if DOJ requested records for the purpose of identifying lawful voters it wished to target with spurious investigations for political reasons, the CRA would not condone such action. More benignly, but equally absurd, under its interpretation DOJ could satisfy the statutory elements by claiming its purpose was to identify the number of registered voters whose names begin with the letter "P." By not allowing judicial inquiry into the basis and purpose for its request, DOJ's interpretation would effectively eliminate that element from the statute.

relief as is necessary to carry out" the NVRA). DOJ should not be permitted to utilize an older and more general statue (the CRA) to sidestep Congress's intent in the later and more specific statute (the NVRA). *See, e.g.*, *United States v. Est. of Romani*, 523 U.S. 517, 530 (1998) ("[A] specific policy embodied in a later federal statute should control our construction of the priority statute."); *also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (A court must "interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into [a] harmonious whole'" (citations omitted)). In short, the CRA does not exempt a record demand from the ordinary Civil Rules, and this Court must be able to scrutinize DOJ's pretextual basis and purpose for its demand.

## II. The Secretary is entitled to dismissal because DOJ's pleadings prove that it has not disclosed its actual purpose for requesting a copy of Colorado's voter registration list.

Any demand for records under the CRA must include "a statement of the basis and purpose therefore." 52 U.S.C. § 20703. Implicit in this requirement is truthfulness. DOJ must disclose the actual reason for its request. Here, DOJ's own pleadings show that the May 2025 request upon which this action rests did not truthfully disclose the purpose of the demand. Because DOJ has not satisfied the statute, dismissal is appropriate.

According to DOJ, its May 2025 letter articulated: (1) a legal basis for the demand, "Title III of the CRA," (2) a factual basis for the demand, "a complaint received by the [DOJ] alleging noncompliance by Secretary Griswold," and (3) the purpose for the demand, "to assist the DOJ's efforts in evaluating the complaint." DOJ Opp'n at 6 (quotations omitted). Thus, according to DOJ, both the basis and purpose for its request rest on the alleged complaint DOJ received.

Despite its centrality to this action, DOJ cannot settle on the actual contents of this complaint. In the May 2025 letter, DOJ says that the complaint alleges "noncompliance by your

office with the duties outlined in 52 U.S.C. § 20507" (the NVRA). Docket No. 37-2 at 1. At times before this Court, DOJ echoes this description. *See, e.g.*, DOJ Opp'n at 6–7 (quoting Docket No. 5-1); *id.* at 32 ("The United States made its requests pursuant to the CRA to investigate a complaint it received that Colorado was violating Section 8 of the NVRA.").

But elsewhere, DOJ claims the complaint alleges that the Secretary "failed to retain all the necessary documents required under the *CRA*." DOJ Opp'n at 10 (emphasis added). DOJ repeats this formulation throughout its opposition brief. *See, e.g.*, *id.* at 6 (describing complaint as "alleging noncompliance by Secretary Griswold regarding retention of election records as required by Title III [of the CRA]"); *id.* at 19–20 (describing a "complaint about Secretary Griswold not preserving factual records as required by Title III").

Thanks to DOJ's shifting explanations, neither the Secretary, nor the Court, can know what DOJ's stated purpose is. Is it to investigate allegations concerning the Secretary's list maintenance practices under the NVRA? Or allegations that the Secretary is not appropriately retaining records under the CRA? DOJ itself cannot consistently explain its purpose in requesting a copy of Colorado's voter registration list, and has declined the opportunity to clarify its purpose through the disclosure of meaningful detail about the complaint.

Failure to allege an ascertainable basis and purpose is sufficient reason for the Court to hold that DOJ has not pled a necessary element of the CRA. But dismissal is still appropriate even if the Court credits DOJ's own declarant, who describes the complaint as addressing the Secretary's records retention, not her compliance with federal list maintenance laws. 2d Decl. of Eric Neff (Docket No. 49-1) ¶ 2 ("[T]he United States seeks these documents under the CRA to evaluate a complaint alleging Colorado failed to retain documents necessary to evaluate

Colorado's list maintenance duties[.]"). Thus, the purpose stated in the May 2025 letter (to investigate a complaint relating to list maintenance obligations under the NVRA), is apparently not DOJ's actual purpose (to investigate a complaint relating to records retention obligations under the CRA). *Compare* Docket No. 37-2 at 1 *with* Docket No. 49-1 ¶ 2. Therefore, the May 2025 request did not contain "the" basis and purpose for DOJ's request.[3]

Of course, given the shifting explanations and backdrop, there is no reason for the Court to accept DOJ's pleadings or declarations at face value. *See United States v. Oregon*, 25-cv-01666-MTK, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to [DOJ] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."). Even the new stated purpose for requesting Colorado's voter registration list is plainly pretextual. *See also United States v. Weber*, 25-cv-09149-DOC-ADS, 2026 WL 118807, at *12 (C.D. Cal. Jan. 15, 2026) (noting "DOJ's obfuscation of its true motives" in requesting voter registration lists); *Oregon*, 2026 WL 318402, at *11 (expressing "suspicion about the purposes for which [DOJ] seeks statewide unredacted voter registration lists"). The Court can, and should, hold that DOJ has not satisfied the textual elements of a CRA request where the record clearly shows that it has been anything but candid with the Secretary and the Court about the basis and purpose for its request.

[3] DOJ also fails to explain how Colorado's voter registration list is necessary or even useful in evaluating whether Colorado is retaining election records as required by federal law. The list is a snapshot of Colorado's registered voters. It includes nothing that would enable an investigation into whether Colorado is maintaining election records.

## III. By not addressing the Secretary's contention that she has already produced what DOJ is asking the Court to order, DOJ has conceded that argument.

On February 10, the Secretary filed two pleadings: (1) a Motion to Dismiss ("Mot. to Dismiss") (Docket No. 40), and (2) an Opposition to DOJ's Motion to Compel ("Opp'n to Mot. to Compel") (Docket No. 37). DOJ responded to the former, Docket No. 40, but did not file a Reply to the latter. The consolidated Opposition fails to address several arguments that were raised in the Secretary's Motion to Dismiss. And because DOJ has failed to file a Reply in Support of its Motion to Compel, it has waived any non-obvious response to the Secretary's arguments found in her opposition to that Motion, and the Court may "assume the state's . . . analysis is correct." *Eaton v. Pacheco*, 931 F.3d 1009, 1031 (10th Cir. 2019) (discussing consequence of failing to file a reply brief); *see also In re Syngenta AG MIR 162 Corn Litig.*, 111 F.4th 1095, 1110 n.15 (10th Cir. 2024) (failing to file a reply waives "any non-obvious rejoinders to arguments raised in the response brief").

### A. DOJ already received what it is asking this Court to order produced.

The Secretary has already provided DOJ what it is seeking in this action. Mot. to Dismiss at 6; Opp'n to Mot. to Compel at 8. Specifically, the Secretary has provided a copy of Colorado's statewide voter registration list, which includes each registrant's name, address, year of birth, and Help America Vote Act ("HAVA") unique identifier. Ex. B to Opp'n to Mot. to Compel (Docket No. 37-10) ¶ 14. This is functionally identical to that which DOJ asks the Court to compel production. *See* Compl. (Docket No. 1) at 6–7 (requesting list with each registrant's

"name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier").[4]

In initiating this action, DOJ was either unaware that a copy of Colorado's voter list had already been provided or failed to candidly acknowledge that fact to this Court. Neff Decl. (Docket No. 5-2) ¶ 5. The Secretary demonstrated that she had produced a copy of the voter roll, and DOJ confines its concession of its own inaccurate statements to a single sentence in a single footnote of its Opposition. DOJ Opp'n at 7 n.2. It did not withdraw or correct its sworn declaration, explain how the factual inaccuracy made its way into the sworn declaration, or (most importantly) meaningfully address the Secretary's response that she had provided substantially the same information DOJ now requests.

Instead, DOJ now claims that the Secretary's May 2025 response "did not . . . provide all the records requested, including the unredacted" voter registration list. *Id.* But that assertion is belied by both DOJ's May 2025 request, and its requested relief in this lawsuit.

As to the former, DOJ's May 2025 request asked for "all records" retained pursuant to the CRA. Docket No. 37-2 at 1. As the Secretary has explained, the voter registration list, which

---

[4] DOJ's ignorance of list maintenance practices is highlighted by its inaccurate suggestion that Colorado provides unredacted registration lists to the Electronic Registration Information Center ("ERIC"). DOJ Opp'n at 30. ERIC is a nonprofit that helps states coordinate their voter registration list maintenance across jurisdictions. Ex. A, 2d Rudy Decl. ¶ 2. For the same reasons the Secretary has not provided Colorado voters' sensitive personal information to DOJ, she does not provide that information to ERIC. Rather, ERIC requires each member state to apply a "cryptographic one-way hash" to all sensitive data (such as Social Security numbers, driver's license numbers, or dates of birth), which converts these sensitive datapoints to a "string of random characters. *Id.* ¶¶ 4, 5 (quoting ERIC Technology and Security Overview). ERIC never sees or receives an unredacted copy of Colorado's statewide voter registration list. *Id.* ¶¶ 3, 5.

is compiled by her and by Colorado's 64 County Clerks and Recorders, is not a record under the CRA. *See* Mot. to Dismiss (Docket No. 40) at 9–11.

But more importantly, what the Secretary *did* produce in response to DOJ's request is also what DOJ asks for in this action. DOJ wants a copy of Colorado's voter registration list that includes each voter's "name, date of birth, residential address, and *either* their state driver's license number, the last four digits of their Social Security number, *or* HAVA unique identifier." Compl. (Docket No. 1) at 6–7 (emphases added). The Secretary produced exactly that last May: a copy of the state voter registration list that included each registrant's name, birth year, residential address, and HAVA unique identifier. Docket No. 37-10 ¶ 14. DOJ's Opposition seems to focus on drivers' license numbers and SSNs, *see, e.g.*, DOJ Opp'n at 27, but ignores that its requested relief permits production of HAVA unique identifiers instead.[5]

This highlights the nationwide scope of DOJ's efforts and the pretextual nature of its Colorado-specific justifications. When it brought this suit, DOJ—at minimum—could not be bothered to check whether the Secretary had responded to its earlier requests for records. Once it was pointed out that she had responded, DOJ surprisingly ignored the substance of that response and the implications of her already providing it.

### B. DOJ's Opposition failed to address numerous other arguments raised by the Secretary, most importantly that state privacy law prohibits production of driver's license or Social Security numbers.

DOJ's Opposition fails to address the Secretary's arguments relating to the E-Government Act, the Driver's Privacy Protection Act, and Colorado privacy law. *See* Opp'n to

[5] DOJ does not address the distinction, if any, between date of birth and birth year.

Mot. to Compel at 13–14. DOJ's failure to even discuss compliance with these critical federal and state laws waives any non-obvious response to those arguments.

DOJ also chose not to address the Secretary's arguments against electronic production. *See id*. at 15. In the event the Court concludes that DOJ is entitled to additional records, DOJ is limited to receiving what the text of the CRA entitles it to: an opportunity to inspect, reproduce, and copy the records it seeks in person at the Secretary's principal office. 52 U.S.C. § 20703.

**IV. A voter registration list, updated regularly based on new information, is not a record that must be "preserved" in static form under the CRA.**

An electronic, statewide, voter registration list—required by HAVA—is not a "record[]" or "paper[]" which "come[s] into [an election official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting[.]" 52 U.S.C. § 20701; *see also Benson*, 2026 WL 362789, at *9. DOJ's arguments otherwise misstate prior decisions and ignore both the Secretary's arguments and subsequent enactments of the United States Congress.

First, DOJ argues that "federal courts that have applied [the CRA] have concluded that . . . [i]t does not categorically exclude production of" voter registration lists. DOJ Opp'n at 22 (citing *Gallion*, 187 F. Supp. at 855 and *Lynd*, 306 F.2d at 226). But neither *Gallion* nor *Lynd* address whether a statewide voter registration list is subject to the CRA's preservation requirement. In *Gallion*, DOJ requested all records covered by the CRA, 187 F. Supp. at 851, and the court never addressed whether a voter registration list qualifies. In fact, it is unlikely a statewide voter registration list even would have existed in Alabama in the 1960s, before voter rolls were centralized at the state level by HAVA in the early-2000s. So too in *Lynd*. 306 F.2d at 226. In fact, even in the special statutory procedure *Lynd* describes, it notes that if a dispute

arises over "whether or not any specified particular paper or record" falls within the CRA, that question is subject to judicial inquiry and determination. *Id.*

Second, DOJ does not address the Secretary's argument that defining a voter registration list as a record subject to preservation under the CRA would be incompatible with Congress's intent for such lists as reflected in the later-enacted and more specific statute, HAVA. Mot. to Dismiss at 10–11. Under HAVA, voter rolls must be updated each time a voter moves, dies, or updates their registration. 52 U.S.C. § 21083(a)(2)(A). Necessarily, then, election officials cannot "preserve" those lists in static form as required for records covered by the CRA. 52 U.S.C. § 20701. The only way to read these two statutes in harmony is to apply the plain language of the CRA, as the *Benson* court did, and conclude that a registration list is not a "record[] or paper[]" under the CRA. 2026 WL 362789, at *9. And to the extent the two irreconcilably conflict, the statute which deals specifically with voter registration lists—HAVA—must prevail over the more general record-keeping requirement in the CRA. *See United States v. Wesley*, 60 F.4th 1277, 1284 (10th Cir. 2023) (observing the "canon of statutory construction that specific controls over general").

Finally, DOJ argues that the Secretary's interpretation would render the CRA meaningless because most of Colorado's records exist only in electronic form. DOJ Opp'n at 23 & n.7. It is true that many voter registration applications now arrive in electronic form. *See* Ex. A, 2d Rudy Decl. ¶ 7. And electronic copies are scanned into Colorado's electronic voter registration database by Colorado's county clerks. *Id.*. But this is irrelevant to the point that both the Secretary and the *Benson* court made. Neither *Benson* nor the Secretary argue that the CRA does not apply to electronic records. Rather, the CRA applies only to "documents that people

submit to the State as part of the voter registration process." *Benson*, 2026 WL 362789, at *9. It does not apply to databases, like registration lists, that are "created by state officials." *Id.*

DOJ's argument does, however, highlight how more recent laws have left it trying to fit a square peg into a round hole. Even after the CRA was enacted, its "enforcement . . . encountered serious obstacles in various regions of the country." H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2441. Thus, in 1965, Congress enacted the Voting Rights Act ("VRA") of 1965, "to adopt more effective measures than exist[ed]" prior to its passage. *Id.* at 2442. As a result, the CRA fell mostly into desuetude until DOJ's present efforts to revive it for an ulterior purpose. *See also* DOJ Opp'n at 4 n.1 (observing that "caselaw addressing the CRA in any depth" is limited to cases "in the early years following the CRA's enactment").

In the meantime, Congress repeatedly passed more specific legislation to address voter list retention and maintenance. In the NVRA, Congress included specific provisions regarding retention and production of voter lists. 52 U.S.C. § 20507(i).[6] And in HAVA, Congress required those lists to be maintained electronically and periodically updated. 52 U.S.C. §§ 21083(a)(1)(A), (a)(2)(A). To the extent the plain language interpretation of the CRA creates results that are "pedantic," *Benson*, 2026 WL 362789, at *10, or "absurd," DOJ Opp'n at 26, it is because the records retention and production provisions of the CRA are outdated and have been surpassed by both technology and subsequent enactments.

[6] The reason DOJ seeks to resuscitate the CRA, instead of using the NVRA, is that federal courts are nearly unanimous in holding that the NVRA permits states to redact voters' sensitive personal information from voter registration lists produced under the act. *See Benson*, 2026 WL 362789, at *3 (collecting cases).

## CONCLUSION

The Court should grant the Secretary's Motion to Dismiss.

Dated: March 17, 2026

PHILIP J. WEISER
Attorney General

/s Lane Towery

***Peter G. Baumann***, Senior Assistant Attorney General
***Lane Towery***, Assistant Attorney General
1300 Broadway, Denver, CO 80203
Telephone: (720) 508-6000
Email: peter.baumann@coag.gov; lane.towery@coag.gov
Attorneys for Secretary Jena Griswold

# Exhibit A

## to Reply in Support of Mot. to Dismiss

## *Supp. Declaration of Hilary Rudy*

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

March 17, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03967-PAB-TPO

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

JENA GRISWOLD, in her Official Capacity as Secretary of State for the State of Colorado,

Defendant.

---

**SECOND DECLARATION OF HILARY RUDY**

---

I, Hilary Rudy, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746.

1. I am over 21 years of age and employed as the Deputy Director of the Elections Division within the Colorado Department of State. In this role, among other responsibilities, I am involved in Colorado's voter registration list maintenance activities.

2. As part of my responsibilities, I am involved in managing Colorado relationship with the Electronic Registration Information Center ("ERIC"). ERIC is a nonpartisan nonprofit membership organization founded by state election officials from across the United States to improve registration list maintenance by coordinating efforts across jurisdictions. Its mission is "to help states improve the accuracy of America's voter rolls, increase access to voter registration for all eligible citizens, reduce election costs, and increase efficiencies in elections." *See* Ex. 1 – ERIC Technology and Security Overview.

3. At regular intervals, Colorado and other member states submit voter registration data to ERIC. However, consistent with state law, we do not submit unredacted voter information to ERIC.

4. Instead, ERIC uses a robust anonymization process to ensure that neither ERIC nor any other member state ever sees sensitive data elements such as a voter's driver's license number, social security number, or date of birth. Prior to sending ERIC data, the Department of State applies "a cryptographic one-way hash" to those elements. Ex. 1 at 2.

5. The hashed data remains unintelligible to ERIC and is only compared to data from other states using data matching software. At any point, if a human were to see sensitive data provided to ERIC by the Department of State, that data would appear as "a string of random characters." Ex. 1 at 2.

6. As part of my responsibilities I am also familiar with how Colorado counties process voter registration applications in SCORE, Colorado's statewide voter registration database.

7. Although voters may register in person, many voters now register online, or through the Division of Motor Vehicles. These online registration applications, like hardcopy paper applications, are scanned into SCORE by county clerks and recorders, where they are maintained in their original form.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 16th day of March, 2026, at Denver, Colorado.

_/s/ Hilary Rudy_______________________
Hilary Rudy
Deputy Director of the Elections Division
Colorado Department of State

# Exhibit 1

to Supp. Rudy Declaration

*United States v. Griswold*, No. 1:25-cv-03967-PAB-TPO

March 17, 2026

# Electronic Registration Information Center (ERIC): Technology and Security Overview

## Introduction

ERIC is a public charity non-profit membership organization comprised of states who choose to join. Formed in 2012, ERIC's mission is to help states improve the accuracy of America's voter rolls, increase access to voter registration for all eligible citizens, reduce election costs, and increase efficiencies in elections. ERIC is governed and funded by its members.

Members securely submit voter registration and motor vehicle department (MVD) data to ERIC. ERIC is also certified to use official death data from the Social Security Administration and subscribes to official change of address data from the United States Postal Service. Utilizing these four data sources, ERIC provides its members with reports that identify inaccurate or out-of-date voter registration records, deceased voters, individuals who appear to be eligible to vote but who are not yet registered, and possible cases of illegal voting. In compliance with federal and state laws, members use these reports to contact voters for the purposes of updating their record or to remove ineligible and deceased voters from the rolls. Members also contact likely eligible but not yet registered individuals, providing information on how best to register. Possible cases of illegal voting are reviewed and, if found credible, referred to law enforcement.

## Information Security Management Approach

Information security management and corporate transparency are core principles for ERIC. In support of these principles, ERIC employs risk and information security management techniques that align with industry guidelines published by national and international information security management organizations.[i] ERIC practices include, but are not limited to:

- Building a culture of continuous review and improvement.
- Using standards-based risk assessment and risk management practices.
- Performing routine internal and external audits of risk profiles and security management policies, operations, and procedures.
- Requiring governing board approval of updates to ERIC's Information Security Management Plan, risk assessment, and associated information security policies.
- Requiring members to adhere to information security commitments via ERIC's by-laws and membership agreement, which are consistent with applicable federal laws and regulations.
- Requiring that its data center vendor provide documentation of an annual security assessment by an independent third party to ensure its security practices align with industry-accepted standards.

## Information Security Basics

This section provides a general overview of the organization's information security basics pertaining to ERIC Servers and Employees.

### ERIC Servers

- For security reasons, ERIC does not publicly disclose the location of the secure U.S. based data center where its servers are housed.

- The data center is hosted by a U.S. based vendor. The vendor is subject to Type 2 SOC 1 and Type 2 SOC 2 audits.
- There is no web-based access to the ERIC servers. ERIC's website is not connected to or hosted on the servers.
- Members do not have access to any other member's data or reports stored on the servers.
- ERIC servers are never connected to any state's voter registration system.
- Only authorized ERIC employees have access to the ERIC servers. Members and Advisory Board Members do not have access to the servers.

### ERIC Employees

- Employees must pass a criminal background check.
- Employees sign an annual agreement to comply with ERIC's information security policies, procedures, and practices.
- Employees work remotely from U.S. based locations. Secure remote access to the data center is limited to only employees who need it to perform their duties.

## Data Security in Practice

Participating as a member in ERIC involves preparing and securely transmitting data to ERIC, and securely accessing the reports ERIC generates.

### Preparing and Securely Transmitting Data

At least every 60 days, each member submits their voter registration data and licensing and identification data from their MVD to ERIC. ERIC refers to these data as Member Data. Data fields related to name, address, driver's license or state ID number, last four digits of social security number, date of birth, and activity date are required, if present. Members also submit information on current record status (e.g., is the record "active" or "cancelled"), phone number, and email address when available. These fields improve the quality of the data matching process.

ERIC distributes to each member an application members use to apply a cryptographic one-way hash to sensitive data elements before the jurisdiction submits the data to ERIC. The ERIC hashing application uses a module provided by IBM, in conjunction with Senzing, which implements an HMAC-SHA2-256 one-way hashing algorithm with a 1024-bit secret key. The secret key is housed in a PKCS#11 interfaced secure store that leverages AES-128 encryption.[ii]

The sensitive data elements are the driver's license or state ID number, any part of the social security number, and date of birth. The hashing application converts these data into what appears to be a string of random characters, making the data significantly more difficult for a potential hacker to utilize. A cryptographic hash is not meant to be decrypted. ERIC only accepts voter and driver's license data files that have been hashed using the application. This ensures these sensitive data are protected at the source, in the member's environment, prior to submission to the ERIC data center. The distribution of the hashing application to ERIC members is a closely monitored and structured process.

Once the data is hashed, ERIC members employ layers of industry-standard security mechanisms to transmit the data file to the ERIC data center, including multiple rounds and types of encryption. There are also specific procedures directed at communication of member credentials.

## ERIC Data Management, Matching, and Report Delivery

Once ERIC accepts the data files, ERIC applies the hashing process to the same sensitive data elements a second time using different hashing parameters. This ensures the hashed values are different and more secure.

At the ERIC data center, the Member Data and official death data from the Social Security Administration are combined using data matching software from Senzing. The data matching software[iii] compares common fields like name, address, and other identifiers to determine if the records refer to the same people. With entity-centric learning, matching gets smarter over time as more records become available. For instance, the mailing address on a DMV record might provide the missing link that confirms a match between two voter records that otherwise wouldn't have enough information on their own to be sure.

ERIC produces reports for each member by analyzing the results of the matching to identify voter records from that member that may be outdated or inaccurate, or to identify people who are not currently registered to vote. Once the reports are generated, they are available for secure download. Members cannot access the reports of other members. (Visit www.ericstates.org for more information on the reports ERIC produces for its members.)

## External Assessment and Review

As a matter of best practice and in support of the organization's mindset of continuous improvement, ERIC subjects itself to independent review of its information security practices, policies, procedures, and systems. These independent assessments are in addition to ERIC's annual internal review of its Risk/Threat Assessment, Information Security Management Plan, and associated policies and procedures.

To maintain its subscription to the Social Security Limited Access Death Master File, ERIC complies with the National Technical Information Service subscriber requirement to attain a third-party attestation that its systems, facilities, and procedures adequately safeguard this information. This process must be conducted every three years. It is similar to an audit and includes an extensive review and examination of all information security policies, practices, systems, facilities, and procedures relative to the handling of Social Security data. ERIC successfully received this attestation starting in 2017 and every three years after, as required. The latest attestation was in 2023.

In 2023, ERIC successfully completed its first annual SOC 2 audit. SOC 2 audits are intended to assure ERIC members and the public that their information is protected and secure. The SOC 2 audit was conducted by leading compliance assessor, A-LIGN. Established by the American Institute of Certified Public Accountants, the SOC 2 examination is designed for organizations of any size, regardless of industry and scope, to ensure the personal assets of their customers are protected. SOC 2 reports are recognized around the world and affirm that a company's infrastructure, software, people, policies, procedures, and operations have been formally reviewed. Because the SOC 2 Report contains information that could compromise the security of the data ERIC holds, it is confidential and available for review only to ERIC members.

In 2021, ERIC utilized information security assessment services from the U.S. Department of Homeland Security (DHS) and the Cybersecurity and Infrastructure Security Agency (CISA). These included a cyber-

hygiene review and an External Dependencies Assessment. At no time during these engagements did DHS or CISA have access to ERIC's servers, data, or technical infrastructure.

In 2020, ERIC contracted with an independent U.S.-based cyber security firm to conduct a comprehensive assessment of its information security and compliance posture. The external evaluation included the following:

- Cyber security risk assessment using ISO 27001 and 27002 security controls
- Code review of the hashing application used by members and ERIC to secure sensitive data
- Office and network scan and penetration testing
- Email security assessment
- Phishing/Social Engineering campaign
- Data handling practices relative to member data

The cyber security firm concluded "ERIC has strong data security practices" and identified "no critical findings."

## ERIC Board of Directors and Privacy and Technology Advisory Board

The ERIC Board of Directors is dedicated to the security and protection of the data ERIC utilizes, the reports it provides members, and the organization's critical infrastructure. The Board of Directors reviews and approves annual updates to ERIC's Information Security Management Plan, Risk/Threat Assessment, and associated policies and procedures. The Board also provides advice and guidance on external assessments, and reviews external assessment reports.

Upon ERIC's founding in 2012, the Board appointed a Privacy and Technology Advisory Board to advise on best practices and support the organization's "continuous improvement" mindset toward data security and privacy. The advisory board is comprised of up to four experts in the field of data security, data matching, and encryption and has no governing authority. The advisory board reviews ERIC's Information Security Management Plan and makes recommendations related to security and data handling practices. It does not have access to the data ERIC utilizes or to ERIC's technical infrastructure. Advisory Board members:

- Glenn Newkirk, President of InfoSENTRY Services, Inc., http://www.infosentry.com/
- Ross Stapleton-Gray, Customer Trust, Dovetail, https://dovetail.com
- Rebecca Wright, Professor of Computer Science, Barnard College, and Director, Vagelos Computational Science Center. https://www.cs.columbia.edu/~rwright/

---

[i] Review ERIC's Membership Agreement for more information on the legal protections that apply to the data ERIC utilizes and the reports it generates for its members.

[ii] For more information on the hashing mechanism and secure store, visit https://senzing.zendesk.com/hc/en-us/articles/360000970834-Selective-Feature-Hashing. A free Zendesk account may be required for access.

[iii] The technical term is "Entity Resolution." Simply put, Entity Resolution is the process of determining when real world entities are the same, despite differences in how they are described. For example, a voter registration record and a DMV record that have the same name and address, but the dates of birth clearly indicate it is a junior and senior; not the same person. For more on Entity Resolution watch this explainer video: https://senzing.com/what-is-entity-resolution/

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03967-PAB-TPO

UNITED STATES OF AMERICA,

Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Secretary of State of Colorado,

Defendant.

---

COLORADO ALLIANCE FOR RETIRED AMERICANS AND BRITTON DEFORD'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION TO DISMISS, ECF No. 49

---

DOJ has filed dozens of lawsuits to compel the production of States' unredacted voter lists. Every court to reach a decision in these cases has dismissed them. *United States v. Weber*, No. 25-cv-9149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026). Nothing in DOJ's opposition provides reason to conclude otherwise. Instead, new information from DOJ about the purported "basis" for its demand only proves that it does not and cannot comply with the plain text of the Civil Rights Act of 1960 ("CRA"). 52 U.S.C. § 20703.

## ARGUMENT

### I. The motion to dismiss is appropriate under the Federal Rules.

DOJ's contention that a motion to dismiss is procedurally improper in a Title III proceeding is foreclosed by Supreme Court precedent, as two federal courts recently concluded. *Weber*, 2026 WL 118807, at *8; *Oregon*, 2026 WL 318402, at *8. DOJ relies

on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), and other out-of-circuit cases from the 1960s, ECF No. 49 ("Opp.") at 9-10, 14, but as *Weber* and *Oregon* held, those cases are irreconcilable with *United States v. Powell*, 379 U.S. 48 (1964). *See* ECF No. 38-2 at 5-6. The same is true of DOJ's assertion that "Congress has indicated that" the Federal Rules "are inapplicable" to the CRA, Opp. at 10, which cannot be reconciled with *Powell*'s holding that identical language to that in the CRA found in 26 U.S.C. § 7604(a), compelled the conclusion that the Federal Rules apply, 379 U.S. at 58 n.18. DOJ also points to *Benson*, but that court *granted* the intervenors' Rule 12(b)(6) motion and dismissed DOJ's complaint—so it cannot have held such motions improper. 2026 WL 362789, at *2, 11.

## II. The Court must review the lawfulness of DOJ's demand.

The CRA is unequivocal: any demand by DOJ under the CRA "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. And courts routinely review the lawfulness of the government's demand for records. *See, e.g.*, *Powell*, 379 U.S. at 57 (holding government must show its investigation "will be conducted pursuant to a legitimate purpose" and that "the inquiry may be relevant to the purpose"); *United States v. Wilson*, 98 F.4th 1204, 1221 (10th Cir. 2024) (reviewing administrative subpoena to determine if it is "sufficiently limited in scope" and "relevant in purpose"); *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458-60 (5th Cir. 2018) (evaluating purpose and basis of civil investigative demand).

Judicial review does not require "specific[]" statutory "authoriz[ation]." Opp. at 12. "It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Powell*, 379 U.S. at 58. This is not limited

to IRS demands. *See, e.g.*, *Wilson*, 98 F.4th at 1221 (administrative subpoena); *Source for Pub. Data, L.P.*, 903 F.3d at 458-60 (civil investigative demand); *CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017) (declining to enforce demand due to failure to comply with statutory requirements).

Even *Lynd* agreed that a court must decide "whether the written demand has been made" according to the CRA's requirements. 306 F.2d at 226. Courts have done so in all challenges to DOJ's parallel demands and found them lacking. *Weber*, 2026 WL 118807, at *8-10; *Oregon*, 2026 WL 318402, at *7-10. That includes *Benson*, where the court's "limited" role in reviewing CRA demands resulted in dismissal. 2026 WL 362789, at *9.

## III. DOJ failed to state an adequate basis and purpose for its demand.

The CRA requires that any request made must state the "basis and the purpose for" the demand in the demand. 52 U.S.C. § 20703. And that demand must be "reasonabl[y] relevan[t]" to the government's investigation. *Wilson*, 98 F.4th at 1221. DOJ stated in its motion to compel that its demand's "purpose" "was to assess Colorado's compliance with the list maintenance requirements" of the NVRA and HAVA. ECF No. 5 at 2. But it now states its demand was based on a complaint regarding *document retention* procedures, not list maintenance. Opp. at 6, 19-20. The problem is, DOJ's demand has nothing to do with document retention procedures. Thus, the opposition provides further reason to find the demand fails the CRA.

### A. DOJ's opposition brief reveals new, material information.

In its Complaint, DOJ asserted that its May 12 letter to the Secretary was its "written demand" under the CRA, and that it contained the "statement of the basis and

the purpose therefor." Compl. ¶¶ 26-27. That letter said that DOJ "received a complaint alleging noncompliance by [the Secretary's] office with the duties outlined in 52 U.S.C. §20507." ECF No. 37-2 at 1; *see* Compl. ¶¶ 19-20. But § 20507 is a sprawling provision, with ten subsections, imposing obligations related separately to list maintenance, 52 U.S.C. § 20507(a)(4), (b)-(g), and document retention, *id.* § 20507(i).

In its motion to compel filed with its complaint in December, DOJ asserted that the May 12 letter was sent "regarding Colorado's compliance with federal list maintenance requirements," ECF No. 5 at 4.[1] But now, in its opposition, DOJ states that the complaint it received "alleg[ed] noncompliance by Secretary Griswold regarding *retention of election records*." Opp. at 6 (emphasis added); *see id.* at 19-20 (similar). This makes more sense given that the May 12 letter is almost singularly focused on document retention issues, *not* anything related to list maintenance. *See* ECF No. 37-2.

**B. DOJ failed to state a valid "basis and . . . purpose" of its demand.**

The voter list is a snapshot of Colorado's currently eligible voters. *See* ECF No. 37-10. Obtaining an unredacted copy will not show whether the Secretary appropriately *retained* records. Further, Colorado has provided DOJ with the public version, so all that DOJ claims to be missing are social security numbers, driver's license numbers, and full dates of birth. *See* ECF No. 37 at 3, 8. Providing DOJ with these sensitive personal

[1] DOJ claims the letter "explained that the purpose of the demand was to assess Colorado's compliance with . . . list maintenance requirements." *Id.* at 2. This is not true, ECF No. 37-2, nor is it the only material mistake DOJ made regarding its correspondence. In its Complaint and in a sworn declaration, DOJ stated the Secretary never responded to the letter. ECF No. 5-2, ¶ 5; Compl. ¶ 23. But the Secretary did respond by letter and provided substantial information, including the redacted voter file. ECF No. 37 at 3-4.

identifiers cannot help it "evaluate" a "complaint" alleging that the Secretary failed to properly retain documents. Thus, DOJ's demand fails this Circuit's "reasonable relevance" standard, *Wilson*, 98 F.4th at 1221, and DOJ cannot rely on this "complaint" as the required "basis" for its CRA demand for Colorado's voter file.

DOJ claims that naming the CRA as the "statutory basis" is sufficient, Opp. at 20, but the CRA is the *authority* under which DOJ's request was purportedly made. It cannot also be the *basis* for the request, because that would make the requirement to provide the "basis" superfluous, as any CRA demand is necessarily issued under the CRA. *See Chevron Mining Inc. v. United States,* 863 F.3d 1261, 1282-83 n.15 (10th Cir. 2017); *Oregon*, 2026 WL 318402.

For similar reasons, DOJ did not adequately disclose its "purpose" in its demand. DOJ now claims that its "purpose" is to evaluate Colorado's list maintenance efforts, ECF No. 5 at 2, and it relies on its May 12 letter as the document that purportedly contained the statement of its "purpose," Compl. ¶¶ 26-27. But the only purpose evident in the May 12 letter dealt with whether the Secretary engaged in appropriate document retention policies, *not* anything related to list maintenance.[2]

**IV. Evaluating list maintenance efforts is not a proper purpose under the CRA.**

The Complaint should also be dismissed because auditing list maintenance efforts is not an allowable purpose under the CRA. DOJ's attempt to invoke the CRA to allow the

---

[2] DOJ briefly asserts that the Court should compel production "of all responsive federal election records," Opp. at 5, by which it apparently means *every* record covered by Title III. But its Complaint asks only for the voter list. *See* ECF No. 40 ("MTD"), at 8 n.5. Further, a request for *every* document covered by Title III would plainly fail the "reasonable relevance" standard, *Wilson*, 98 F.4th at 1221, a point to which DOJ offers no response.

federal government to superintend nationwide list maintenance efforts is unprecedented, and when "an agency claims to discover in a long-extant statute an unheralded power," courts "typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That skepticism is amply warranted here.

DOJ relies on isolated provisions of the CRA to justify its efforts to use it for list-maintenance supervision. But courts "construe statutes, not isolated provisions," and read them "in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 486 (2015) (citations omitted). When an agency claims sweeping statutory authority, courts do not assume Congress means "to confer the power the agency has asserted" simply because an isolated phrase can bear that reading. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Instead, courts examine the entire statute and reject expansive constructions that have a "colorable textual basis" but unduly strain the statute's structure and design. *See id.* at 721-23.

Here, the statutory framework confirms that the CRA creates an enforcement tool for DOJ to investigate violations of voting rights—not a general review power over state elections. Congress codified this provision in the chapter titled "Elective Franchise," alongside substantive voting protections it had enacted in the Civil Rights Act of 1957. *See* 42 U.S.C. §§ 1971-1974 (1958 & Supp. IV) (later recodified in Title 52). That structure indicates Congress intended Title III to be an enforcement mechanism to protect federal voting rights, not a mandate to supervise state election regulation. *Smith v. Doe*, 538 U.S. 84, 85 (2003) (statutory codification is "probative of the legislature's intent").

The text confirms this. The CRA directs states to preserve records "relating to any application, registration, payment of poll tax, or other act requisite to voting," 52 U.S.C. § 20701, categories that are keyed to the substantive guarantees codified alongside it, which prohibit deprivations of "the opportunity to register to vote," 42 U.S.C. § 1971(a)(e) (1958 & Supp. IV). Likewise, requiring DOJ to state the "basis" and "purpose" of its demand is consistent with a rights-enforcement tool designed for discrete investigations but makes little sense if it confers freestanding access to state election data for any purpose or no purpose at all, as DOJ contends. Contemporary sources also recognize that Congress's objective was "to secure a more effective protection of the right to vote," *Alabama ex. rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960); *see also* H.R. Rep. No. 86-956, at 7 (1959), not to enforce the NVRA's or HAVA's administrative requirements that would not exist until decades later, *see Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 158 (1975) (a statute "should not be stretched to apply to new situations not fairly within [its] scope"). If Congress intended to create a general federal power to audit state elections, it would have said so. *West Virginia*, 597 U.S. at 721-23.[3]

**V. Title III does not prohibit the redaction of sensitive voter information.**

Colorado is also entitled to redact sensitive information from the statewide voter list, including in response to a CRA demand. *See* MTD at 10-12. Colorado law protects such information. The question, then, is whether the CRA preempts these laws and requires the production of sensitive information. It does not. Even *Lynd* observes that the

[3] DOJ asserts that it "has pursued successful matters" to obtain unredacted voter lists under the CRA. Opp. at 27. But in neither instance that it cites was the applicability of the CRA contested or resolved by a court. *See* ECF Nos. 49-2, 49-7.

CRA is intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," *not* "confidential, private papers and effects." 306 F.2d at 231. DOJ does not address or acknowledge this. Opp. at 28-31. Instead, DOJ argues that it must require the production of sensitive information because otherwise Section 304 of the CRA—which limits the instances in which DOJ may disclose records it receives pursuant to a Title III demand—would have no purpose. *Id*. at 29. That is wrong. Section 304 prevents *DOJ* from disclosing sensitive information; it does not indicate any congressional intent to preempt states from enacting *broader* protection from disclosure.

As for DOJ's claim that it is entitled to sensitive information because Title III requires production of "all records" and "[a]ll means all," *id.*, it is at odds with Tenth Circuit precedent holding that redaction is permitted under the NVRA. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); MTD at 11-12 & n.8. Both statutes address closely related subjects and use markedly similar language. It would make little sense to conclude that the CRA demands that Colorado produce sensitive information to allow DOJ to assess NVRA and HAVA compliance when those statutes do not require producing the same information. *See Weber*, 2026 WL 118807, at *12-13 (noting DOJ conceded that States can redact sensitive voter information under the NVRA in briefs as recently as 2023); *Oregon*, 2026 WL 318402, at *12 (finding redaction "appropriate and permissible"). The NVRA, too, mandates public inspection of "*all* records," 52 U.S.C. § 20507(i)(1) (emphasis added). The Tenth Circuit held that text is consistent with redaction of sensitive information. *Voter Reference Found.*, 160 F.4th at 1083 n.14. DOJ simply ignores *Voter Reference Foundation*. DOJ's policy argument that

DOJ would not be able to "meaningfully investigate" a state's list maintenance efforts under HAVA and the NVRA without "access to the voter identification numbers," Opp. at 30, also fails because there is no indication that Congress ever meant for DOJ to be able to "investigate" a state's compliance with HAVA or the NVRA using Title III to begin with. Instead, Congress created a disclosure provision in the NVRA for this purpose and courts agree it does not prohibit states from redacting sensitive voter information. MTD at 10-12. DOJ again fails to coherently explain why such information would be necessary for such an investigation.[4]

## VI. DOJ's collection of Colorado's voter list would violate the Privacy Act.

Lastly, DOJ misunderstands how the Privacy Act operates. That Act does not "simply require" that protected information "be securely stored and not be subject to unauthorized dissemination or use." Opp. at 31. It requires more, including public notice and detailed disclosures upon the "establishment or revision" of a system of records. 5 U.S.C. § 552a(e)(4), (11). An agency must publish a Systems of Record Notice ("SORN") that discloses the name and location of the system, the categories of records maintained in it, and all "routine uses" to which the system can be put, among other things. *Id.* § 552a(e)(4). The agency must also "provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

DOJ does not contest that the Privacy Act applies here and that DOJ cannot collect

---

[4] DOJ's claim that "private parties have been granted access to even more detailed voter data," Opp. at 30-31, is false. In the case DOJ cites, the court *excluded* social security numbers and other confidential information and entered a strict protective order. *See* Protective Order & Sch. A, *Coal. for Open Democracy v. Formella*, No. 1:24-CV-00312-SETSM (D.N.H. June 18, 2025), ECF Nos. 87 & 87-1.

or maintain Colorado's voter list unless there is an applicable SORN. *Id.* § 552a(e)(4). Although DOJ's proposed memorandum of understanding cited three Federal Register notices containing SORNs in an attempt to show compliance, ECF No. 37-8 at 4, none of the cited SORNs can be read to cover DOJ's unprecedented effort here, *see* MTD at 13-14. DOJ's response does not rebut this; it merely gestures at "dozens" of SORNs that are listed in a Federal Register notice advising the public that all DOJ SORNs are being updated to include routine uses that are relevant in the event of a data breach. Opp. at 32; *see* Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017). But this does not explain how any specific SORN could conceivably cover a State's voter file. *See Weber*, 2026 WL 118807, at *18 ("[N]one of the SORN[s] identified give sufficient notice to the American public as required under the Privacy Act."). Until DOJ complies with the Privacy Act's requirements, that statute bars it from collecting and maintaining Colorado's voter list. *Id.*

## CONCLUSION

The Court should dismiss the Complaint with prejudice.

Respectfully submitted,

Dated: March 18, 2026

***David D. Powell, Jr.***
***Lys Runnerstrom***
GARNETT POWELL MAXIMON
BARLOW & FARBES
1125 17th St., Suite 2200
Denver, CO 80202
Telephone: (720) 252-7947
E-mail: david.powell@garnettlegalgroup.com

/s/ Elisabeth C. Frost
***Elisabeth C. Frost***
***Joshua C. Abbuhl***
***Kevin R. Kowalewski***
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
E-mail: efrost@elias.law
Attorneys for Proposed Intervenors

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

UNITED STATES OF AMERICA,

Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Secretary of State for the State of Colorado,

Defendant.

Civil Case No.: 1:25-cv-03967

**BRIEF OF AMICI CURIAE FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE**

Title III of the Civil Rights Act of 1960 is a vital tool that helps the Attorney General make "preliminary investigations of registration practices," determine whether to file voting lawsuits, and obtain evidence for those suits. *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962). Though "[w]ide scope must be accorded the Attorney General in the facilities for adequate investigation," *id.* at 228, that scope is not unlimited. Title III requires DOJ to provide "a statement of the basis and the purpose" for its information requests. 52 U.S.C. § 20703. Here, DOJ has overstepped its bounds by requesting "all fields" of the registration list for every voter in Colorado—including registration method, party affiliation, partial Social Security Numbers (SSNs), and driver's license numbers—without a sufficient basis and in furtherance of an improper purpose. DOJ has not provided any basis at all for thinking that Colorado might be violating federal statutes, much less a basis that would justify requesting sensitive voter data about all Colorado voters. And while DOJ has provided a purpose for its requests—enforcing federal list-maintenance requirements—that purpose appears to be a stalking horse for its true purpose: to enable the federal government to conduct its own list maintenance to discover whether noncitizens or undocumented immigrants are registered to vote. That purpose cannot justify the requests for sensitive data here. Federal

law places *States* in charge of developing and maintaining voter registration lists. DOJ's sweeping request, made without adequate investigative rationale, is a radical departure from the sorts of targeted, justified Title III requests that *amici* and others at DOJ have previously made.

## INTEREST OF AMICI

*Amici curiae*, listed in Appendix A, are all former attorneys who worked on voting enforcement in the Civil Rights Division of the U.S. Department of Justice (DOJ). Many *amici* have made, reviewed, and approved information requests to States and localities under Title III of the Civil Rights Act of 1960, or have litigated under the Civil Rights Act, the National Voter Registration Act (NVRA), and the Help America Vote Act (HAVA) on behalf of the United States. *Amici* file this brief to explain that, even though DOJ retains significant authority to investigate potential violations of federal election law, DOJ's request to Colorado for its full unredacted voter file is inconsistent with prior DOJ practice and cannot be justified by the authority it has invoked.

## ARGUMENT: THE 1960 CIVIL RIGHTS ACT DOES NOT JUSTIFY THE DEPARTMENT OF JUSTICE'S REQUESTS IN THIS CASE

Title III of the Civil Rights Act of 1960 gave election officials a new duty to preserve, and granted DOJ a new power to request, certain election-related documents—subject to important guardrails. Under Title III, "[e]very officer of election shall retain and preserve" for 22 months after a federal election "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. DOJ may then seek "inspection, reproduction, and copying" of the records they are required to "retain and preserve." 52 U.S.C. § 20703. But the government must have, and provide its targets with, both a "purpose" for conducting an inquiry and a "basis" for thinking there may be a legal violation to which the requested records would be relevant. *Id.*

DOJ has failed to meet that basic standard here: it (1) fails to provide a "basis" for suspecting that Colorado is not fulfilling its NVRA and HAVA obligations, and (2) appears to be obscuring its true "purpose" in seeking not only Colorado's voter rolls, but the rolls of every State in the country. When DOJ has used the 1960 Civil Rights Act, it has rarely sought a State's entire voter database, and it certainly has not done so to enable a fishing expedition.

### A. DOJ's Justification For Seeking Full Voter Files From Colorado Is Inadequate Under the Civil Rights Act

DOJ may use the 1960 Civil Rights Act to seek some information that cannot be disclosed under other statutes, like the NVRA. But Title III's statutory framework establishes restrictions on DOJ's ability to obtain and disseminate this material. *First*, DOJ must make a "demand in writing" for the requested records. 52 U.S.C. § 20703. That demand "shall contain a statement of the basis and the purpose" for seeking the information. *Id.* *Second*, DOJ must not "disclose any record or paper produced" pursuant to Title III, except to Congress or other agencies, or in court proceedings. 52 U.S.C. § 20704. *Third*, courts have "jurisdiction *by appropriate process* to compel the production" of records. 52 U.S.C. § 20705 (emphasis added). DOJ is bound by these restrictions and processes whenever it seeks voting records under the 1960 Civil Rights Act.

This case directly implicates the written demand requirement. Under Title III, any demand for records "shall contain a statement of *the basis and the purpose* therefor." 52 U.S.C. § 20703 (emphasis added). Like any statute, this provision must be "so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1274 (10th Cir. 2017). Thus, the purpose and basis must be read as independent requirements. The *purpose* of a records request is the rationale for the investigation—*e.g.*, determining whether a State is complying with the NVRA, HAVA, or the

Voting Rights Act (VRA). The *basis* is the statement indicating why DOJ believes, or what evidence suggests, that it should investigate this particular State or locality, or what other suspected violation the records are needed to investigate. Combined, the basis and purpose requirements make explicit what is implicitly true for many other coercive, investigative information requests: the agency seeking information must have both a legitimate *purpose* within its enforcement ambit for pursuing an investigation and a sufficient *basis* for suspecting a potential violation to which the requested records would be relevant. *See United States v. Powell*, 379 U.S. 48, 58 (1964) (noting an administrative summons must have a proper purpose "reflecting on the good faith of the particular investigation"); *see also In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *2, 4 (D. Colo. Jan. 5, 2026) (stating that administrative subpoenas must be within statutory authority and "[r]elevant in [p]urpose").

DOJ's investigative actions in the early years of Title III confirm the difference between these two necessary procedural elements, both of which were provided in its requests under Section 20703. In *Lynd*, 306 F.2d at 229 n.6, for instance, DOJ said that its purpose in requesting records was "to ascertain whether or not violations of Federal law in regard to registration and voting"—*i.e.*, the Civil Rights Act of 1957—"have occurred." And it stated that the basis for the request was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Id.* DOJ made similar statements of basis and purpose in *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). DOJ cannot seek Colorado's full, unredacted voter file when it has satisfied neither Title III's "basis" nor its "purpose" requirement.

### 1. DOJ has provided no adequate "basis" for needing records from Colorado, as the Civil Rights Act requires.

DOJ has not provided an adequate basis for the broad requests it has made in this case. Although Title III does not impose a high standard for the basis of a demand for records, the provision is not so deferential as to allow DOJ to engage in fishing expeditions. *See E.E.O.C. v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 113 (4th Cir. 1997) ("[A]n agency's 'broad access to information relevant to inquiries' is not without limits."). Rather, the statutory requirement that the Attorney General articulate in writing the "basis" for a Title III demand means that DOJ must know of specific, articulable facts suggesting that a violation of federal law may have occurred. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6.

To be sure, early cases—decided in the midst of a concerted effort to frustrate federal investigations of racial discrimination in voter registration in the Jim Crow South—opined that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand, § [20703], is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. That assertion in *Lynd* must be considered in the context of what was a particularized investigation into racial discrimination in 1961 Forrest County, Mississippi, and in four rural parishes in northwest Louisiana, and not a dragnet of unprecedented national scope. But even so, the Supreme Court has since held that notice requirements similar to those in Title III create judicially reviewable standards. *See Powell*, 379 U.S. at 53, 58 (holding that statute requiring Treasury Secretary to "notif[y] the taxpayer in writing that an additional inspection is necessary" allows courts to "inquire into the underlying reasons for the examination" because "a court may not permit its process to be abused"). The Court also has long applied a strong presumption in favor of judicial review of the government's actions, and the Administrative

Procedure Act "itself articulates the default principle that parties in enforcement proceedings can challenge an agency's interpretation of a statute." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 156 (2025).

Here, DOJ has provided no basis at all for demanding sensitive data about every Colorado voter, much less a basis that would indicate that Colorado possibly violated federal law. DOJ's initial letter claimed that it had received a "complaint alleging" an unspecified "noncompliance with the duties outlined in 52 U.S.C. § 20507" and sought "*all* records" covered by Title III. Dkt. 37-2, at 2. Colorado provided the public version of its statewide voter registration database, along with other records. Dkt. 37-3, at 2. Six months later, DOJ sent a follow-up email requesting "the nonpublic, unredacted voter registration list." Dkt. 37-7, at 2. It also attached a proposed Memorandum of Understanding (MOU) that made clear DOJ was seeking voters' driver's license numbers or partial SSNs, cited the NVRA, HAVA, and Title III as authorizing its information requests, and stated that DOJ sought the registration list "to test, analyze, and assess states' [lists] for proper list maintenance and compliance with federal law." Dkt. 37-8, at 2-3. Yet DOJ never stated any *basis* for needing to request Colorado's *entire, unredacted* voter registration list.

Requiring that basis is especially important given the questionable fit between DOJ's demand and its ostensible purpose. The statutes DOJ invokes only require States to conduct a "general program" of list maintenance that makes a "reasonable effort" to remove ineligible voters from the rolls. 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(4)(A) (requiring a "system of file maintenance"). They also require only a "reasonable effort" to remove deceased or relocated voters. *Id.* "[T]he attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025),

*petition for cert. filed*, No. 25-437 (U.S. Oct. 7, 2025). A snapshot of a State's voter file at one point in time is unlikely to convey whether a State is engaging in that reasonable effort through a continuing program. *See, e.g.*, *id.* (rejecting identification of "27,000 'potentially deceased' voters on Michigan's registration rolls" as evidence of an NVRA violation). Indeed, HAVA provides that "[t]he specific choices on the methods of complying with [the list maintenance mandate] shall be left to the discretion of the State." 52 U.S.C. § 21085. And the potential for government misuse of the information sought—including partial SSNs and driver's license numbers—outweighs any reason yet provided for needing that information to investigate an ostensible HAVA or NVRA violation. DOJ therefore cannot derive from the NVRA's and HAVA's mandates a "basis" for seeking Colorado's full, unredacted voter files. 52 U.S.C. § 20703.

**2. DOJ cannot seek voter records for the purposes of conducting its own list maintenance and identifying noncitizens.**

DOJ fails the purpose prong of Title III's basis-and-purpose requirement because DOJ's true purpose is not articulated in the request for records and would exceed DOJ's Title III enforcement authority. Although courts' "review" of an information request's purpose is deferential, courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). News reports and the Administration's public statements have revealed that DOJ's true purpose in seeking these voter files is not what DOJ stated in its information requests—*i.e.*, to monitor Colorado's compliance with the NVRA and HAVA's list-maintenance requirements. Rather, that proffered purpose has been shown to be a pretext for other, undeclared aims that appear to include collecting all States' voter data and then sharing that information with the Department of Homeland Security (DHS) as part of a broader effort to discover what DOJ thinks are undocumented immigrants who are unlawfully voting.

DOJ is currently "compiling the largest set of national voter roll data it has ever collected" in an attempt "to prove long-running, unsubstantiated claims that droves of undocumented immigrants have voted illegally." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/9PM4-2A6R. As part of that scheme, DOJ plans to compare States' "voter data to a different database, maintained by the Department of Homeland Security, to see how many registered voters on the state lists match up with noncitizens listed by immigration agents." *Id.*; *see* Kris Maher & Eliza Collins, *The Fight Over the Justice Department's Push for State Voter Data*, Wall St. J. (Dec. 24, 2025) ("The Trump administration has signaled it plans to conduct an unprecedented fact-check of these state voter lists."), https://www.wsj.com/politics/elections/the-fight-over-the-justice-departments-push-for-state-voter-data-111103f8. An executive order, blocked by a court in October 2025, "would have required [DHS] and the Department of Government Efficiency," or DOGE, "to cross-check state voter-registration lists with federal immigration databases." Maher & Collins, *supra*; *see* Exec. Order 14,248, § 2(b)(3), 90 Fed. Reg. 14005, 14006-07 (Mar. 28, 2025). To fulfill these goals, DOJ has requested voter-roll data from 47 States and has sued 24 of them and the District of Columbia. *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Feb. 13, 2026), https://perma.cc/N25Z-NN2E.

DHS has largely confirmed these reports, issuing a statement to media outlets explaining that the Administration's plan to have DOJ and DHS share voter roll information is essential to "scrub aliens from voter rolls," and that DHS's "collaboration" with DOJ will "prevent illegal aliens" from voting. Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists With Homeland Security*, Stateline (Sept. 12, 2025), https://perma.cc/C6RQ-6ATP. As DHS put it, "[e]lections

exist for the American people to choose their leaders, not illegal aliens," *id.*, and "[b]y allowing states to efficiently verify voter eligibility, we are reinforcing the principle that America's elections are reserved exclusively for American citizens," Maher & Collins, *supra*. For its part, DOJ admitted in a separate statement that state voter rolls were in fact "being screened for ineligible voter entries." *Id.*; *accord* Shorman*, supra*. Assistant Attorney General for Civil Rights Harmeet Dhillon has also stated that the federal government has "checked 47.5 million voter records"—apparently through SAVE, a system with known accuracy issues—and that there are "several thousand noncitizens who are enrolled to vote in federal elections." Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://perma.cc/6NE7-ECGT. DHS has expanded the SAVE database to include Social Security and passport data, "and the Trump administration has encouraged states to upload their voter files to the beefed-up SAVE system to hunt for potential noncitizens on their voter rolls." Tierney Sneed & Fredreka Schouten, *Bondi's Injection of Voter Roll Demands into Minneapolis ICE Tensions Draws Claims of 'Ransom,'* CNN (Jan 27, 2026), https://perma.cc/7VF6-U4CU.

An attorney in the Housing Section of the Civil Rights Division, who was "detailed to work in the Voting Section enforcing the [NVRA]" and participated in making the requests for States' voter rolls, has also explained DOJ's true purpose to the *New York Times*:

> Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. The idea was, We want to identify undocumented immigrants that have registered to vote. There was no pre-existing evidence this is a problem. I had a concern that the data would be used not for purging voter rolls of people who aren't eligible to vote but for broader immigration enforcement.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://perma.cc/JGH7-NQ7P.

DOJ recently underscored the potential connection between its efforts to seek States' voter rolls and its immigration enforcement efforts. In response to intense outrage over a sustained Immigration and Customs Enforcement (ICE) operation in Minneapolis—including two fatal attacks by ICE officers on citizens—Attorney General Pam Bondi sent a letter to Minnesota Governor Tim Walz outlining three "common sense solutions" to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota." Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minn. 2 (Jan. 24, 2026), https://perma.cc/34U4-3SK3. One of the solutions was to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law." *Id.* at 3.

DOJ's use of the Civil Rights Act to maintain its own voter lists and then use those lists to substantiate its claims of widespread voter fraud by noncitizens is improper twice over. First, it is not the "purpose" that DOJ set forth in its "statement" to Colorado. 52 U.S.C. § 20703. "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). An agency's action thus cannot be sustained when there is "a significant mismatch between the decision [an agency] made and the rationale [it] provided." *Dep't of Com.*, 588 U.S. at 783. This principle is especially important in the context of a proceeding to enforce administrative process, since it would be an abuse of the court's *own* process to invoke it when there are doubts about "the good faith of the particular investigation." *Powell*, 379 U.S. at 58.

Second, even if DOJ had been truthful about its purpose for seeking voter data, that purpose would have been improper, as the very statutes that DOJ invokes establish that the *States*, not the federal government, are in charge of maintaining voter rolls. The NVRA provides that "each *State*

shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4) (emphasis added). HAVA is likewise clear that *States* are required to define, maintain, and administer voter rolls. For example, HAVA requires "each State" to "implement" "a single, uniform, official, centralized, interactive computerized statewide voter registration list *defined, maintained, and administered at the State level*." 52 U.S.C. § 21083(a)(1)(A) (emphasis added). It is this "list" that serves "as the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* HAVA similarly requires each State to provide for a "[m]inimum standard for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), but leaves the means of implementation to the States, 52 U.S.C. § 21085. While DOJ has authority to enforce these provisions, 52 U.S.C. §§ 20510(a), 21111, it does *not* have authority to conduct list maintenance itself and then force States to remove certain voters from their rolls. Yet that is precisely what the MOU that DOJ offered to Colorado proposed to do. *See* Dkt. 37-8, at 6. Nothing in Title III, the NVRA, or HAVA authorizes DOJ to use highly sensitive, personal data in state voter rolls to conduct a nationwide search for individual registrants that it suspects may not be eligible to vote.

### B. The Civil Rights Division Has Previously Used The Civil Rights Act To Seek Targeted Information Based On Reasonable Law-Enforcement Concerns

DOJ's demand for Colorado's full voter roll is also out of step with the way the Civil Rights Division historically has used Title III's records-inspection authority: as a focused investigative tool tethered to concrete, articulable concerns about unlawful registration or voting laws or practices. The earliest Title III cases from the 1960s arose against a backdrop of blatant, widely documented racial exclusion from voter registration. *See Lynd*, 301 F.2d at 818-19 (describing the government's clear showing of voting rights discrimination against Black voters). Those decisions

reflect two relevant features of Title III practice. First, DOJ's demands were directed at "records and papers" connected to the mechanics of registration and voting—materials that would allow federal investigators to evaluate whether discriminatory administration was occurring. They were not generalized requests for personal identifiers untethered to a defined investigative need. For example, in *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962), DOJ sought inspection of various registration-related records and provided both a basis ("distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction") and a purpose ("to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred").

Second, those cases underscore that Title III's inspection mechanism was conceived as an investigative instrument keyed to identifiable concerns about discriminatory voting practices in discrete locations, not a free-standing entitlement to assemble broad voter data sets to try to find a "problem" in the first place. In *Bruce*, the Fifth Circuit noted that the record reflected extraordinary racial disparities in access to registration in Wilcox County, Alabama, that made an inspection plainly appropriate. 298 F.2d at 863-64. And in *Lynd*, the Fifth Circuit emphasized with respect to five southern counties that a Title III application is intended to "enable the Attorney General to determine whether . . . suit[s] . . . should be instituted" and "to enable him to obtain evidence for use in such [suits] if and when filed." 306 F.2d at 228. These requests fulfilled Title III's principal purpose: serving as a "necessary supplement" to, and helping to "implement federal enforcement" of, the 1957 Civil Rights Act's prohibitions against racial discrimination in voting. H.R. Rep. No. 86-956, at 26 (1959). It is unthinkable that the Department of Justice in 1960 could instead have invoked the authority of the new Civil Rights Act to demand millions of voter registration cards

held by the thousands of voter registration authorities across the country.

Modern practice reinforces the same point. When the Civil Rights Division has invoked Title III more recently, it has typically done so to obtain discrete categories of records narrowly keyed to a specific, articulated enforcement concern. Several examples illustrate how the Civil Rights Division has traditionally wielded its investigative authority, including under Title III:

- When necessary to investigate potential violations of Section 2 of the VRA, the Voting Section may send Title III requests to jurisdictions under investigation based on definite, articulable discriminatory practices, seeking, *e.g.*, a voter registration list to conduct racial bloc voting analysis of elections held within the jurisdiction. DOJ has not generally needed, and has rarely made, Title III requests for SSNs or driver's license numbers to conduct any such analyses.
- In 2021, the United States challenged several provisions of Georgia's new omnibus voting law, SB202, as having a discriminatory purpose. *See* Compl. ¶ 161, *United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga. June 25, 2021), Dkt. No. 1. Counties with records relevant to the case were not parties to the suit, and the district court froze discovery while deciding the motions to dismiss. *See* Min. Order of Aug. 6, 2021, *Georgia*, *supra*. DOJ therefore used its authority under the 1960 Civil Rights Act to request county records that were relevant to the allegations that DOJ had already made in its lawsuit: (1) the Numbered Lists of Provisional Voters from each polling place in a county—paper lists of provisional voters, with voters' names and their reasons for casting a provisional ballot—which were relevant to DOJ's challenge to SB202's "prohibition on counting most out-of-precinct provisional ballots," Compl. ¶ 161(g); and (2) Drop Box Ballot Transfer Forms—paper records of how many ballots a county picked up from each mail-in ballot drop box on each day—which were relevant to DOJ's challenge to

SB202's "cutback in the number of drop boxes permitted" and limitations on their dates and times of use, *see id.* ¶ 161(e). *See, e.g.*, Decl. of Dr. Barry C. Burden, 35, 51, *In re Georgia Senate Bill 202*, No. 1:21-mi-55555 (N.D. Ga. May 30, 2023), Dkt. No. 566-42.

- In 2024, DOJ sued Alabama for systematically removing several thousand people from its voter rolls within 90 days of a federal election, which would violate the NVRA's Quiet-Period Provision, 52 U.S.C. § 20507(c)(2). *See* Compl. ¶¶ 2-4, *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024), Dkt. No. 1. DOJ sent a letter to state election officials explaining that DOJ had "reviewed reports" (which it cited) suggesting that the State was implementing within 90 days of the November 5, 2024 federal election a "program" to identify and remove registrants identified as noncitizens, in violation of the Quiet-Period Provision. Letter, *Alabama*, *supra*, Dkt. No. 11-7, at 2. DOJ then requested a defined set of materials keyed to that asserted concern, including (1) a list of the voters removed under the State's new processes; (2) a list of any additional voters sent notices of intent to cancel on similar grounds; and (3) a "complete description" of the methodology used, including contacts with or requests to federal agencies. Letter, *Alabama*, *supra*, at 2-3. The letter did not explicitly invoke Title III. *Id.* But in later conversations, DOJ did "assert[]" that authority, and the State "produced" the requested records "in compliance with Title III of the Civil Rights Act of 1960." Letter, *Alabama*, *supra*, Dkt. No. 11-9, at 1. DOJ did not request SSN or driver's license data, but the State did provide it for those registrants who were ensnared in its program.

Thus, in the rare instances when DOJ has requested sensitive information like SSNs and driver's license numbers, it was because this information was vital to investigating or proving a potential legal violation in a particular jurisdiction, and there was an articulable reason to believe

that a violation might have occurred. DOJ does not usually request such data under Title III. *Cf.* Dkt. 42, at 13 n.5. To the extent DOJ has need of sensitive voter data, it has instead tended to obtain it through traditional civil litigation tools. *See, e.g.*, Fed. R. Civ. P. 34, 45. And crucially, it has done so under strict court supervision and pursuant to the terms of detailed protective orders that prescribe procedures for exchanging, handling, storing, protecting, and deleting this sensitive data. Title III does not offer these kinds of safeguards. *See* 52 U.S.C. § 20704.

Against this backdrop, DOJ's approach in this litigation stands out for both overbreadth and lack of justification. DOJ demands an unredacted copy of the State's registration list, asserting simply that the data was needed "to test, analyze, and assess states' [registration lists] for proper list maintenance." Dkt. 37-8, at 2. DOJ expressly insists in its requests that the statewide file be "unredacted" and include "all fields"—including driver's license numbers or the last four digits of SSNs. *Id.* at 4; Dkt. 37-7, at 2. DOJ has not sought this information to further any *purpose* for which DOJ traditionally might need this sensitive voter data; nor has DOJ offered the kind of articulated enforcement *basis* that must accompany such requests. The 1960 Civil Rights Act does not authorize such a sweeping information request on such flimsy grounds.

## CONCLUSION

For the reasons discussed above, the Court should grant Defendants' motions to dismiss.

Dated: February 18, 2026

Respectfully submitted,

*Attorney for* Amici Curiae *Former Employees of the U.S. Department of Justice*

/s/ Leah Godesky
Leah Godesky
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
(310) 246-8501
lgodesky@omm.com

**CERTIFICATE OF SERVICE**

I hereby certify, pursuant to Local Rule 7.1(b), that on this 18th day of February, 2026, I caused to be served a copy of the above document on all counsel of record and parties via the ECF system.

/s/ Leah Godesky

Leah Godesky

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-03967-PAB-TPO

UNITED STATES OF AMERICA,

Plaintiff,

v.

JENA GRISWOLD, in her Official Capacity as
Secretary of State for the State of Colorado,

Defendant.

---

**ORDER**

---

**Timothy P. O'Hara, United States Magistrate Judge**

This matter is before this Court for consideration of several Motions: (1) the Unopposed Motion of Colorado Alliance for Retired Americans and Britton Deford (hereinafter, "Proposed Alliance Intervenors") to Intervene as Intervenor-Defendants [ECF 10];[1] (2) the Motion of Common Cause, Kyle Giddings, and Dr. Anne Keke (hereinafter, "Proposed Common Cause Intervenors") to Intervene as Defendants [ECF 17]; (3) the Motion for Leave to File Amicus Curiae Brief [ECF 33] filed by Ms. Danielle Purdy;[2] and (4) the Unopposed Motion for Leave to file Proposed Motion to Dismiss and Proposed Opposition to Motion for Order to Compel Records by

[1] In support of their Motion to Intervene, Proposed Colorado Voter Intervenors also filed several Motions for Leave to File Notice of Supplemental Authority [ECFs 27, 39, 59, 63, and 71]. The Court **grants** these Motions [ECFs 27, 39, 59, 63, and 71] and has considered these supplemental authorities.

[2] The briefing for Ms. Purdy's Motion for Leave to file Amicus Brief consists of the Motion, ECF 33; Defendant's Response in opposition, ECF 32; and a "Notice of Clarification of Alignment" filed by Ms. Purdy, which this Court construes as a Reply, ECF 45. Ms. Purdy also filed an "Amicus Curiae Supplemental Statement of Fact" without the Court's leave. ECF 53.

Proposed Intervenors Colorado Alliance for Retired Americans and Britton Deford [ECF 38]. These Motions are ripe for review and have been referred to the undersigned by U.S. District Judge Philip A. Brimmer. For the reasons stated herein, the two Unopposed Motions to Intervene [ECFs 10 and 17] are **granted**. The [opposed] Motion for Leave to File Amicus Curiae Brief [ECF 33] is **denied**.[3] The Unopposed Motion for Leave to File Proposed Motion to Dismiss and Proposed Opposition to Motion for Order to Compel Records [ECF 38] is **granted**.

## BACKGROUND

On December 11, 2025, the Attorney General of the United States brought this action against Colorado Secretary of State, Jena Griswold, under Title II of the Civil Rights Act of 1960, 52 U.S.C. § 20701. *See* ECF 1. The Attorney General has sought an order compelling Defendant Griswold to disclose "the current electronic copy of Colorado's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or [Help America Vote Act] unique identifier." ECF 1 at 6-7. Also on December 11, 2025, the Attorney General filed a Motion to Compel the records pursuant to 52 U.S.C. § 20701. *See* ECF 2.

Two groups have now sought leave to intervene to contest Plaintiff's requested disclosure of Colorado voter registration information: (1) the Colorado Alliance for Retired Americans and

[3] This Court proceeds by order and not recommendation. Neither the Motion to Intervene nor the Motion to File an Amicus Curiae Brief are dispositive of any Party's claims or defenses, and issuing an order is not proscribed by statute. *See* 28 U.S.C. § 636(b)(1)(A); *Judicial Watch, Inc. v. Griswold*, No. 20-cv-02992-PAB-KMT, 2021 WL 4272719, at *2 (D. Colo. Sept. 20, 2021) ("motions to intervene are generally considered to be non-dispositive." (collecting cases)); *e.g.*, *Lomax v. Starbucks Corp.*, No. 23-cv-01426-GPG-SBP, 2024 WL 554068, at *1 (D. Colo. Feb. 12, 2024) (finding motion for leave to appear as amicus curiae non-dispositive and issuing an order).

its member, Britton DeFord, *see* ECF 10, and (2) Common Cause and two of its members, Kyle Giddings and Dr. Anne Keke, *see* ECF 17. In their Motions for Leave to Intervene, the Proposed Intervenors highlight that the Department of Justice has sent similar demands to nearly every other state in an "unprecedented" nationwide campaign for unredacted voter registration information. *See* ECFs 10 at 4-5; 17 at 3-4. The Proposed Intervenors contend that the data at risk of disclosure includes highly sensitive, non-public, personal information about all registered Colorado voters. *See* ECFs 10 at 1; 17 at 2.

***Proposed Intervenor-Defendants Colorado Alliance for Retired Americans and Britton Deford***

On December 17, 2025, the Proposed Alliance Intervenors filed an Unopposed Motion to Intervene as Intervenor-Defendants. ECF 10. The Proposed Alliance Intervenors include 41,000 members of the Colorado Alliance for Retired Americans and an individual member and Colorado voter, Britton DeFord. ECF 10 at 7-9.

The Colorado Alliance for Retired Americans ("the Alliance") is a "501(c)(4) nonprofit, social welfare organization and the Colorado affiliate of the national Alliance for Retired Americans." *Id.* at 8 (citing ECF 10-1 at 34 ¶ 4). Its members are "primarily retirees from unions, who are politically active and engaged." *Id.* (citing ECF 10-1 at 34 ¶ 5). Its goals include "ensuring social and economic justice and full civil rights for all retirees in Colorado," and "[e]ncouraging political participation is central to its mission." *Id.* (citing ECF 10-1 at 35 ¶¶ 7-8). It asserts that disclosure "will undermine the Alliance's mission and harm the privacy interests of its members." *Id.* (citing ECF 10-1 at 35-37 ¶¶ 9-13) The members' concerns include an increased risk of fraud, including social security fraud and identity theft, and that the "current presidential administration will weaponize the data in the statewide voter file against its perceived political enemies," which may include the Alliance's members. *Id.* at 8-9 (citing ECF 10-1 at 36 ¶ 11).

Ms. DeFord "is a teacher and registered Colorado voter." *Id.* at 9 (citing ECF 10-1 at 39 ¶¶ 2-3). Her personal information has previously been compromised in data breaches, so she distrusts the federal government's handling of her sensitive date. *Id.* (citing ECF 10-1 at 40-41 ¶ 8). Ms. DeFord also is concerned that the federal government may use the sensitive information for purposes like seeking "retribution against perceived political opponents." *Id.* (citing ECF 10-1 at 41 ¶ 9).

***Proposed Intervenor-Defendants Common Cause, Kyle Giddings, and Dr. Anne Keke***

On December 19, 2025, the Proposed Common Cause Intervenors filed their Motion to Intervene as Intervenor-Defendants. ECF 17. The Proposed Common Cause Intervenors include Common Cause and its individual members and Colorado voters, Kyle Giddings and Dr. Anne Keke. *Id.* at 1. Neither Plaintiff nor Defendant take a position on the Motion. *See* ECF 17 at 1 n.1.

Common Cause is a "non-partisan organization dedicated to grassroots voter engagement in Colorado" and asserts an interest in protecting its members' voting and privacy rights and in its organizational mission. *Id.* at 2. The organization's voter engagement and assistance efforts "includ[e] registering qualified people to vote, helping voters manage the vote-by-mail process, encouraging participation, and assisting voters who face problems trying to vote." *Id.* at 6 (citing ECF 17-3 ¶¶ 9-10, 13). Important to its success is that voters maintain trust in the State "that information will not be abused, their privacy will be respected, and their right to participate will be honored." *Id.* at 6-7 (citing ECF 17-3 ¶¶ 10-11). Over 24,000 Common Cause members are Colorado voters. *Id.* at 7 (citing ECF 17-3 ¶ 4). Common Cause attests that some members "include voters who are at particular risk of being caught up in the DOJ's efforts to remove voters from voter rolls, whether because they have a supposed 'duplicate' record in the system, registered to vote by mail, have a felony conviction, and/or are naturalized citizens." *Id.* (citing ECF 17-3 ¶¶ 6, 11-12; ECF 17-4 ¶¶ 1-2, 4; ECF 17-5 ¶¶ 6-10). These members may also include Colorado voters

"whose identifying information is particularly important to keep private, for example, due to their status as victims of domestic violence." *Id.* (citing ECF 17-3 ¶¶ 11-12; Colo. Rev. Stat. §§ 24-30-2104, 2108, 2109).

Mr. Giddings and Dr. Keke are individual members who assert that their voting and privacy rights are at risk. *Id.* at 2. Mr. Giddings is a Colorado voter with a prior felony conviction. *See id.* at 7; ECF 17-4 ¶¶ 2, 4. Dr. Keke is a Colorado voter who is a naturalized citizen. *See* ECFs 17 at 7; 17-5 ¶¶ 6-10.

The two groups of Proposed Intervenors share common objectives of protecting Colorado voters' privacy interests and their respective organizational interests in voter engagement and participation.

***Proposed Amicus Curiae Danielle Purdy***

On February 6, 2026, Danielle Purdy, "an independent researcher and resident of Colorado," sought leave to appear *pro se* as an *amicus curiae*. ECF 33. Ms. Purdy states she has "coordinated the collection of 561 voluntary 'Voter Waivers and Declarations' from residents across 58 of Colorado's 64 counties." *Id.* at 2. She seeks to submit an *amicus* brief to "represent a unique expression of the citizenry's desire for transparency regarding the voter registration records at issue in this case." *Id.* Attached to the Motion is a "Voter Waivers and Declarations" list, which Ms. Purdy asks the Court to consider as "evidence critical to the Court's evaluation of the 'Public Interest' factor" not "currently represented by the parties." *Id.*; ECF 33-2 at 3-13. The Court notes that the information submitted in the attached list was obtained through a Google Forms survey over a period of five days, *see* ECF 33 at 2; ECF 33-2 at 14-15, and Ms. Purdy has not stated the methodology for collecting or verifying the data.

Defendant Secretary Griswold opposes the Motion. ECF 43.

## LEGAL STANDARDS

### I. Intervention

Federal Rule of Civil Procedure Rule 24 provides for intervention as a matter of right and permissive intervention.

A court must permit intervention as a matter of right for a non-party that:

> (1) is given an unconditional right to intervene by federal statute; or
>
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2). The movant must establish that "(1) the application is timely; (2) the applicant claims an interest relating to the property . . . which is the subject of the action; (3) the applicant's interest may as a practical matter be impaired or impeded; and (4) the applicant's interest is not adequately represented by existing parties." *United States v. Albert Inv. Co., Inc.*, 585 F.3d 1386, 1391 (10th Cir. 2009) (cleaned up) (quoting *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1249 (10th Cir. 2001)). The Tenth Circuit "has historically taken a 'liberal' approach to intervention and thus favors the granting of motions to intervene." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1164 (10th Cir. 2017) (citing *Coal. of Ariz./N.M. Ctys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996)). Additionally, "the requirements for intervention may be relaxed in cases raising significant public interests." *Kane Cnty., Utah v. United States*, 928 F.3d 877, 890 (10th Cir. 2019) (citation and quotations omitted).

Even if a potential intervenor does not have a right to intervene, "[o]n a timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). Courts have discretion to grant

permissive intervention and "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

## II. *Amicus Curiae*

The Federal Rules of Civil Procedure have no specific procedure for allowing or denying *amicus* participation. *Oregon-California Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1073 (D. Colo. June 17, 2020). Therefore, federal courts retain "broad discretion" to permit *amicus* briefs. *Id.* (quoting *Medina v. Catholic Health Initiatives*, 2015 WL 13683647, at *1 (D. Colo. Oct. 7, 2015)). "Historically, *amicus curiae* is an impartial individual who suggests the interpretation and status of the law, gives information concerning it, and advises the Court in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another." *Wildearth Guardians v. Lane*, No. CIV 12-118 LFG/KBM, 2012 WL 10028647, at *2 (D.N.M. June 20, 2012) (citation and quotations omitted). District courts typically consider several factors in determining whether to allow participation:

> (1) Whether the proposed *amicus* is a disinterested entity; (2) whether there is opposition to the entry of the *amicus*; (3) whether counsel is capable of making arguments without the assistance of an *amicus*; (4) the strength of the information and argument presented by the potential *amicus curiae*'s interests; and, perhaps most importantly (5) the usefulness of information and argument presented by the *amicus curiae* to the court.

*Id.* (quoting *Ass'n of Am. Sch. Paper Suppliers*, 683 F. Supp. 2d 1326, 1328 (Ct. Int'l Trade 2010)).

# ANALYSIS

## I. Motions for Leave to Intervene

The respective groups of proposed Intervenor-Defendants argue they satisfy both standards for intervention as a matter of right and permissive intervention. The nature of this case and its potential impact on voters are important considerations. Because this case involves the potential disclosure of Colorado voters' personal information to the federal government, it "plainly involves

significant public interests." *United States v. Henderson*, No. 2:26-cv-0166-DBB-DAO, 2026 WL 800636, at **1-2 (D. Utah Mar. 23, 2026) (granting intervention as of right in similar Utah case). The "significant public interest" is evident from the parallel litigation ongoing across the country, many involving similar efforts to intervene as highlighted in the Proposed Colorado Voter Intervenors' Motion, *see* ECF 10-1 at 11-23, and 25-29,[4] and supplemental authorities, *see* ECFs 27-1; 27-2; 39-1; 59-1; 59-2; 63-1; 63-2; 71-1; 71-2; 71-3; and 71-4.[5] Accordingly, the intervention standards may be "relaxed." *Id.* at *1; *Kane*, 928 F.3d at 890. Applying these standards, the Court finds that the movants are entitled to intervene as a matter of right. Because the Proposed Intervenors have asserted similar interests, and because both requests are unopposed, the Court does not conduct detailed individualized analyses.

*Timeliness*

The Proposed Alliance Intervenors timely sought intervention, "a mere six days after DOJ brought suit and before any case schedule has been set." ECF 10 at 10. The Proposed Common Cause Intervenors timely filed their Motion eight days after this action was initiated. *See* ECF 17. No Party has opposed the timeliness, and so the Court finds this factor easily met.

---

[4] *United States v. Benson*, Case No. 1:25-cv-1148-HYJ-PJG, ECF 45 (W.D. Mich. Dec. 9, 2025); *United States v. State of Oregon*, Case No. 6:25-cv-01666-MTK, ECF 52 (D. Or. Dec. 5, 2025).

[5] *United States v. Scanlan*, Case No. 25-cv-371-AJ (D.N.H. Jan. 5, 2026), ECF 23; *United States of America v. Nago*, Case No. 1:25-cv-00522-LEK-RT (D. Haw. Jan. 5, 2026), ECF 20; *United States v. Copeland Hanzas*, Case No. 2:25-cv-903 (D. Vt. Jan. 16, 2026), ECF 41; *United States v. Albence*, Case No. 25-cv-1453 (D. Del. Jan. 15, 2026), ECF 22; *United States v. Raffensperger*, Case No. 26-cv-485 (N.D. Ga. Jan. 30, 2026), ECF 13; *United States v. DeMarinis*, Case No. 25-cv-3934 (D. Md. Feb. 2, 2026), ECF 37; *United States v. Evans*, Case No. 1:25-cv-04403 (D.D.C. Mar. 16, 2026); *United States v. Matthews*, Case No. 3:25-cv-03398 (C.D. Ill. Mar. 2, 2026); *United States v. Henderson*, Case No. 2:26-cv-0166 (D. Utah Mar. 23, 2026); *United States v. Aguilar*, Case No. 3:25-cv-00728 (D. Nev. Mar. 20, 2026); *United States v. Adams*, Case No. 3:26-cv-00019 (E.D. Ky. Apr. 14, 2026); *United States v. Hobbs*, Case No. 3:25-cv-06078 (W.D. Wash. May 18, 2026).

*Impaired Interest*

A movant seeking to intervene as of right "must have an interest that could be adversely affected by the litigation." *San Juan Cnty., Utah v. U.S.*, 503 F.3d 1163, 1199 (10th Cir. 2007). The test is not rigid, but rather, "practical judgment must be applied in determining whether the strength of the interest and the potential risk of injury to that interest justify intervention." *Id.* A movant bears only a "minimal burden." *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1199 (10th Cir. 2010) (citation omitted).

Here, the Proposed Alliance Intervenors have a special interest as a voter advocacy group and as individual members with privacy rights, protected by Colorado statute. ECF 10 at 10-12. They assert that unredacted disclosure would impair these interests. *Id.* at 11. Chilling voter participation would hinder its core mission. For the members, including Ms. DeFord, disclosure poses risks to their sensitive personal data and to their data being used "for retaliation by the federal government against voters who engage in political activities disfavored by the current administration." *Id.*

Similarly, the Proposed Common Cause Intervenors assert their "right to privacy in the sensitive data sought," which is protected by Colorado law, Colo. Rev. Stat. § 1-2-302, and federal law, 5. U.S.C. § 552a(e)(7). ECF 17 at 9. They further assert an interest in "not being disenfranchised by so-called 'election integrity measures.'" *Id.* at 10. Common Cause maintains that its organizational interests and core mission would be harmed from disclosure that may chill voter participation, and from being forced to redirect its efforts from registering and engaging voters to mitigating disenfranchisement of existing voters. *Id.* at 10-11.

Based on these representations, the Court finds that the Proposed Alliance Intervenors and Proposed Common Cause Intervenors have demonstrated interests that may be impaired because

of this litigation. Should the government prevail, personal, non-public data would be disclosed. If the existing Parties were to reach a confidential agreement without the movants' participation, they may lose their ability to meaningfully participate and to advocate for their positions while this issue remains contested. Moreover, as the Proposed Common Cause Intervenors point out, a judgment in Plaintiff's favor may harm the movants' ability to present legal challenges in the future. *See* ECF 17 at 12 (citing *Clinton*, 255 F.3d at 1254). As a result, this first factor supports the Proposed Intervenors' right to intervene.

*Adequate Representation*

Next, the Court finds that the Proposed Intervenors' interests are not adequately represented by Defendant. This burden here is also "minimal," and adequate representation is presumed where the representative party's interests are identical. *Kane*, 928 F.3d at 892; *see Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 196 (2022) (noting some Circuits presume adequate representation where interests are identical, but presumption applies only where interests fully overlap). The presumption of adequate representation where a movant and existing party share the same objective may be "rebutted by the fact that the public interest the government is obligated to represent may differ from the would-be intervenor's particular interest." *Clinton*, 255 F.3d at 1555.

The Defendant, Secretary Griswold, represents the public interest as a Colorado official, and these interests may not align with the movants' private interests. *See Kobach v. U.S. Election Assistance Com'n*, No. 13-cv-4095-EFM-DJW, 2013 WL 6511874, at *4 (D. Kan. Dec. 12, 2013) (finding that the government defendants "have a duty to represent the public interest, which may diverge from the private interest of [Intervenors]."). Even if Defendant and the Proposed Alliance and Common Cause Intervenors share mutual objectives of opposing the government's Complaint

and Motion to Compel, the Court cannot assume that Defendant Griswold will adequately represent these movants' interests. *See Clinton*, 255 F. 3d at 1255-56. The Proposed Alliance Intervenors point out that Defendant Secretary Griswold may be inclined to settle "because she must balance her personal views with her public duties, including under federal and state laws governing voter registration." ECF 10 at 9-10. The movants may raise distinct arguments and issues specific to their privacy and organizational interests that would differ from the Defendant's legal arguments. *See* ECF 17 at 13-14. And because Defendant Secretary Griswold's must "bear in mind broader public-policy implications" in her defense of this litigation, the Defendant's and the movants' interests are "related" but not "identical." *See Berger*, 597 U.S. at 196; *Western Energy Alliance v. Zinke*, 877 F.3d 1157, 1168 (10th Cir. 2017). As a result, the Proposed Alliance and Common Cause Intervenors' interests are not adequately represented by Defendant Secretary Griswold.

Considering the "minimal burdens" imposed on proposed intervenors to demonstrate their right to intervene, further "relaxed" because of the significant public interests at issue here, the Court finds that the Proposed Intervenors have a right to intervene as Intervenor Defendants in this matter.

## II. Motion for Leave to File *Amicus Curiae* Brief

Because the proposed *amicus* would not assist the Court, the Court denies Ms. Purdy's request for leave to file an *amicus* brief.

First, Defendant has opposed the entry of the *amicus*. ECF 43. Defendant argues that Ms. Purdy improperly attempts to "import facts into this case that are not included in the record." *Id.* at 1. (citing *Or.-Cal. Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1074 (D. Colo. 2020)). Defendant also opposes the *amicus* brief because the "waivers" cannot be verified and presents

neither strong nor useful arguments warranting consideration and because the "waivers" are only for "state-level privacy protections." *Id.* at 2. Defendant's opposition weighs against permitting Ms. Purdy's *amicus* participation.

Second, Ms. Purdy seeks to advocate for the Plaintiff's position, *see* ECF 45 ("My interests, and the interests of the 561 voters I represent, are diametrically opposed to those of the Defendant, Secretary Jena Griswold. . . [M]y position aligns with the Plaintiff."), but the government is aptly represented by competent counsel and capable of presenting its own claims. Plaintiff has extensively briefed the government's legal arguments. This factor weighs strongly against granting leave. *See, e.g., Medina v. Catholic Health Initiatives*, No. 13-cv-01249-REB-KLM, 2015 WL 13683647, at *1 (D. Colo. Oct. 7, 2015) (denying *amicus curiae* participation and considering adequate representation as strong factor against permitting *amicus* brief).

Finally, the Court agrees with Defendant that Ms. Purdy's brief fails the "usefulness" factor. Ms. Purdy requests that the Court consider the unverified Google form responses as an "Evidence Log," but the brief fails to identify how this document is useful or relevant to disposition of the Motions to Dismiss or Plaintiff's Motion to Compel. *See, e.g., U.S. v. Bd. of Cnty. Cmmr's of the Cnty. of Otero*, 184 F. Supp. 3d 1097, 1118 (D.N.M. 2015) (denying leave to file *amicus* brief because it sought to inject new issues and failed to articulate relevance to the issues). Ms. Purdy also generally states "this evidence is critical for the Court's evaluation of the 'Public Interest' factor" without elaborating on what "public interest factor" is implicated or how the Court should construe the "evidence." *See* ECF 33 at 2. Ms. Purdy's *pro se*, non-attorney *amicus* brief offers no interpretation of the law that would assist the Court, nor does it cite any legal authority. The attached survey results are not useful, nor would they clearly be admissible or judicially noticeable. The Court is unable to verify the data, and the survey methods are unclear—as are Ms.

Purdy's credentials or authorization to purportedly "represent" other voters' interests. *See* ECF 45 (stating position of "voters I represent"). Ms. Purdy substantiates the exhibit with nothing but her own affidavit. ECF 33-2 at 2. In any event, even considering the proposed information to be true, 561 Colorado voters waiving their rights to disclosure would bear little on the central legal analyses of this case.

As a result, the Court will deny Ms. Purdy leave to file an *amicus* brief.

## CONCLUSION[6]

The Court finds that the Proposed Intervenors have a right to intervene pursuant to Fed. R. Civ. P. 24(a)(2). Accordingly, it is hereby **ordered** that:

1. The Unopposed Motion of Colorado Alliance for Retired Americans and Britton Deford to Intervene as Intervenor-Defendants [ECF 10] is **granted**;

2. The Motion of Common Cause, Kyle Giddings, and Anne Klein to Intervene as Defendants [ECF 17] is **granted**; and

3. The Unopposed Motion for Leave to File Proposed Motion to Dismiss and Proposed Opposition to Motion for Order to Compel Records by Proposed Intervenors Colorado Alliance for Retired Americans and Brittany DeFord [ECF 38] is **granted**.

By **July 10, 2026**, the Alliance Intervenor-Defendants shall file their Motion to Dismiss [ECF 38-1] and Opposition to Motion to Compel [ECF 38-1] as separate docket entries.[7] Also by **July 10, 2026**, the Common Cause Intervenor-Defendants shall file their Proposed Motion to

[6] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections to this non-dispositive order. Fed. R. Civ. P. 72(a). "The district judge in the case must consider timely objections and modify or set aside any part if the order that is clearly erroneous or is contrary to law." *Id.*

[7] The Court notes that Plaintiff has submitted a brief in opposition to the Alliance Intervenor-Defendants' Motion to Dismiss [ECF 49], and the Alliance Intervenor-Defendants have submitted a Reply [ECF 62]. Because the Parties have already submitted briefing on the Proposed Motion to Dismiss [ECF 38-1], no further briefing shall be permitted on the Common Cause Motion to Dismiss unless the Parties seek leave to amend and/or supplement their briefing.

Dismiss [ECF 17-1] as a separate docket entry. The deadline for filing a Response to the Common Cause Intervenors' Motion to Dismiss shall be **fourteen (14) days** from the date of filing. The deadline for filing any Reply shall be **seven (7) days** after the Response is filed.

Consistent with this Court's Order, the Clerk of Court is **directed** to update the case caption with the Intervenor-Defendants as Parties to this action.

It is **further ordered** that:

4. The Motions for Leave to File Notices of Supplemental Authority [ECFs 27; 39; 59; 63; and 71] are **granted**;[8] and

5. The Motion for Leave to File Amicus Curiae Brief [ECF 33] is **denied**.

DATED at Denver, Colorado, this day of 8th day of July, 2026.

BY THE COURT:



Timothy P. O'Hara
United States Magistrate Judge

[8] The Court has considered the attached supplemental authorities and will not require the Alliance Intervenor-Defendants to file the Notices separately.